Thomas Stenson (OR Bar No. 152894)
tstenson@droregon.org
Joel Greenberg (OR Bar No. 94323)
jgreenberg@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR 97205-2748
(503) 243-2081

Seth M. Galanter (D.C. Bar No. 479919)*
sgalanter@youthlaw.org
Alice Y. Abrokwa (D.C. Bar No. 1023510)*
aabrokwa@youthlaw.org
National Center for Youth Law
1313 L Street NW, Suite 130
Washington, DC 20005-4141
(202) 868-4786

Selene Almazan-Altobelli (MD Bar No. 10506)*
selene@copaa.org
Council of Parent Attorneys and Advocates, Inc.
8 Market Place, Suite 300
Baltimore, MD 21202-4113
(844) 426-7224 ext. 702

Ira A. Burnim (D.C. Bar No. 406154)*
irab@bazelon.org
Lewis Bossing (D.C. Bar No. 984609)*
lewisb@bazelon.org
Judge David L. Bazelon Center for Mental Health Law
1101 15th Street NW, Suite 1212
Washington, DC 20005-5002
(202) 467-5730

Peter Simshauser, Esq. (MA Bar No. 665153)*
peter.simshauser@probonolaw.com
Stacy Horth-Neubert, Esq. (CA Bar No. 214565)*
stacy.horth-neubert@probonolaw.com
Michael Folger, Esq. (NY Bar No. 5151337)*
michael.folger@probonolaw.com
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
(213) 687-5000

*Pro hac vice motions forthcoming*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| J.N., by and through his next friend, T.S.; E.O., by and through his next friend, Alisha Overstreet; J.V., by and through his next friend, Sarah Kaplansky; B.M., by and through his next friend, Traci Modugno; on behalf of themselves and all others similarly situated, and | Case No. <u>6:19-cv-96</u>_____ |
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., | |
| Plaintiffs, | CLASS ACTION ALLEGATION COMPLAINT FOR EQUITABLE RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT, AMERICANS WITH DISABILITIES ACT, AND SECTION 504 OF THE REHABILITATION ACT |
| v. | |
| OREGON DEPARTMENT OF EDUCATION, | |
| COLT GILL, in his official capacities as Director of Oregon Department of Education and Deputy Superintendent of Public Instruction for the State of Oregon, and | |
| KATHERINE BROWN, in her official capacities as Governor and Superintendent of Public Instruction for the State of Oregon, | |
| Defendants. | |

## INTRODUCTION

1.     For years, hundreds of children with disabilities across Oregon have been denied

the opportunity to attend a full day of school.  This longstanding denial persists unabated today.

Though all children with disabilities have the right under federal law to a free appropriate public

education and equal educational opportunity, many public schools throughout Oregon have

unnecessarily and unlawfully shortened the school day for children who engage in challenging classroom behaviors related to their disabilities.  Schools frequently resort to this drastic and harmful action without first adequately considering and developing services and supports that would allow the students to successfully attend school for the full day, as required by law.

2.      These excluded children are not among the very small group of students for whom a shortened school day may be appropriate to accommodate medical conditions that limit their ability to attend school safely and productively.  Rather, they comprise a separate, larger class of students who are denied the opportunity to attend school for the full day specifically due to their disability-related behaviors.

3.      Instead of receiving the full day of instruction provided to other students, which typically lasts for six hours in Oregon public schools, children who are placed on shortened school days often receive one or two hours of instruction per day; some receive as little as half an hour of daily instruction.  Even younger students—including five- and six-year-olds in their first years of school—are routinely provided far less than a full school day because their needs have not been supported.  Although shortened school days are often proposed as a temporary measure to manage student behaviors, students regularly remain on a shortened school day schedule for an extended and sometimes indefinite basis that can last for months, semesters, or entire school years.  Some children who are subjected to shortened school days due to their disability-related behaviors are eventually denied any instruction at all.

4.      When these children *do* receive instruction, it is often provided through tutoring at home or in a separate classroom where they learn alone or solely with other students with disabilities, rather than in a general education classroom where students with and without disabilities learn together and are far more likely to enjoy academic and social success.  This

isolation harms students by perpetuating the stigma, misunderstanding, and fear that often underlies a school district's decision to exclude children with disability-related behaviors from the classroom.  It further reinforces the unwarranted feelings of shame and humiliation these children experience as a result of being deemed unfit to learn alongside their peers.  Children who are placed in these restrictive and isolating environments receive a clear and discriminatory message: by virtue of their disabilities, they are unwelcome in and unsupported by their schools.

5.    When children are subjected to shortened school days, they frequently fall behind academically and miss out on critical social opportunities in which they can practice appropriate behaviors.  Instead of receiving this needed instruction, they are separated and disconnected from peers who receive the academic, social, and emotional benefits of attending school for a full day.

6.    Shortening the school day of a child with a disability is not an appropriate substitute for providing the academic and behavioral services and supports that would enable that child to learn and progress socially during a full school day.  The vast majority of children with disability-related behavioral challenges can learn in general education classrooms along with their nondisabled peers if given the appropriate and legally required services and supports.

7.    The Governor of Oregon,[1] the Oregon Department of Education, and its Director (collectively, Defendants or "the State") are legally responsible for ensuring that *all* Oregon students with disabilities receive a free appropriate public education that is free from discrimination, and for taking effective action when school districts fail to provide such an education.  Though well aware of this responsibility, the State has failed to effectively address

---

[1]    The Governor of Oregon also serves as Oregon's Superintendent of Public Instruction. *See* Or. Const. Art. VIII, § 1; Or. Rev. Stat. § 326.300.

the practice among its school districts of unnecessarily subjecting students to shortened school days, or denying them a school day entirely, due to their disability-related behaviors.

8.      Under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, the State must "ensure" that all eligible children with disabilities receive a free appropriate public education.  20 U.S.C. § 1412(a)(1).  The standard for such an education is a "demanding" one: students with disabilities must receive an "appropriately ambitious" educational program that gives them "the chance to meet challenging objectives."  *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

9.      Congress enacted the IDEA, an "ambitious piece of legislation," in response to the serious problem that "a majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out."  *Id.* at 999 (internal quotation marks and citations omitted).  Such exclusion leads to "pervasive and tragic academic stagnation."  *Id.*  Thus, for most children with disabilities, an appropriate education requires fully integrating the students into the general education classroom and curriculum.  *See id.* at 999–1000.

10.     Accordingly, the IDEA also holds the State responsible for ensuring that children with disabilities are educated in the least restrictive environment in which they can learn alongside their nondisabled peers to the maximum extent appropriate to their needs.  20 U.S.C. § 1412(a)(5).  Children with disabilities, including children whose disabilities affect their behavior, may not be removed unnecessarily from general education classrooms in neighborhood schools in which they could be served effectively with appropriate services and supports.  *See id.*

11.     Under the requirements of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C.

§ 794, the State may not discriminate against students on the basis of their disabilities. State agencies and officials thus may not permit practices that result in the unnecessary segregation of children with disabilities who can be educated effectively for the full day in school alongside their nondisabled peers if given needed services and supports. Congress enacted the ADA and Section 504 to directly address the discrimination that people with disabilities face when they are unnecessarily excluded from public life, such as the public school system, due to their disabilities. *See Olmstead v. L.C.*, 527 U.S. 581, 599–601 (1999).

12.     The State of Oregon has been on notice for years that many of its school districts, often rural and small school districts, deny children with disability-related behaviors a full day of school—or the chance to attend school at all—in lieu of providing them with needed services. By permitting these practices, Oregon violates the IDEA, ADA, and Section 504.

13.     Despite years of pressure from families and advocates, the State has taken only belated and insufficient steps to address this harmful and unlawful practice. In January 2016, the State issued an Executive Memorandum to districts generally discouraging the use of shortened school days due to student behaviors but approving the practice for students with severe behaviors.[2] In June 2017, the State passed a law that allows school districts to impose shortened school days, but the law establishes each student's "presumptive right" to the same hours of instruction as other children receive and prohibits school districts from unilaterally shortening a student's school day. *See* O.R.S. §§ 343.161(4)(a)(C), (2). The State further asked some of its advisory bodies to provide recommendations to ensure that all Oregon students are supported in

---

[2]      *See* Oregon Dep't of Ed. (ODE), Executive Numbered Memorandum 009-2015-16 Reduced School Days (Jan. 27, 2016), https://www.ode.state.or.us/news/announcements/announcement.aspx?ID=13563.

school and "experience[] an inclusive, safe and welcoming learning environment."[3]  Lastly, the State, through the Oregon Department of Education, has investigated administrative complaints about this problem and, in some cases, ordered limited relief to individual students upon finding violations of the IDEA.

14.     However, these policies and practices have been inadequate to identify, correct, or prevent the frequent violations of federal law that continue to occur on the State's watch.  The State has yet to put an end to the widespread failures among its districts to provide students who have disability-related behaviors with the supports they need to access a full day of instruction, even in cases where the absence of such services and supports drives unlawful reliance on shortened school days.  The State's inertia in addressing this ongoing and systemic practice, beyond the limited steps described above, has deprived these children of the education that the State is legally required to ensure.

15.     J.N., E.O., J.V., B.M.[4] ("Named Plaintiffs"), and the class of children they seek to represent (collectively, "Plaintiff class"), are harmed or are at substantial and imminent risk of harm because Defendants' actions and inactions unnecessarily segregate them and deprive them of educational services they need and to which they are entitled by the IDEA, ADA, and Section 504.  Plaintiff Council of Parent Attorneys and Advocates, Inc. is a non-profit organization whose members include the parents of, attorneys for, or advocates for the Plaintiff class.

---

[3]     ODE, Oregon Safe and Effective Schools for ALL Students Advisory Committee, "Summary and Recommendations Report" 3 (June 2018) (emphasis omitted); *see also* ODE, Joint State Advisory Council for Special Education and State Interagency Coordinating Council, "SB Overview" (Mar. 16, 2018) (on file with Plaintiffs).  The Oregon Dispute Resolution Committee also has discussed the issue of shortened school days for students with disabilities.
[4]     Pursuant to Rule 5.2(a) of the Federal Rules of Civil Procedure, the minor Named Plaintiffs are identified by their initials.  A motion and accompanying memorandum requesting leave of the Court for the next friend of Plaintiff J.N. to proceed anonymously is forthcoming.

16.    Although the Supreme Court has made clear that "every child should have the chance to meet challenging objectives," *Endrew F.*, 137 S. Ct. at 1000, the children in the Plaintiff class have very little chance to meet *any* objectives due to their exclusion from school. These children, like all Oregon children, are entitled to a chance to meet challenging objectives and to a full and equal opportunity to learn free from discrimination. Plaintiffs seek declaratory and injunctive relief to remedy the harms that Defendants have caused the Plaintiff class.

## PARTIES

**A.    Plaintiffs**

17.    J.N. is a 6-year-old public school student residing in Oregon. He is a student with a disability who is eligible for special education and related services under the IDEA. He also is a qualified individual with a disability under the ADA and Section 504. Due to behaviors related to his disabilities, J.N. was subjected to a shortened school day during the entire 2017-2018 school year, when he was in kindergarten. For several months, the length of J.N.'s school day was just one hour. He brings this action through his next friend, T.S.

18.    E.O. is a 10-year-old public school student residing in Oregon. He is a student with a disability who is eligible for special education and related services under the IDEA. He also is a qualified individual with a disability under the ADA and Section 504. Due to his behavioral needs, E.O. currently receives a shortened school day. He brings this action through his next friend, Alisha Overstreet.

19.    J.V. is a 7-year-old public school student residing in Oregon. He is a student with a disability who is eligible for special education and related services under the IDEA. He also is a qualified individual with a disability under the ADA and Section 504. Until the current school

year, J.V. had never been permitted to attend school for a full day due to behaviors caused by his disabilities.  He brings this action through his next friend, Sarah Kaplansky.

20.    B.M. is a 14-year-old public school student residing in Oregon.  He is a student with a disability who is eligible for special education and related services under the IDEA.  He also is a qualified individual with a disability under the ADA and Section 504.  Because of his disability-related behaviors, B.M. has received multiple shortened school day schedules of varying lengths, including just thirty minutes of daily instruction during the 2015-2016 school year.  Due to his behaviors, B.M. has been prohibited from attending school and provided little or no instruction this school year.  He brings this action through his next friend, Traci Modugno.

21.    Plaintiff Council of Parent Attorneys and Advocates, Inc. (COPAA) is a national not-for-profit membership organization of parents of children with disabilities, their attorneys, and their advocates.  COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families.  COPAA's primary goal is to secure appropriate educational services for children with disabilities in accordance with federal laws, including the IDEA, ADA, and Section 504.

22.    COPAA accomplishes its mission by, among other things: providing resources, training, and information to members to assist them in obtaining a free appropriate public education and equal educational opportunity for children with disabilities; helping parents and advocates file administrative complaints; educating the public and policymakers about the experiences of children with disabilities and their families; and educating members about developments in the federal laws and policies affecting education of children with disabilities.

23.    COPAA has more than 2,100 members located across the United States. Membership is open to all persons who are interested in furthering COPAA's purposes and who

pay annual dues as required.  The Board of Directors is composed exclusively of COPAA members.  COPAA has active members in Oregon, including parents of children who are eligible for special education and related services under the IDEA and are currently being subjected, and are at substantial risk of being subjected, to shortened school days due to their behaviors.

24.    COPAA's members also include attorneys and advocates who represent students with disabilities in Oregon and seek to obtain a free appropriate public education and equal educational opportunity for these students.  The State's failure to take effective action to address the systemic and unlawful use of shortened school days by its school districts has made achieving this mission more difficult, time-consuming, and resource-intensive for these members.  In the absence of an adequate State system for detecting, correcting, and preventing this practice, these attorneys and advocates have expended time and resources they would have devoted to other work on behalf of students with disabilities in order to respond to requests for assistance concerning the inappropriate use of shortened school days.

25.    COPAA's office is located at 8 Market Place, Suite 300, Baltimore, MD 21202. COPAA brings this action on behalf of its active members who have children in the Plaintiff class or who represent a child in the Plaintiff class as an attorney or advocate.

**B.    Defendants**

26.    Defendant Oregon Department of Education (ODE) is the "state educational agency" for Oregon, a governmental entity defined by the IDEA as "primarily responsible for the State supervision of public elementary and secondary schools" and the provision of a free appropriate public education in the least restrictive environment to all eligible students.  20 U.S.C. §§ 1401(32), 1412(a)(1), 1412(a)(5).  ODE is a public entity covered by Title II of the

ADA, 42 U.S.C. § 12131 *et seq*., and a recipient of federal financial assistance subject to Section 504, 29 U.S.C. § 794. ODE's office is located at 255 Capitol Street NE, Salem, OR 97310.

27.     Defendant Colt Gill is Director of ODE and the Deputy Superintendent of Public Instruction for Oregon. He is responsible for supervising and directing ODE's services, programs, and activities, including enforcement of the IDEA, ADA, and Section 504. *See* Or. Rev. Stat. §§ 326.300, 326.310. He is further responsible for supervising all special education programs administered by any other state agency and for coordinating with other public agencies as needed to ensure that eligible students receive the services required by the IDEA. *See* Or. Rev. Stat. § 343.041; 20 U.S.C. § 1412(a)(12)(A). Defendant Gill's office is located at 255 Capitol Street NE, Salem, OR 97310. Defendant Gill is sued in his official capacity.

28.     Defendant Katherine Brown is the Governor of Oregon and Superintendent of Public Instruction for Oregon. *See* Or. Const. Art. VIII, § 1; Or. Rev. Stat. §§ 326.300, 326.310. She is responsible for supervising and directing ODE's services, programs, and activities, including enforcement of the IDEA, ADA, and Section 504. *See id.* She is further responsible for supervising all special education programs administered by any other state agency and for coordinating with other public agencies as needed to ensure that eligible students receive the services required by the IDEA. *See* Or. Rev. Stat. § 343.041; 20 U.S.C. § 1412(a)(12)(A). Defendant Brown's office is located at 775 Court Street NE, Salem, OR, 97301. Defendant Brown is sued in her official capacity.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under federal law, specifically the Individuals with Disabilities Education Act,

the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act. Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201-02.

30.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and because all Defendants maintain offices in this district and are responsible for enforcing the laws relevant to this litigation in this district.

## THE PLAINTIFF CLASS

31.    Plaintiffs J.N., E.O., J.V., B.M., and COPAA bring this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of the Named Plaintiffs and the following class: All students with disabilities aged 3 to 21 residing in Oregon who are eligible for special education and related services under the IDEA and are currently being subjected to a shortened school day or are at substantial risk of being subjected to a shortened school day due to their disability-related behaviors.[5]

32.    The Plaintiff class is so numerous that joinder of all members is impracticable. During the 2016-2017 school year, a total of 77,964 Oregon children received special education services under the IDEA, thousands of whom have disabilities that impact their behaviors.[6] Disability Rights Oregon, the federally designated protection and advocacy program that

---

[5]    The proposed Plaintiff class does not include students with medical needs unrelated to their behaviors that limit the students' ability to attend school or students aged 18 to 21 who choose to attend a partial day of school in order to work as part of an adult transition program.
[6]    *See* ODE, Statewide Report Card 2016-2017, at 71 (Nov. 30, 2017), https://www.oregon.gov/ode/schools-and-districts/reportcards/Documents/rptcard2017.pdf. Among these students, 4,996 have an "emotional disturbance," 9,329 have autism spectrum disorder, and 13,503 have an "other health impairment," which includes attention deficit disorder and attention deficit hyperactivity disorder. *Id. See also* 34 C.F.R. § 300.8 (defining disability categories).

provides legal advocacy to Oregon children with disabilities, reported to ODE in November 2015 that it had received parent complaints concerning shortened school days for at least 34 students with disabilities who have behavioral needs in 27 of Oregon's 197 school districts. Furthermore, data from FACT Oregon, an advocacy organization that operates a helpline for Oregon parents, indicates that it received nearly 280 unduplicated calls on behalf of children with disabilities subjected to shortened school days due to their behaviors from September 2016 to December 2018 alone.

33.    There are questions of law and fact common to the claims of all class members, including (a) whether the State's alleged failure to adequately supervise and monitor the use of shortened school days by its school districts and to enforce the provision of a free appropriate public education in the least restrictive environment by those school districts violates the IDEA, and (b) whether the State's alleged failure to adequately supervise, monitor, and enforce nondiscrimination policies and practices concerning the use of shortened school days by its school districts violates Title II of the ADA and Section 504.

34.    The claims of J.N., E.O., J.V., and B.M. are typical of the claims of the class. Due to Defendants' policies, practices, procedures, acts, and omissions, the Named Plaintiffs and the class members are currently being subjected to or are at substantial risk of being subjected to a shortened school day at an Oregon public school because of their disability-related behaviors.

35.    The Named Plaintiffs will fairly and adequately represent the interests of the class. Each Named Plaintiff possesses a strong personal interest in the subject matter of this lawsuit. The Named Plaintiffs are represented by experienced counsel with expertise in federal laws concerning disability rights and special education, as well as expertise in federal class

action litigation.  Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

36.     Defendants' policies, practices, procedures, acts, and omissions harm all class members in the same manner.  Defendants' failure to take effective action to identify, correct, and prevent the systemic use of shortened school days by Oregon school districts for children with disability-related behaviors has deprived the Plaintiff class of the educational services to which they are entitled by federal law, subjected them to disability-based discrimination, and increased their risk of being subjected to such harms in the future.  Final injunctive and declaratory relief is thus appropriate for the Plaintiff class as a whole.

## STATUTORY BACKGROUND

### A.     The Individuals with Disabilities Education Act

37.     Under the IDEA, each state must "ensure" that it provides "special education" and "related services" to all children with disabilities aged 3 to 21 residing in the state.  20 U.S.C. §§ 1401(9), 1412(a)(1).  Special education means specially designed instruction that meets the unique needs of a child with a disability.  *See* 20 U.S.C. § 1401(29).  Related services means the supportive services "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26).  The State directs local school districts to provide special education and related services to each eligible student with a disability by implementing an "individualized education program" (IEP), an individually tailored statement that is developed, reviewed, and revised by an "IEP team."  *See* 20 U.S.C. § 1414(d).

38.     The IDEA further requires states to "ensure" that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular

educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5).

39.     Together, these requirements are commonly referred to as the State's duty to provide students a free appropriate public education in the least restrictive environment.  As the state educational agency for Oregon, ODE is specifically "responsible for ensuring that" all eligible Oregon children with disabilities receive a free appropriate public education in the least restrictive environment.  20 U.S.C. §§ 1412(a)(11)(A), (a)(1), (a)(5).  ODE must coordinate with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under the IDEA.  *See* 20 U.S.C. § 1412(12).

40.     To fulfill these responsibilities, the State, among other things, must engage in "effective monitoring" to ensure that local school districts provide a free appropriate public education in the least restrictive environment to all eligible children.  *See* 20 U.S.C. §§ 1416(a)(1)(C), (a)(3)(A), (a)(3)(B).  While the State must use data to measure school districts' performance, maintain an administrative complaint process,[7] and take corrective action upon finding any violations of the Act, *see* 20 U.S.C. §§ 1411(e)(2)(B)(i), 1415, 1416(a)(3), its duty requires far more.

41.     Rather than focusing on technical compliance, the State's "primary focus" must be on "improving educational results and functional outcomes for all children with disabilities."

---

[7]     Under the IDEA, a state's administrative complaint processes must allow the filing of (a) a "due process" complaint specific to an individual child, and (b) a "state complaint," which any organization or individual may file alleging violations of the IDEA and that need not relate to a specific child.  *See* 34 C.F.R. §§ 300.153, 300.507.

20 U.S.C. § 1416(a)(2)(A).[8]  The State must ensure that students actually receive a free

appropriate public education in the least restrictive environment.  *See* 20 U.S.C. §§ 1412(a)(1),

(a)(5); 1416(a)(1)(C), (a)(3)(A).  Accordingly, the State must now guarantee that districts meet

the "markedly more demanding" standard for a free appropriate public education as clarified by

the Supreme Court in *Endrew F.*, which explicitly demands that every child with a disability

receive an "ambitious" education, with the chance to meet "challenging objectives," and

anticipates that most children can do so in the general education classroom.  137 S. Ct. at 1000.

**B.**     **The Americans with Disabilities Act and Section 504 of the Rehabilitation Act**

42.     Under Title II of the ADA (Title II), "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity."  42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130.  Title II requires that public schools

provide children with disabilities an equal educational opportunity.  *See* 28 C.F.R.

§ 35.130(b)(1)(ii).

---

[8]     *See also* U.S. Dep't of Educ., *Dear Colleague Letter to Chief State School Officers on Results-Driven Accountability* (May 21, 2014), https://www2.ed.gov/about/offices/list/osers/osep/rda/050914rda-lette-to-chiefs-final.pdf.  After evaluating the State's technical compliance and educational results, each year since 2015, the U.S. Department of Education has listed Oregon as a state in need of assistance in implementing the IDEA for two or more consecutive years.  *See* U.S. Dep't of Educ., 2018 Determination Letters on State Implementation of IDEA (July 24, 2018), https://www2.ed.gov/fund/data/report/idea/ideafactsheet-determinations-2018.pdf; U.S. Dep't of Educ., 2017 Determination Letters on State Implementation of IDEA (July 12, 2017), https://sites.ed.gov/idea/files/ideafactsheet-determinations-2017.pdf; U.S. Dep't of Educ., 2016 Determination Letters on State Implementation of IDEA (July 10, 2016), https://www2.ed.gov/fund/data/report/idea/ideafactsheet-determinations-2016.pdf; U.S. Dep't of Educ., Determination Letters on State Implementation of IDEA (June 2015), https://www2.ed.gov/fund/data/report/idea/2015-ideafactsheet-determinations.pdf.

43.     Title II also prohibits the unnecessary segregation of individuals with disabilities and requires public entities to administer their services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  *See Olmstead v. L.C.*, 527 U.S. 581 (1999) (interpreting Title II); *see also* 28 C.F.R. § 35.130(d).

44.     Public entities must make reasonable modifications to their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7).

45.     Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, requires entities that receive federal financial assistance to provide aids, benefits, and services to individuals with disabilities in the most integrated setting appropriate to the individual's needs. 34 C.F.R. § 104.4(b)(2).

46.     Section 504 also requires that covered entities provide children with disabilities a free appropriate public education, often implemented through an individualized "Section 504 plan."  A free appropriate public education under Section 504 means special education and related aids and services designed to meet the needs of children with disabilities as adequately as the needs of nondisabled children are met.  *See* 34 C.F.R. § 104.33(a), (b)(1).  This requirement is similar to the IDEA requirement to provide a free appropriate public education (FAPE) but, "unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program."  *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008).  Nonetheless, implementation of an IEP developed in accordance with the IDEA is one means of meeting Section 504's requirement.  *See* 34 C.F.R. § 104.33(b)(2).

47.     Both Title II and Section 504 prohibit states from discriminating when providing educational services, programs, and activities to children with disabilities, whether a state does so directly or through other arrangements.  *See* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1).  Further, states may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities.  *See* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4). The State of Oregon must therefore adequately supervise the school districts that carry out its educational programs to ensure that students with disabilities are not subjected to discrimination.

## FACTUAL ALLEGATIONS

**A.     Oregon Students with Disabilities are Unnecessarily Subjected to Shortened School Days**

48.     For students whose disabilities lead to challenging classroom behaviors, school districts throughout Oregon frequently reduce the length of their school day, often by several hours, in violation of the students' rights under federal law to receive a free appropriate public education without discrimination based on disability.  These violations occur when districts modify students' IEPs or Section 504 plans to shorten their school days or informally shorten students' daily schedules without documentation.  The widespread nature of this problem is reflected by the facts that each of the Named Plaintiffs is enrolled in a different school district in a different region of Oregon and that COPAA members encounter this problem statewide.

49.     Although a small number of students with disabilities require a shortened school day to accommodate medical needs that limit the number of hours or the time of day when those students are able to learn, the children in the Plaintiff class are medically able to remain in school for a full day.  They are excluded because of classroom behaviors related to their disabilities.

50.     Many school districts, often in rural and isolated areas of Oregon, routinely shorten the school day of such students without first developing, implementing, and revising as needed plans to provide academic and behavioral interventions that will support the students' needs and ensure productive full days of school.  The failure to provide such interventions often means that, even when students return to school full-time after having been subjected to a shortened school day, their full instructional day is short-lived.  School districts often respond to the students' still-unmet behavioral needs either by again unlawfully resorting to shortened school days or turning to other practices that deprive students of time in the classroom.

51.     Such practices cause students to lose substantial instructional time and time to engage with their peers, making it harder for them to catch up academically and socially.  They also experience stigma and emotional trauma associated with being unwelcome and excluded—especially those placed on shortened schedules for prolonged or indefinite periods of time—which further compounds the challenges of returning to and reengaging in school for a full day.

52.     The harms resulting from unnecessary shortened school days can impact students for years, derailing their future opportunities in school and in life.  Like Plaintiff B.M., *see infra* pp. 28-32, some students fall so far behind academically and behaviorally while placed on a shortened school day schedule that their districts eventually choose to deny them access to any education at all.  Students who are subjected to a shortened school day in lieu of receiving appropriate services and supports in school may face further consequences of having unaddressed behavioral needs, such as placement in residential facilities, institutionalization, or court-involvement.

53.     Even for students with disability-related behaviors who currently attend a full day of school, the State's failure to effectively address this systemic practice has placed them at

substantial risk of being subjected to a shortened school day and experiencing such harms in the future.  This risk is particularly heightened for those students who have previously been denied the opportunity to attend school for the full day.  The passage of state legislation in 2017 that requires districts to obtain data that would enable proactive monitoring of districts' use of shortened school days has not solved this problem.  The law has not resulted in measurable progress because the State has not actually collected or reviewed any such data; instead, it continues to rely on its ad hoc, administrative complaint process to identify and correct violations.  Making matters worse, the State actually has *exacerbated* the risk of inappropriately and unlawfully shortened school days by expressly authorizing in its 2016 Executive Memorandum the use of shortened school days for students with the most severe behavioral needs.  *See supra* n.2.  The State permits school districts to shorten students' school days but fails to either effectively clarify the limited circumstances under which such shortened days may be permissible or provide supports to help school districts educate students with behavioral needs for a full school day.  *See id.*  Moreover, the State's education funding formula rewards school districts that impose shortened school days by paying them the same amount for providing a student with one hour of tutoring as it would if that student had received a full day of instruction in school, creating a financial incentive to rely on shortened school days for students with challenging behaviors.  *See* O.A.R. 581-023-0006(7)(b)(D).

54.    Despite notice that unlawfully shortened school days for students with disabilities recur within and across Oregon school districts and have so recurred for years, the State's acquiescence to this ongoing and statewide practice has enabled the districts' continued reliance on shortened school days.  Because of the State's actions and inactions, students with challenging behaviors are therefore at substantial and imminent risk of being subjected to this

practice regardless of which school district serves them.  As a result, the State has deprived the Named Plaintiffs and the Plaintiff class of the education to which they are entitled.

*Plaintiff J.N.*

55.    Plaintiff J.N. is a 6-year-old boy in the first grade who receives special education and related services under the IDEA.  He has been diagnosed with a hearing impairment, anxiety, hyperactivity, and a developmental delay.  During the 2017-2018 school year, J.N.'s small, rural school district drastically shortened his school day due to behaviors related to his disabilities.

56.    J.N.'s teachers have described him as a very bright, tenacious, inquisitive, and creative child.  He loves animals, books, superheroes, and "monster" trucks.

57.    As a result of his disabilities, J.N. has difficulty managing his behaviors, focusing on learning, and expressing himself with words.  When he is upset or his work is not adequately engaging, J.N. has displayed disruptive classroom behaviors that include throwing objects and hitting or threatening others.

58.    After J.N. was diagnosed with hearing loss in October 2016, he was found eligible under the IDEA to receive special education and related services as a student with a hearing impairment.  When J.N. began kindergarten in September 2017, his IEP team noted that he needed behavioral supports in addition to communication and technology supports related to his hearing impairment.  At the urging of J.N.'s mother and his educational advocate, the district agreed to conduct a functional behavioral assessment to analyze the functions of J.N.'s behaviors.  It also developed a two-page interim behavior support plan for J.N., which focused primarily on obtaining J.N.'s compliance with wearing his hearing aids.

59.    J.N. began kindergarten attending classes in the general education classroom for the full school day, lasting roughly six hours.  However, J.N. soon had several incidents in which

he engaged in disruptive behaviors related to his disabilities.  Rather than expediting his

behavioral assessment or modifying his interim behavior support plan, his school district

shortened J.N.'s school day to a single hour over his mother's objections, within the first three

weeks of his very first year in school.  As a result, J.N. was scheduled to receive only 15 minutes

of instruction in literacy and 15 minutes in math—coupled with 15 minutes of recess and 15

minutes of sensory activities—in a separate classroom for special education students.  The

district sometimes failed to provide J.N. even this minimal amount of daily instruction.

60.    After shortening J.N.'s school day to a single hour, J.N.'s school district revised

his IEP in October 2017.  The school district did not include any academic goals or interventions

in the IEP and acknowledged that J.N. was "not currently accessing any curriculum or classroom

activities" and was "unable to access his education."

61.    After repeated requests by his mother, the school district eventually increased the

length of J.N.'s school day.  By January 2018, he attended school for two hours and 15 minutes

each day, including some time in the general education classroom.  However, although J.N. was

still missing nearly two-thirds of the school day that his peers received, the district did not

complete his behavioral assessment or modify his interim behavior plan until that January.

Despite continued parent concerns, it did not formally evaluate J.N.'s academic and behavioral

strengths and needs until February 2018.  Following its delay in considering all of J.N.'s needs,

the district recognized in March 2018 that J.N. is additionally eligible for IDEA services due to

his behavior-related disabilities.

62.    In February 2018, J.N.'s mother filed an administrative state complaint against the

school district for, among other things, shortening J.N.'s school day without adequately

considering and providing supportive services that could enable him to succeed for the full day.

The complaint also alleged that ODE had violated its own obligations to ensure that J.N. and other children receive a free appropriate public education in the least restrictive environment.

63.    ODE determined that J.N.'s district had indeed denied him a free appropriate public education in the least restrictive environment by unnecessarily subjecting him to a shortened school day.  Despite this finding, ODE did not find itself in violation for failing to ensure that J.N. received a free appropriate public education in the least restrictive environment, asserting that it was unaware of the district's failure to meet J.N.'s needs until the complaint.

64.    Being subjected to a shortened school day substantially impaired J.N.'s ability to make academic and behavioral progress and caused him to fall even further behind.  His exclusion from school has been emotionally devastating for J.N., who continues to want to be with his classmates for the full day.  J.N. transferred to another school in the district and, when his family drives past his old school, he often has told his mother: "that's where they hurt me."

65.    Following the resolution of J.N.'s complaint, the district eventually agreed to increase the length of his school day after he began taking medications that improved his behaviors.  J.N. is now allowed to attend a full day of school, though he has been placed in a separate classroom for students with behavioral needs.  Furthermore, the medication periodically causes J.N. to fall asleep in class for much of the school day.  J.N.'s teachers and school staff do not wake him when he falls asleep, and his IEP team has not reassessed how to meet his learning needs.  He has thus missed hours of instruction daily even while physically present at school.

66.    J.N. has yet to receive effective interventions from the district to address his behavioral needs, as the district has continued to implement strategies which proved ineffective before J.N. began taking medication to help manage his behaviors.  Even with the medication, the district already has prohibited J.N. from attending a field trip with his class this school year

due to his behaviors, reflecting the district's ongoing failure to adequately support J.N.'s behavioral needs. Without effective action by the State to ensure that J.N. consistently receives the necessary behavioral supports, he faces a significant risk of being again subjected to a shortened school day due to his disability-related behaviors.

*Plaintiff E.O.*

67.    Plaintiff E.O. is a 10-year-old boy in the fourth grade who receives special education and related services under the IDEA from a small, rural school district. Among other disabilities, he has been diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder.

68.    E.O. is a bright and curious student. School staff describe him as a very friendly, cheerful, kind-hearted, and compassionate boy who likes to give hugs. He enjoys helping his teachers and setting a good example for younger students. E.O. is interested in Greek mythology and archaeology, and he loves dinosaurs and Legos.

69.    Due to his disabilities, E.O. has difficulty regulating his emotions and impulses, interpreting social cues, and remaining on task. He becomes upset if he perceives that a situation is unfair, believes that he is being "picked on," or experiences a change to his routine. E.O. sometimes responds to his frustrations in school by yelling, stomping off, hitting, or kicking. As his IEP team has recognized, some of E.O.'s behaviors "may be interpreted as intentional when he simply does not know another way."

70.    E.O. began attending school in his current district in the 2015-2016 school year, when he was in the first grade. School staff noted that E.O. lacked skills to self-regulate and, in February 2016, the school developed a behavioral intervention plan with general strategies to address E.O.'s behaviors. This plan was developed without a functional behavior assessment

analyzing the purposes of E.O.'s behaviors, and it did not specify how school staff would teach E.O. the skills to manage his emotions or how they would measure the plan's effectiveness.

71.    E.O. received a full day of school throughout the 2015-2016 school year, spending most of each day in the general education classroom.  In June 2016, the school district found E.O. eligible for special education and related services under the IDEA due to his autism.

72.    E.O.'s challenging classroom behaviors continued during the second and third grade.  In March 2017, the school district developed a new behavior intervention plan for E.O.  However, this plan was even less detailed than the generic behavioral intervention plan from the prior school year and similarly was not informed by a functional behavior assessment.

73.    The 2017-2018 school year was particularly challenging for E.O. as his needs remained unmet.  In October 2017, a district representative acknowledged that E.O. "definitely has academic needs that are not being met right now," but both school and district staff considered those needs secondary to his behavioral needs.  In response to his behaviors, the school district repeatedly called E.O.'s parents to pick him up early and suspended him multiple times.  In December 2017, after the district proposed suspending him for five days, E.O.'s IEP team concluded that his behaviors were a manifestation of his disabilities, and the district agreed to conduct a functional behavior assessment.  The district completed that assessment in January 2018, by which time it already had suspended E.O. for eleven days that school year.

74.    By December of 2017, the district had placed E.O. on a half-day schedule due to his behaviors, notwithstanding the State's 2016 Executive Memorandum generally discouraging the practice.  The district failed to document E.O.'s shortened school day in his IEP, in violation of the 2017 state law requiring districts to include a statement in the IEP "that explains the reasons the student was placed on an abbreviated school day program."  O.R.S. § 343.161(4)(c).

75.    E.O. remained on a half-day schedule for the rest of his third grade year, spending each day in a class with just one other student and a special education aide.  He saw other students only at lunch.  His teachers that year reported that E.O. missed being in the general education classroom and regularly talked about wanting to be with his peers.  After E.O. spent much of third grade receiving just half the instructional time that his classmates received, he experienced gaps in his learning.

76.    E.O.'s mother has repeatedly requested that E.O. be permitted to attend a full day of school and to learn in a general education classroom, but the district has continued to subject E.O. to a shortened school day over her objection.  At the start of the 2018-2019 school year, the district shortened E.O.'s school day by one hour and fifteen minutes and placed him in a setting where he spent roughly two-thirds of each day separated from the general education class. Following intervention by an attorney in December 2018, the district is now shortening E.O.'s school day by thirty minutes each day.  It has not provided E.O. with any additional services or supports to ensure that he is successful during his longer school day.

77.    The State's ongoing failure to effectively monitor the use of shortened school days by local school districts has enabled E.O.'s district to shorten his school day with little consideration of whether he could successfully remain at school for the full day with additional or different services and supports.

78.    Being unnecessarily denied the opportunity to attend a full day of school along with his classmates has caused and continues to cause E.O. significant harm.  He has reported that he "hates being different from his friends," and while E.O. previously had some social interactions with his classmates, those relationships fell apart during the period when he was permitted to attend school for only half a day.  He currently has no friends at school and is now

reluctant to attend because he believes that no one likes him at his school.  E.O. wants to learn

how to connect with his peers, but his shortened school day has made it even harder for him to

develop and practice the necessary skills for building positive relationships with others.  E.O.

remains on a shortened school day schedule, and unless the district provides him with additional

services and supports to address this skills deficit, he is at significant risk of being subjected to

an even shorter school day in the future.

*Plaintiff J.V.*

79.    Plaintiff J.V. is a 7-year-old boy in the second grade who receives special

education and related services under the IDEA from a small, rural school district.  He has been

diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder.

80.    J.V. loves going to school and has been described by school staff as a fun and

active child who enjoys being helpful and responds well to praise.  He likes singing and building

obstacle courses with cars and blocks.  J.V. is largely non-verbal and is limited in his ability to

communicate, though he is eager to mimic the sounds of speech and interact socially with others.

81.    Because of his disabilities, J.V. has difficulty adapting to changes in routine,

connecting with his peers, and sustaining attention to a given task.  When upset, J.V. has run

away from adults, thrown objects, or been physically aggressive towards himself or others,

including pinching and clawing himself or banging his fists.  Because J.V. is limited in his verbal

ability to communicate his needs and wants, his behaviors are a primary form of communication.

82.    J.V. was diagnosed with autism at age two and received special education and

related services under the IDEA prior to kindergarten.  Before J.V. had attended a single day of

kindergarten, his IEP team "lower[ed] [its] demands/expectations" for him due to his behaviors.

83.    Although it had yet to conduct an assessment of J.V.'s behaviors or provide him with a behavior support plan to help prevent and manage his behaviors in the classroom, J.V.'s school district restricted J.V. to a severely shortened two-hour school day on his very first day of school in the district in August 2016.  The district amended J.V.'s IEP in September 2016 to formally adopt the shortened school day that already was informally in place, over his mother's objections.  J.V. never attended school for the full 4.5 hour day that other students received during his kindergarten year.  Often, J.V. did not receive even the mere two hours of instruction set forth in his IEP because his mother received near daily calls to pick him up early from school.

84.    Moreover, under his shortened schedule, J.V. was completely isolated from his peers.  He received his instruction from two aides in an 8' x 16' workspace that was separate from the larger classroom in which other special education students learned.

85.    J.V. struggled both academically and behaviorally during his kindergarten year.  School staff had difficulty helping him focus on academic instruction during the short period he was in school, and he regressed in his verbal and social communication skills.  Furthermore, despite J.V.'s initial enthusiasm for school, his exclusion from school and his classmates negatively impacted his perception of school and his desire to be there.

86.    J.V.'s behaviors worsened after he was placed on a shortened school day schedule, but instead of identifying additional or different services that could better support his needs and inclusion in the classroom, the district proposed in November 2016 that J.V. be sent to a secure residential facility located over 200 miles away from his home and family.  While the district was evaluating the appropriateness of this facility for J.V., it offered J.V. six hours per week of home tutoring in three two-hour sessions.  In actuality, the district generally provided the tutoring sessions to J.V. only once or twice a week.

87.    With the help of legal counsel, J.V.'s mother convinced the school district to consult with an independent behavioral expert who found that placement in the residential facility was unnecessary and recommended that the district provide J.V. a device to help him communicate more effectively.  J.V. remained in his school, and the district agreed to increase the length of his school day gradually—initially to two-and-a-half hours each day—with the expectation that he would attend a full day of school by September of the 2017-2018 school year.

88.    However, when J.V. returned to school in September 2017, the school district refused to provide a communication device, ended its consultation with the behavioral expert, and returned J.V. to a shortened school day of three hours each day, just a few minutes longer than his school day had been at the end of the prior school year.

89.    On behalf of J.V., his mother filed an administrative due process complaint against both the school district and ODE in October 2017.  ODE dismissed J.V.'s claims against itself for failing to ensure that J.V. received a free appropriate public education in the least restrictive environment, holding that ODE is not a proper party to due process proceedings unless it is required by law to *directly* provide services.  The school district and J.V.'s mother reached a confidential settlement in November 2017.  J.V. completed the 2017-2018 year while successfully attending school for one hour less each day than his first-grade classmates.

90.    J.V. currently attends a full day of school but remains at significant risk of being subjected to a shortened school day in the future, especially given his school district's decision last school year to continue J.V. on a shortened school day despite indicating earlier that he would attend school for the full day.  J.V.'s mother has not worked since he began school due to the substantial risk that, absent effective action by the State, J.V.'s school district will return to its practice of sending him home early or constantly calling her to help manage J.V.'s behaviors.

*Plaintiff B.M.*

91.     Plaintiff B.M. is a 14-year-old boy in the eighth grade who is eligible to receive special education and related services under the IDEA from a rural school district.  He has been diagnosed with autism spectrum disorder and epilepsy.  Since his family moved to the district in 2013, B.M.'s school district has either restricted him to a significantly shortened school day or prohibited him from attending school at all due to behaviors caused by his disabilities.

92.     B.M. came to his current school district as a happy and affectionate child who had an infectious laugh and liked to smile.  He is athletic and enjoys swimming, basketball, and jumping on the trampoline.  B.M. responds strongly to certain sensations and craves movement; for example, B.M. flaps his hands at his sides or slaps his legs when he is excited, rocks back and forth while seated or standing, and enjoys spinning himself and jumping around.  B.M. has been consistently described by the adults who work with him as a bright and intelligent child.

93.     Due to his disabilities, B.M. has trouble transitioning to new routines, maintaining attention, and controlling his impulses.  B.M. also struggles to initiate, engage in, and maintain social contact with others.  B.M. is nonverbal and his frustration with his inability to communicate has often led to aggressive behaviors, including biting his own hand, yelling, kicking, hitting, or pinching.

94.     B.M. moved to his current school district during the 2013-2014 school year, when he was in the third grade.  The district placed him in a class with several other children with disabilities and he became overwhelmed at the sensory stimuli in the classroom.  His behaviors deteriorated and he began refusing to enter the building.

95.     B.M.'s challenging behaviors continued during the 2014-2015 school year and his mother received multiple calls a week to pick him up from school following behavioral

incidents.  The school district ultimately presented his mother with the choice of keeping B.M. in a classroom that was not effectively meeting his needs, accepting home instruction, or transferring B.M. early to middle school.  Because B.M. was making little progress in his classroom and she feared that he would be unable to thrive in a new school with classmates who were two years older, B.M.'s mother reluctantly acquiesced to the home instruction.

96.    B.M. was moved to a middle school for the 2015-2016 school year, but he struggled to return to school from home instruction, and the behavior support plan that the school district developed was ineffective.  After this transition, his already minimal language skills deteriorated further, and he lost the few words that he previously used to communicate.  The length of B.M.'s school day has fluctuated throughout his time in the district, but he began the 2015-2016 school year attending just the last half-hour of each school day; by March 2016, B.M. had not received more than ninety minutes of daily instruction during that school year.

97.    Receiving such limited instruction in isolated settings only worsened B.M.'s behaviors, yet the district continued to shorten his school day.  By March of 2016, the district decided to provide B.M. only thirty minutes of instruction per day.  His instruction was to be provided in a classroom separate from children without disabilities by a paraprofessional educator, rather than a teacher.  The IEP team also identified B.M.'s severely limited ability to communicate as a cause of his behaviors and determined that he urgently needed a device to help him communicate.  However, the district was unable to hire the paraprofessional necessary to implement this plan, and its minimal efforts to help him communicate were unsuccessful.

98.    The district did hire an autism specialist to work with B.M. and students with similar needs, but B.M. was so disengaged from school by this point that he was only successful in attending school intermittently during the fall of 2016, never for a full day.  In September

2016, the district contracted with a behavior specialist who had worked with B.M. previously, even though the behavior specialist was based over an hour away from the district. The behavior specialist was contracted to provide behavior coaching to B.M. in school on an interim basis and to train the paraprofessional educator who the district would hire to take over, but the district never filled the paraprofessional position. The behavior specialist resigned during the 2016 winter break, and no district staff filled the specialist's role.

99.     Lacking needed academic, behavioral, and communication supports, B.M. became increasingly frustrated and resistant to his school's efforts to educate him. Although the goal in B.M.'s IEP was to transition him to a four-hour school day by the end of the 2016-2017 school year, he did not receive *any* services from the district to help him do this from January 2017 through the end of that school year.

100.     On January 4, 2017, B.M.'s attorney wrote ODE's Assistant Superintendent raising a concern that the district lacked the expertise required to support B.M. and that there were multiple children in the district like B.M. whose behavioral needs were not being met. The ODE specialist replied that B.M. could file an administrative complaint.

101.     The special education director for B.M.'s school district also wrote ODE to share the view that a lack of resources had limited the district's ability to serve B.M. and that both the district and B.M.'s attorney hoped the State would provide additional resources. Despite these requests for help, and an in-person meeting between ODE and the district to discuss providing such resources to meet B.M.'s needs, ODE failed to provide the district any additional resources.

102.     In April 2017, B.M.'s mother filed an administrative state complaint against the school district and against ODE. ODE found that the school district had failed to provide B.M. a free appropriate public education and ordered the district to take corrective action. However, it

did not substantiate any of the allegations against itself, instead asserting that none of the district's failures were due to a lack of resources from the State.  Furthermore, despite ODE's direct involvement in conversations about B.M.'s needs, ODE asserted that its knowledge of B.M.'s situation was only "slight" until the complaint was investigated and thus it had no prior opportunity to address the district's noncompliance.

103.    B.M.'s experiences at his school have been traumatic and have caused him to be extremely anxious about attending his school or entering the school building.  Although B.M. prevailed in his administrative claims against the school district, the district continues to fail to meet his needs.  During the 2018-2019 school year, the district allowed B.M. to attend school only once, and it provided him a handful of home tutoring sessions.  When the aide hired to provide the home instruction left for another job, the district asked B.M.'s mother not to bring him to school until a suitable replacement aide could be found.  After expressly prohibiting B.M. from attending school, the district removed B.M. from its roster for failure to attend and proposed transferring him out of the district.

104.    Despite his continued eligibility for services under the IDEA, B.M.'s school district is currently failing to provide him with any instruction or other services—in school or at home—that would enable him to transition back to the school setting on a daily schedule that meets his needs.  He has now been placed in a facility for residential treatment and is expected to receive educational services from another school district.  Although the State did monitor the district to ensure its compliance with the order requiring corrective action after B.M.'s administrative complaint, the State has not continued to monitor whether the district is providing B.M. with the required educational services or supports, nor has it taken action to address the district's complete failure to do so.  Absent action from the State, when educational services

resume for B.M., he faces a significant likelihood of again being denied needed instructional time and experiencing the harms associated with unnecessary shortened school days.

**B.**     **The State's Knowledge of the Systemic, Unnecessary Use of Shortened School Days**

105.    For several years, the State has had ample notice that its school districts unnecessarily and systematically deny children like J.N., E.O., J.V., and B.M. access to a full school day and fail to provide these students with interventions, services, and supports required by federal law.

106.    On June 3, 2013, Disability Rights Oregon informed ODE that it had received frequent inquiries from families across the state concerned about the use of shortened school days for their children with behavioral needs.  Since at least 2013, advocates have regularly urged the State to solve this problem, prompting ODE to issue its 2016 Executive Memorandum.

107.    After being made aware by families and advocates that this practice has continued statewide following issuance of the Executive Memorandum, the state legislature passed Senate Bill 263 in June 2017.  The law concerns shortened (or "abbreviated") school days, defined as "any school day during which a student receives instruction or educational services for fewer hours than other students who are in the same grade within the same school."  O.R.S. § 343.161(1)(a).  Among other things, the law establishes each student's "presumptive right to receive the same number of hours of instruction or educational services as other students who are in the same grade within the same school," and prohibits districts from imposing a shortened school day on a student without the parent's consent.  O.R.S. §§ 343.161(1)(d), (2), (4)(a)(C).

108.    The State also has known of this systemic problem due to the long history of administrative complaints filed against school districts and the State itself.  Since 2008, the State has issued roughly thirty written opinions resolving state complaints on behalf of students across

Oregon who received shortened school days due to their behaviors, representing 12 percent of ODE's written opinions for state complaints but a mere fraction of the hundreds of families who have reported the inappropriate use of shortened school days to advocates. *See supra* ¶ 32.

109.    However, the State repeatedly has disclaimed notice of violations until the filing of complaints.  For example, after finding that one school district had systemically denied free appropriate public education to students with disability-related behaviors by placing them on shortened school day schedules, ODE determined that it was "unaware of" the denials and "not afforded any reasonable opportunity to compel local compliance" prior to the complaints since "[l]ittle, if any, of the data obtained through the Department's monitoring and supervision processes yields information that could put the Department on notice of any issues related to a specific student."[9]  Notwithstanding this position, the history of complaints involving shortened school days—which does not include those resolved without a written opinion—has given the State clear notice that this practice occurs on a statewide basis and has persisted for years.

110.    The State also has been notified of multiple complaints filed with the Office for Civil Rights of the U.S. Department of Education (OCR) alleging the unlawful use of shortened school days under Title II and Section 504.  In 2014, OCR received three complaints involving shortened school days for students with behavioral needs in three rural Oregon districts, each of which settled.  OCR has also received complaints against Oregon districts for sending students with disabilities home earlier than their peers for the school's administrative convenience and, in

---

[9]    ODE, Findings of Fact, Conclusions, and Final Order Case No. 18-054-017, at 8-9 (June 4, 2018), https://www.oregon.gov/ode/rules-and-policies/2018complaints/18-054-017%20Dallas.pdf.

2016, cautioned two districts against doing so.[10]  In all of these cases, the State was notified of

the allegations that its districts had unlawfully shortened the school days of students with

disabilities.

111.    Lastly, the State for years has been made aware of the harmful impact of

unnecessarily shortened school days on children with disabilities through several local news

reports and essays discussing this issue.[11]

**C.    The State's Inadequate System for Ensuring an Appropriate Education**

112.    Despite its clear legal obligations and years of notice, the State has failed to

implement effective policies and procedures to ensure that Oregon children who are subjected to

shortened school days or denied a school day entirely due to their behaviors receive the services

to which they are entitled and are not unnecessarily excluded from school.

113.    The State has developed some policies in response to this ongoing problem, such

as its 2016 Executive Memorandum and an administrative rule regarding minimum instructional

time.  *See supra* n.2 (citing O.A.R. 581-022-1620, *renumbered as* O.A.R. 581-022-2320).  The

State also has developed general procedures to supervise and monitor school districts, which

_____

[10]    *See e.g.,* U.S. Dep't of Ed., Letter to Silver Falls Sch. Dist. 4J, No. 10151452 (May 16,
2016), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/10151452-a.pdf; U.S.
Dep't of Ed., Letter to Beaverton Sch. Dist., No. 10151271 (Feb. 24, 2016),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/10151271-a.pdf.
[11]    *See e.g.*, Joel Greenberg, *Oregon fails rural schools who need help teaching children
with disabilities: Guest Opinion*, THE OREGONIAN (Nov. 26, 2017),
https://www.oregonlive.com/opinion/index.ssf/2017/11/oregon_fails_rural_schools_who.html;
Samantha Swindler, *When the neediest students get the fewest school hours*, THE OREGONIAN
(Sep. 17, 2017),
https://www.oregonlive.com/portland/index.ssf/2017/09/when_the_needest_students_get.html;
Betsy Hammond, *State scolds schools that shortchange disabled students*, THE OREGONIAN
(Mar. 19, 2016),
https://www.oregonlive.com/education/index.ssf/2016/03/injustice_righted_oregon_schoo.html.

"may include district self-assessment, data collection, analysis and reporting, on-site visits, review of policies and procedures, review of the development and implementation of IEPs, improvement planning, and auditing federal fund use."  O.A.R. 581-015-2015.

114.    However, these policies and procedures are inadequate to meet the State's statutory obligation to *ensure* that students with disability-related behaviors receive a free appropriate public education in the least restrictive environment for a full school day or its obligation under federal civil rights laws to ensure nondiscrimination against these students.

115.    The State's policies and procedures are defective in at least the following respects: (1) the State does not collect readily available information about individual students who are denied access to full school days due to their disabilities or the school districts that impose shortened school days, information which could trigger the need for further monitoring of both individual and systemic failures; (2) the State does not take responsibility for ensuring school districts' compliance with federal law through its enforcement actions beyond implementing its administrative complaint system; and (3) the State fails to provide districts with the technical assistance and other supports needed to prevent the unlawful use of shortened school days for children with disability-related behaviors.

116.    First, although the State has long been aware of the widespread and unlawful use of shortened school days throughout Oregon, it has no policies or procedures in effect that require school districts to report data that would allow it to identify the specific districts in need of further monitoring or corrective action.  As Defendant Gill has publicly acknowledged, the State "[does not] have a way of knowing" whether its districts satisfy educational obligations to

Oregon students with disability-related behavioral needs, including students who are subjected to shortened school days due to their disability-related behaviors.[12]

117.    Senate Bill 263 mandates that school districts create documentation which, if collected by ODE, would allow the State to reliably estimate the number of Oregon children who receive shortened school days during each school term.[13]  Furthermore, the State's Executive Memorandum on shortened school days encourages—but does not require—districts to collect data demonstrating that a shortened school day is appropriate for a given student and that the student's parents have been meaningfully included in that decision.  *See supra* n.2.  However, the State has knowingly failed to collect and review any of this data in order to ensure that students receive an education in accordance with federal law and its own administrative rules and policies regarding instructional time, even though two of its own advisory bodies have urgently recommended robust data collection and reporting on shortened school days.[14]

118.    Moreover, the self-assessments that school districts must complete for the State under the IDEA are based on a sample of student files that, in some cases, do not include records from students who experience shortened school days in school districts that systemically engage in this practice.  For example, even when the State investigated a series of complaints and found

---

[12]    Alisha Roemeling, Violent student behaviors on the rise, officials say, THE REGISTER-GUARD (Nov. 26, 2018), https://www.registerguard.com/news/20181117/violent-student-behaviors-on-rise-officials-say.
[13]    Senate Bill 263 requires that school districts obtain from parents signed acknowledgements that they have been informed of their rights under the law and that districts document the reasons for placing a student on a shortened school day in the IEP.  *See* O.R.S. §§ 343.161(4)(b), (4)(c).
[14]    *See* ODE, Oregon Safe and Effective Schools for ALL Students Advisory Committee, "Summary and Recommendations Report" 11 (June 2018); ODE, Joint State Advisory Council for Special Education and State Interagency Coordinating Council, Minutes (Mar. 16, 2018), https://www.oregon.gov/ode/students-and-family/SpecialEducation/Documents/sasceminutes3-16-18.pdf.

that one school district had systemically denied a free appropriate public education in the least restrictive environment to three students given shortened school days due to their disability-related behaviors, none of those students were included in the data sample reported to the State. *See supra* n.9, at 7, 9 n.19.  The State's passive approach to ensuring the provision of a free appropriate public education in the least restrictive environment thus failed to detect this systemic denial until these families filed complaints with the assistance of counsel.

119.    Second, the State fails to take sufficient enforcement action to ensure compliance with federal law or with its own deficient policies and procedures regarding shortened school days and instructional time.  The State insists that it can "find and remediate local school district non-compliance" through its administrative complaint procedures.[15]

120.    Although operating an effective complaint system is a critical responsibility of state departments of education, the State's haphazard correction of legal violations in the subset of claims that come forward through the complaint process does not and cannot ensure that all students actually receive a free appropriate public education in the least restrictive environment or prevent discrimination based on disability, particularly when a district is the subject of a systemic complaint or multiple complaints about the same issue.  Furthermore, the State's insistence that the administrative complaints that are filed adequately represent all of the

---

[15]    *See* ODE, Findings of Fact, Conclusions, and Final Order Case No. 17-054-012, at 17 (June 22, 2017), https://www.oregon.gov/ode/rules-and-policies/2017complaints/17-054-012%20ODE-Douglas%20Co.pdf.  As required, the State operates an administrative complaint process in which it investigates and resolves complaints alleging violations of the IDEA by school districts or ODE itself.  *See* 34 C.F.R. § 300.151 *et seq.*; 34 C.F.R. §300.507 *et seq.* Parents of children with disabilities may also file claims of discrimination under Section 504 with the State or they may file a claim of discrimination under the ADA directly with their school district and appeal if needed to ODE.

individual and systemic problems across districts regarding the use of shortened school days is belied by the reports to advocates from hundreds of concerned families.

121.    For example, in August 2017, ODE found that one school district substantially shortened the school days of four children with disabilities to just two or three hours a day due to their disruptive behaviors.  It determined that the district gave little or no consideration to less restrictive options and had systemically failed to consider providing positive behavioral interventions and supports.  However, because the district did not document the services that it was providing students, ODE concluded that it could not determine which services were needed to keep these students in school for the full day and that it thus lacked sufficient information to find a violation of the IDEA.  Despite its own Executive Memorandum directing districts to use shortened school days only in extreme cases when all other options have failed, ODE did not act upon the known misuse of shortened school days for these students to ensure that the district was providing a free appropriate public education in the least restrictive environment to students on shortened school days, such as by conducting onsite visits or offering technical assistance.  Two months later, the parent of another child with disability-related behaviors filed a complaint against the same district for needlessly shortening their child's school day.

122.    Even when the State finds that a school district has violated federal law, it does not sufficiently guard against the same or new denials of students' rights in the future.  For instance, although ODE found that J.N. was denied a free appropriate public education when he was subjected to a shortened school day, he continues to miss hours of daily instruction due to medications he is compelled to take in order to remain at school.  Because of the State's failure to ensure that its districts provide needed services and supports, J.N. and children like him remain unable to access a full day of instruction even after prevailing in the complaint process.

123.    Third, the State has failed to provide school districts with adequate resources, technical assistance, and training to help prevent the unnecessary use of shortened school days and to correct school districts' legal violations prior to and apart from the filing of complaints. The 2016 Executive Memorandum advises school districts that a reduction in instructional time may trigger the procedural safeguards of the IDEA, but it offers scarce guidance on how to effectively support students with behavioral needs and critically omits any reference to the nondiscrimination requirements of the ADA and Section 504.

124.    Some districts that wish to avoid the use of shortened school days and to provide their students with more effective behavioral supports struggle to do so in the absence of additional resources from the State.  Upon information and belief, at least one school district that has systemically imposed shortened school days on students with behavioral needs is now considering using funding that was intended to hire an additional special education teacher and other local resources to instead provide needed school-based behavioral services.

125.    Even when asked directly by districts for help, the State has declined to provide additional resources, expertise, or training to help them support students with disability-related behavior needs.  When B.M.'s attorney and his school district both asked ODE to help the district meet B.M.'s needs, ODE did not provide any such assistance.  Instead, it asserted confidence that the district was doing all that it could—despite later finding that the district had denied B.M. a free appropriate public education—and acknowledged that the district's difficulty in supporting B.M.'s needs is not a unique problem among Oregon districts.

126.    In the absence of needed assistance from the State, many districts have continued to resort to shortening the school day of children with behavioral needs.  Well after the State issued its Executive Memorandum, FACT Oregon reported that sixty-eight (roughly thirteen

percent) of the unduplicated calls and emails it received from families seeking support through its special education helpline from September 2016 to January 2017 concerned children with disabilities who received shortened school days due to their behaviors.  As FACT Oregon told the State in 2017, "shortened school days for behavior, and the inappropriate use of shortened school days in particular, remains a widespread problem for Oregon students with disabilities."[16]

127.    Due to the State's failures, Oregon school districts persist in denying students with disability-related behaviors access to full school days without providing or adequately considering alternative services and supports that could enable these students to learn for the full day.  If the State took effective action to identify the districts engaged in this practice, correct violations of federal law, and provide technical assistance and resources, the children in the Plaintiff class could receive the services that they need to be fully included in their schools.

128.    Following years of calls by advocates for the State to end these systemic violations of the rights of Oregon students with disabilities, State agency representatives met with local stakeholders in June, August, and September 2018 to discuss this issue.  However, the State has not identified any concrete steps it has undertaken since then to address the ongoing problem and Plaintiffs are aware of none.

129.    Through its continued inaction and ineffective policies and procedures regarding shortened school days, the State has violated its duties under the IDEA, ADA, and Section 504. In turn, the State has abandoned the many Oregon students with disabilities who will not receive the education to which they are entitled under federal law until the State takes necessary action.

### CAUSES OF ACTION

---

[16]    Caitlin Shockley, FACT Oregon, SACSE Constituent Report 2 (Jan. 20, 2017), https://olis.leg.state.or.us/liz/2017R1/Downloads/CommitteeMeetingDocument/99821.

**COUNT 1—Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.***

130.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

131.    Each Named Plaintiff and member of the Plaintiff class is a child with a disability who is eligible for special education and related services under the IDEA.  *See* 20 U.S.C. §§ 1401, 1412.  Plaintiff COPAA's members include parents, attorneys, and advocates of the Named Plaintiffs and members of the Plaintiff class.

132.    Defendant Oregon Department of Education, as the state educational agency for the State of Oregon, is "primarily responsible for the State supervision of public elementary and secondary schools" and the provision of a free appropriate public education in the least restrictive environment to all eligible students.  *See* 20 U.S.C. §§ 1401(32), 1412(a)(1), 1412(a)(5).  Defendant Gill and Defendant Brown are the state officials responsible for supervising and directing the services, programs, and activities of the Oregon Department of Education and for supervising all special education programs that are administered by any other state agency.  *See* Or. Rev. Stat. §§ 326.300, 326.310, 343.041.

133.    By the acts and omissions alleged herein, Defendants have violated the rights of the Named Plaintiffs and the Plaintiff class under the IDEA, 20 U.S.C. § 1400 *et seq.*, and its implementing regulations by:

    a.    failing to have in effect policies and procedures to ensure that the State of Oregon provides a free appropriate public education to all eligible children in the state, 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.101;

b.   failing to have in effect policies and procedures to ensure that the State of Oregon educates all eligible children in the least restrictive environment, 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114;

c.   failing to adequately supervise local education agencies in the provision of a free appropriate public education in the least restrictive environment, 20 U.S.C. § 1412(a)(11); 34 C.F.R. § 300.149;

d.   failing to ensure coordination between the Oregon Department of Education and other public agencies as needed to ensure that all services necessary for the provision of a free appropriate public education have been provided, 20 U.S.C. § 1412(a)(12), 34 C.F.R. § 300.154; and

e.   failing to effectively monitor implementation of and to enforce the IDEA's requirements regarding the provision of a free appropriate public education in the least restrictive environment, 20 U.S.C. § 1416(a)(1)(C), (a)(3); 34 C.F.R. § 300.600.

**COUNT 2—Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.***

134.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

135.    Each Named Plaintiff and member of the Plaintiff class is an "individual with a disability" within the meaning of the ADA.  Their disabilities substantially limit one or more major life activities, including but not limited to, learning, reading, concentrating, thinking, and communicating.  42 U.S.C. § 12102.

136.    As school-age children who live in the State of Oregon, each Named Plaintiff and member of the Plaintiff class is qualified to participate in Defendants' educational programs and services.  *See* 42 U.S.C. § 12131(2).

137.    Defendant Oregon Department of Education is a public entity subject to Title II of the ADA.  Defendant Gill and Defendant Brown are the state officials responsible for administering and/or supervising the Oregon Department of Education's services, programs, and activities for children with disabilities.  42 U.S.C. § 12131(1).

138.    By the acts and omissions alleged herein, Defendants have discriminated against the Named Plaintiffs and the Plaintiff class in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq*., and its implementing regulations by, on the basis of disability:

   a.    excluding the Named Plaintiffs and the Plaintiff class from participation in, and denying them the benefits of, a full school day, and otherwise discriminating against them, 28 C.F.R. § 35.130(a);

   b.    denying them an educational opportunity that is equal to the opportunity afforded other children, § 35.130(b)(1)(ii);

   c.    denying them educational services that are as effective as the services provided to other children, § 35.130(b)(1)(iii);

   d.    unnecessarily providing them different or separate educational services, § 35.130(b)(1)(iv);

   e.    aiding or perpetuating discrimination against them by providing significant assistance to local school districts that discriminate against these children on the basis of disability, § 35.130(b)(1)(v);

    f.   utilizing methods of administration that have the effect of subjecting them to

discrimination on the basis of disability, have the effect of substantially impairing

accomplishment of its objectives for students with disabilities, and perpetuate the

discrimination of local school districts against these children, § 35.130(b)(3);

    g.   failing to reasonably modify their policies, practices, or procedures as needed to

avoid discrimination on the basis of disability, § 35.130(b)(7); and

    h.   failing to provide them educational services, programs, and activities in the most

integrated setting appropriate to their needs, § 35.130(d).

139.    Defendants have discriminated against the Named Plaintiffs and the Plaintiff class

on the basis of disability by failing to ensure that Oregon school districts do not unnecessarily

segregate children with disabilities from their peers by subjecting the children to shortened

school days.  *See Olmstead v. L.C*., 527 U.S. 581 (1999).

140.    The relief sought by Plaintiffs and the Plaintiff class would not require a

fundamental alteration to Defendants' programs, services, or activities.

**COUNT 3—Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

141.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this

Complaint as though fully set forth herein.

142.    Each Named Plaintiff and member of the Plaintiff class is an "otherwise qualified

individual with a disability" within the meaning of Section 504.  29 U.S.C. §§ 794, 705(20).

143.    As school-age children who live in the State of Oregon, each Named Plaintiff and

member of the Plaintiff class is qualified to participate in Defendants' educational programs and

services.  34 C.F.R. § 104.3(*l*)(2).

144.    Defendant Oregon Department of Education is a recipient of federal financial assistance subject to Section 504.  29 U.S.C. § 794(b)(2)(B).  Defendant Gill and Defendant Brown are the state officials responsible for administering and/or supervising the Oregon Department of Education's services, programs, and activities for children with disabilities.

145.    By the acts and omissions alleged herein, Defendants have discriminated against the Named Plaintiffs and the Plaintiff class in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794, and its implementing regulations by, solely on the basis of disability:

a.    excluding the Named Plaintiffs and the Plaintiff class from participation in, and denying them the benefits of, a full school day, and otherwise discriminating against them, 34 C.F.R. § 104.4(a);

b.    failing to provide them with a free appropriate public education, including special education and related aids and services that are designed to meet their needs as adequately as the needs of nondisabled children are met and that adhere to the procedural safeguards set forth in Section 504, § 104.33;

c.    denying them an educational opportunity that is equal to the opportunity afforded other children, § 104.4(b)(1)(ii);

d.    denying them educational services that are as effective as the services provided to other children, § 104.4(b)(1)(iii);

e.    unnecessarily providing them different or separate educational services, § 104.4 (b)(1)(iv);

f.    aiding or perpetuating discrimination against them by providing significant assistance to local school districts that discriminate against these children on the basis of disability, § 104.4(b)(1)(v);

g.  utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local school districts against these children, § 104.4(b)(4);

h.  failing to serve them alongside their nondisabled peers in academic and nonacademic settings to the maximum extent appropriate, § 104.34; and

i.  denying them an equal opportunity to participate in non-academic and extracurricular services and activities, § 104.37.

2.  The relief sought by Plaintiffs and the Plaintiff class would not require a fundamental alteration to Defendants' programs, services, or activities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.  Declare that Defendants have violated the Individuals with Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

C.  Permanently enjoin Defendants from subjecting the Named Plaintiffs and Plaintiff class to policies and practices that violate their rights under the Individuals with Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

D.  Order Defendants to develop, adopt, and implement policies and practices that will ensure that the State of Oregon and its school districts provide a free appropriate public education in the least restrictive environment to all eligible children in the state, including by providing children whose disabilities lead to challenging classroom behaviors with the services and supports they need to access a full school day.

E.      Order Defendants to develop, adopt, and implement policies and practices to ensure the State of Oregon and its school districts do not discriminate against students on the basis of disability, including by unnecessarily excluding children with disability-related behaviors from a full school day and thereby denying them an equal educational opportunity.

F.      Award Plaintiffs reasonable costs and attorney's fees incurred in this action; and

G.      Grant any such other relief as the Court deems just, necessary, and proper.

RESPECTFULLY SUBMITTED this 22nd day of January, 2019

Thomas Stenson (OR Bar No. 152894)
Joel Greenberg (OR Bar No. 94323)
Disability Rights Oregon
511 SW 10th Avenue, Suite 200, Portland, OR 97205-2748
(503) 243-2081
Emails: tstenson@droregon.org, jgreenberg@droregon.org

Seth M. Galanter (D.C. Bar No. 479919)*
Alice Y. Abrokwa (D.C. Bar No. 1023510)*
National Center for Youth Law
1313 L Street NW, Suite 130, Washington, DC 20005-4141
(202) 868-4786
Emails: sgalanter@youthlaw.org, aabrokwa@youthlaw.org

Selene Almazan-Altobelli (MD Bar No. 10506)*
Council of Parent Attorneys and Advocates, Inc.
8 Market Place, Suite 300, Baltimore, MD 21202-4113
(844) 426-7224 ext. 702
Email: selene@copaa.org

Ira A. Burnim (D.C. Bar No. 406154)*
Lewis Bossing (D.C. Bar No. 984609)*
Judge David L. Bazelon Center for Mental Health Law
1101 15th Street NW, Suite 1212, Washington, DC 20005-5002
(202) 467-5730
Emails: irab@bazelon.org, lewisb@bazelon.org

Peter Simshauser, Esq. (MA Bar No. 665153)*
Stacy Horth-Neubert, Esq. (CA Bar No. 214565)*
Michael Folger, Esq. (NY Bar No. 5151337)*
300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071

(213) 687-5000
Emails: peter.simshauser@probonolaw.com, stacy.horth-neubert@probonolaw.com,
michael.folger@probonolaw.com

*Pro hac vice motions forthcoming*
Attorneys for Plaintiffs