IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

J.N., et al.,                                             Case No. 6:19-cv-00096-AA
                                                         **OPINION AND ORDER**
        Plaintiffs,

    vs.

OREGON DEPARTMENT OF
EDUCATION, et al.,

    Defendants.

_____

AIKEN, District Judge:

    In this putative class action, four Oregon public school children with

disabilities and the Council of Parent Attorneys and Advocates, Inc. ("COPAA") assert

claims under the Individuals with Disabilities Education Act ("IDEA"), Title II of the

Americans with Disabilities Act ("Title II"), and Section 504 of the Rehabilitation Act

("Section 504") against the Oregon Department of Education ("ODE"), ODE Director

and Assistant Superintendent of Public Instruction Colt Gill, and Oregon Governor

and Superintendent of Public Instruction Katherine Brown. Defendants move to

dismiss for lack of standing. For the reasons discussed below, defendants' Motion (doc. 33) is DENIED.

## BACKGROUND

### I.     *Legal Framework*

Before turning to the allegations in the Complaint, the Court will provide a brief overview of the three statutory schemes at issue in this case—the IDEA, Title II, and Section 504—and the policies that Oregon has adopted to implement its duties under those statutes.

#### A.     *IDEA*

The federal Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. § 1400 *et seq.*, establishes a comprehensive regulatory framework to meet the educational needs of children with disabilities. The IDEA was passed in 1975 in response to Congress' perception that a majority of the approximately 8 million American children with disabilities "were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 179 (1982) (alterations normalized*); see also* 20 U.S.C. § 1400(c)(2). The IDEA is designed to "ensure that all children with disabilities have available to them a free appropriate education" and "that the rights of children with disabilities and parents of such children are protected[.]" 20 U.S.C. § 1400(d)(1)(A)–(B).

To obtain funding under the IDEA, a State must implement policies and procedures to ensure a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") "to all children with disabilities residing in the State between the ages of 3 and 21, inclusive[.]" 20 U.S.C. § 1412(a)(1)(A) & (a)(5). A FAPE consists of "special education"—instruction specially designed to meet the unique needs of a child with disability—and "related services"—developmental, corrective, and other support services as may be required to assist a child to benefit from that instruction. 20 U.S.C. § 1401(9), (29), (26); *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, __ U.S. __, 137 S. Ct. 988, 993–94 (2017). A least restrictive environment is to the maximum extent appropriate, a general education in a regular classroom environment. 20 U.S.C. § 1412(a)(5). "[R]emoval . . . occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

A State receiving funding under the IDEA must formulate an individualized education program, or IEP, for each eligible child. 20 U.S.C. § 1412(a)(4). The IEP sets out a written comprehensive plan to achieve that child's unique academic and functional goals and includes "the special education and related services to be provided so that [the child] can advance appropriately toward those goals." *Fry v. Napoleon Cmty. Schs.*, __ U.S. __, 137 S. Ct. 743, 749 (2017); 20 U.S.C. § 1414(d) (defining IEP); C.F.R. § 300.320. The IEP thus serves as the "primary vehicle" for ensuring each child a FAPE in the least restrictive environment. *Fry*, 137 S. Ct. at

749.  The IEP is developed by a child's IEP Team,[1] which then reviews and revises the IEP to ensure compliance with a detailed set of procedures. 20 U.S.C. § 1412(a)(4); 34 C.F.R. § 300.320—300.328.  Further, the standard for determining whether a child receives a FAPE is whether the educational program offered to the child via the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"—a "standard [that] is markedly more demanding" than *de minimis* progress.  *Endrew F.*, 137 S. Ct. at 1000—01 ("When all is said and done, a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all.") (internal quotation marks omitted).

The IDEA anticipates that a child's disability-related behaviors may challenge a State's ability to provide a FAPE. 20 U.S.C. § 1400(c)(5).  Thus, a State, through its local educational agency ("LEA")—typically a school district—must conduct a functional behavioral assessment for any child who displays challenging behaviors due to a disability and, as appropriate, for any child removed from school for more than ten school days. 20 U.S.C. § 1415(k)(1)(D)(ii), (F).  Further, a school may not remove a child from a regular education environment unless "the nature or severity of the [child's] disability . . . is such that education in regular classes with the use of

---

[1]  The IEP team includes the child's parents or guardians, special education teachers, and a qualified local educational agency ("LEA"), usually school district, representative.  20 U.S.C. § 1414(d)(1)(B).  In developing the IEP, the team must consider a child's strengths; the parents' concerns "for enhancing the education of their child"; the child's intial or most recent evaluation; and the child's academic, developmental, and functional needs.  20 U.S.C. § 1414(d)(3)(A).  If the child has behaviors that impede that child's or other students' learning, the IEP team must consider "the use of positive behavioral interventions and supports, and other strategies to address that behavior" and the need for communicative assistive devices and services, among other things.  20 U.S.C. § 1414(d)(3)(B).

supplementary aids and services cannot be achieved satisfactorily."
20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114.

The IDEA accords two distinct procedural safeguards to parents and students to challenge a student's placement or the formulation or implementation of an IEP: (1) an impartial due process hearing before a hearing officer that can be appealed to the state education agency and then to a court 20 U.S.C. § 1415(b)(6), (i)(2)(a); and (2) a state complaint resolution process before the state education agency, that can also be appealed in a civil action, 20 U.S.C. § 1415(f), (i)(2)(a). If a parent or other person challenges a child's program, that child must "stay put" in his or her "current educational placement" unless that child's parent requests otherwise. 34 C.F.R. § 300.518(a). This guarantee is termed the "stay put" provision. *See Olu-Cole v. E.L. Haynes Public Charter Sch.*, 930 F.3d 519, 524 (D.C. Cir. 2019) ("The purpose of the stay-put command is to strip schools of the *unilateral* authority they traditionally employed to exclude disabled students from school.") (quoting *Honig v. Doe*, 484 U.S. 305, 323 (1988)) (alterations normalized) (emphasis in *Olu-Cole*).

Oregon accepts federal funding for special education under the IDEA. Thus, Oregon's state education agency, ODE, must ensure that the LEA's are providing a FAPE to all eligible students. ODE must monitor the LEAs' performance, enforce the IDEA's requirements, and obtain and provide technical assistance. 20 U.S.C. § 1416(a)(1) & (3), (e)(1). Accordingly, Oregon has enacted statutes and regulations to comply with those requirements. *See* ORS Title 30, Ch. 343 (Special

Education and Other Specialized Education Services); OAR Ch. 581 Div. 15 (Special Education).

Under Oregon's IDEA framework, each LEA is responsible for evaluating and determining the eligibility for all children in the district. OAR 581-015-2105. The LEA must then provide those children a FAPE in the least restrictive environment.[2] OAR 581-015-2040; OAR 581-015-2240. Further, LEAs must provide parents an opportunity to participate in IEP development, annual IEP review, and any IEP modification meetings. OAR 581-015-2190; OAR 581-015-2195. LEAs must provide prior written notice to parents before making IEP changes that affect a child's placement. OAR 581-015-2310.

Oregon has adopted procedures for the two administrative review processes required by federal law: a due process hearing before an Administrative Law Judge of the Oregon Office of Administrative Hearings, OAR 581-015-2340, OAR 581-015-2365; and the "state complaint process" conducted by ODE, OAR 581-015-2030.

### B.    *Title II of the ADA and Section 504*

Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, are federal anti-discrimination laws. Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

[2]    OAR 581-015-2240, modeled after 20 U.S.C. § 1412(a)(5)(A), provides that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who do not have a disability and [s]pecial classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "A regulation implementing Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid . . . discrimination[]" on the basis of disability. *Fry*, 137 S. Ct. at 749; 28 C.F.R. § 35.130(b)(7). Under Section 504, no person with disabilities "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Courts have interpreted Section 504 to require "reasonable modifications to existing practices to accommodate persons with disabilities." *Fry*, 137 S. Ct. at 749 (citing *Alexander v. Choate*, 469 U.S. 287, 299–300 (1985)) (internal quotation marks omitted).

In the context of public education, Title II and Section 504 forbid the denial of meaningful access to public education.[3] *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (stating elements of a claim under Title II or Section 504 and applying to public education). Title II and Section 504 thus guarantee equal access to public education; the IDEA guarantees individually-tailored education services and educational benefit from those services. *See Endrew F.*, 137 S. Ct. at 1000 (holding that a FAPE under the IDEA must confer an "educational benefit that is . . . more than *de minimis*").

---

[3] Although Title II and Section 504 differ in several respects, *see K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013), those differences are not material to this motion to dismiss, so plaintiffs' Title II and Section 504 claims will be addressed together.

Under Section 504, a State must provide a FAPE to all school children with disabilities, often implemented through an individualized Section 504 plan. 34 C.F.R. § 104.33(a); *see also Mark H. v. Lemahieu*, 513 F. 3d 922, 933 (9th Cir. 2008). A FAPE under Section 504 consists of special education and related aids and services designed to meet the needs of children with disabilities as adequately as the needs of nondisabled children. *See* 34 C.F.R. § 104.33(a), (b)(1). Thus, although a Section 504 FAPE is similar to an IDEA FAPE, the 504 FAPE "require[s] a comparison between the manner in which the needs of disabled and non-disabled children are met[.]" *Mark H.*, 513 F.3d at 933. But "adopting a valid IEP under the IDEA is sufficient to provide a FAPE under Section 504." *McKnight v. Lyon Cty. Sch. Dist.*, 812 Fed. App'x 455, 456 (9th Cir. 2020) (citing *Mark H.,* 513 F. 3d at 933); *see also* 34 C.F.R. § 104.33(b)(2).[4]

## II.      *Factual and Procedural Background*

Plaintiffs E.O., J.V., B.M., J.N., and COPAA bring this action on behalf of themselves and similarly-situated Oregon students who are eligible under the IDEA, Title II, and Section 504 for special education and related services and "are currently being subjected to a shortened school day or are at substantial risk of being subjected to a shortened school day due to their disability-related behaviors." Compl. ¶ 31 (doc.1).

---

[4] For the purpose of this motion, the Court will address the IDEA, Title II, and Section 504 claims together because, as discussed below, plaintiffs allege a systemic failure of policies and procedures that result in unnecessarily shortened school day schedules for children with disabilities— an alleged violation of all three statutes. *See, e.g.*, *Christopher S. ex rel. Rita S. v. Stanislaus Cty. Office of Educ.*, 384 F.3d 1205, 1208–09, 1212 (9th Cir. 2004) (holding that a policy of shortened school days for autistic students violates the IDEA, Title II, and Section 504).

### A. *Individual Named Plaintiffs*

The four named plaintiffs are Oregon public school students with disabilities who live in small rural districts and are eligible for special education and related services under the IDEA, Title II, and Section 504.  Compl. ¶¶ 55, 67, 79, 91.  They allege that their districts have shortened their school days due to their disability-related behaviors without first providing the supports and services that would enable them to attend a full school day.  Compl. ¶¶ 55, 74, 83, 95.  Although three of the four named plaintiffs do not presently suffer shortened school days, they have suffered shortened school days in the past and they assert that they face a significant risk of being subjected to an unlawfully shortened school day in the future.  They allege that their respective districts delayed, often times for years, the functional behavioral assessments that are required for students to receive the supports to address their disability-related behaviors and that instead of providing those supports, their districts shortened their school days—against the wishes of parents and sometimes without proper IEP documentation.  They also allege that they repeatedly engaged their districts to obtain those supports only to have them withdrawn even after they were shown to be effective.  In some cases, districts re-instituted supports but only after protracted challenges from parents and advocates.

E.O., diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder, now in the fourth grade, currently has a school day shortened by thirty minutes.  E.O.'s disability-related behaviors were evident in his first-grade year, but a functional behavioral assessment was not done until his third-grade

year—after he had missed a significant amount of school because he had been suspended or sent home from school because of his behaviors. By that time, his school day had been reduced to a half-day, which the district failed to document in his IEP. After an attorney intervened, the district increased E.O.'s school day to its present length. But the district has still not provided him additional supports to ensure he is successful during his longer school day, and he fears his school day will be reduced even more in the future.

J.N., diagnosed with hearing impairment, anxiety, hyperactivity, and developmental delay, had his school day reduced to a single hour within the first three weeks of first grade. He was then denied behavioral supports and communication technology support related to his hearing impairment for over a year. After J.N.'s mother filed an administrative complaint and after J.N. was started on medication, the district agreed to increase his school day, but the district has yet to provide the behavioral supports J.N. needs to succeed at a full day. Further, J.N.'s medication causes him to fall asleep during school, and his teachers and school staff do not wake him.

J.V., diagnosed with autism, began receiving IDEA-required special education and related services before kindergarten. But on the first day of kindergarten, J.V.'s district reduced him to a two-hour school day due to disability-related behaviors without conducting a functional behavioral assessment to see if additional supports could help. Instead, the district recommended residential placement. J.V.'s mother obtained legal counsel that persuaded the district to provide supports including

communication technology, which proved to be effective, but the district later withdrew them.  J.V.'s mother then filed an administrative complaint.  In response, the district provided J.V. a communication device, consultation with a behavioral expert, and a full school day.  J.V., now a second-grader, fears that those supports will be again be withdrawn  and his school day will again be shortened.

B.M., diagnosed with autism spectrum disorder and epilepsy, repeatedly petitioned his district for an autism or behavioral specialist and a communication device that his IEP team determined he "urgently needed."  Compl. ¶ 97.  Because the district would not provide those supports and instead cut his school day to 30 minutes and because B.M.'s communication skills and behaviors severely deteriorated, he retained an attorney.  That attorney and the district's special education director wrote to ODE explaining that the district lacked the expertise and resources to meet B.M.'s and similar students' behavioral needs.  ODE failed to assist B.M.'s district and, in response to B.M.'s administrative complaint, disavowed prior substantial knowledge of and any responsibility for B.M.'s situation.  Even though B.M. prevailed at the administrative hearing, his district allowed him to attend school only once, provided him a handful of home tutoring sessions, and removed him from the school's roster for failure to attend.  As a result, B.M. was placed in a residential facility in another school district.  The State no longer monitors B.M.'s situation to determine whether he receives a FAPE.

### B.     COPAA

COPAA is a national non-profit consisting of parents of and advocates for children with disabilities. COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families. One of COPAA's primary goals is to secure appropriate educational services for children with disabilities in accordance with federal laws. Members of COPAA include the parents of, attorneys for, and advocates for the named plaintiffs and the proposed plaintiff class.

### C.     Defendants

Defendants include ODE, the state educational agency ("SEA") for Oregon; Colt Gill, Director of ODE and Deputy Superintendent of Public Instruction for Oregon; and Katherine Brown, Governor of Oregon and Superintendent of Public Instruction for Oregon.[5]

As SEA for Oregon, ODE has primary responsibility under the IDEA for the supervision of public elementary and secondary schools in Oregon and the provision of a FAPE in the least restrictive environment. ODE is also a public entity covered by Title II and a recipient of federal financial assistance subject to Section 504.

In their roles as Superintendent of Public Instruction and as Deputy Superintendent of Public Instruction and ODE Director, respectively, defendants Brown and Gill are responsible for supervising and directing ODE's services, programs, and activities; supervising all special education programs administered by

---

[5] In this opinion, defendants will generally be referred to collectively, and ODE will be identified by name where appropriate, for example, when discussing actions taken by the agency or its employees.

other state agencies; and coordinating with other public agencies as needed to ensure that eligible students receive the services required by the IDEA. OR. CONST. Art. VIII, § 1; ORS 326.300; ORS 326.310; ORS 343.041; 20 U.S.C. § 1412(a)(12)(A).

## STANDARDS

When a court lacks subject matter jurisdiction, the action must be dismissed. Fed. R. Civ. P. 12(b)(1). A challenge to standing is appropriately raised under Rule 12(b)(1). *Chandler v. State Farm Mutual Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Plaintiffs, as the party seeking to invoke subject matter jurisdiction of the Court, have the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). A facial attack disputes whether the allegations contained in a complaint are sufficient to invoke federal jurisdiction. *Id*. By contrast, a factual attack disputes the truth of those allegations. *Id*.

## DISCUSSION

Plaintiffs bring claims under the IDEA, Title II of the ADA, and Section 504 of the Rehabilitation Act alleging a systemic failure of policies and procedures that deny them a FAPE and that result in discrimination. Specifically, plaintiffs allege that the state of Oregon has known for years that many Oregon public schools have "unnecessarily and unlawfully shortened the school day" for children with disability-related behaviors. Compl. ¶¶ 1, 105–111. Plaintiffs allege that the State has an affirmative statutory duty to monitor and assist the school districts and enforce the

IDEA, Title II, and Section 504 provisions, and that the State has failed to fulfill its statutory duty under these statutes due to several systemic deficiencies. Plaintiffs further allege that these deficiencies have resulted in a FAPE denial and discrimination to the named plaintiffs and others like them. They seek declaratory and injunctive relief.

Defendants challenge plaintiffs' standing to sue. "The purpose of the standing doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will ultimately prevail against the defendant." *Hall v. Norton*, 266 F.3d 969, 976–77 (9th Cir. 2001).

To demonstrate standing, a plaintiff must show: (1) an injury in fact that is concrete and particularized, and actual or imminent; (2) fairly traceable to the challenged conduct of the defendant; and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1547–48 (2016) (citing *Lujan,* 504 U.S. at 560–61). Each prong must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Id*. When, as here, defendants make a facial challenge to standing, the Court must accept plaintiffs' allegations as true and determine whether they sufficiently allege an injury resulting from defendants' conduct. *Id*.

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Service, Inc*., 511 F.3d 974, 985 (9th Cir. 2007).

### A. _Individual Named Plaintiffs_

Defendants argue that: (1) although E.O.'s school day is currently shortened, he suffers no actual injury; (2) the other named plaintiffs suffer no imminent harm because state and federal laws provide procedural safeguards against unlawfully shortened school days; (3) the alleged injuries are not "fairly traceable" to defendants' actions nor are they likely to be redressed by defendants because the harm depends on the independent actions of school districts and parents, and the complaint itself demonstrates that the state's existing procedures are effective; and (4) plaintiff's requested relief is too broad and too vague.

### 1. _Injury_

The denial of a FAPE and disability-based discrimination are injuries to a student sufficient to satisfy the first prong of the standing inquiry. _See e.g._, _Brooke M. ex rel. Stacey M. v. Alaska Dep't of Educ. & Early Dev._, 293 Fed. App'x 452, 454 (9th Cir. 2008) (finding standing for a plaintiff who alleged that defendant's "conduct deprived her of the free appropriate public education that IDEA guarantees"); _Rivera v. Fremont Union High Sch. Dist._, No. 5:12-cv-05714-EJD, 2013 WL 4674831, at * 2 (N.D. Cal. Aug. 30, 2013) (holding that a plaintiff's allegation of FAPE denial "would likely constitute the requisite injury" sufficient to confer standing); _Paul G. v. Monterey Peninsula Unified Sch. Dist._, 256 F. Supp. 3d. 1064, 1071 (N.D. Cal. 2017) (holding that a plaintiff's allegation of FAPE denial was sufficient to establish standing in facial challenge).

Here, plaintiffs' allegations that they suffer an unlawfully shortened school day, thus loss of instructional time, constitutes a denial of a FAPE. *See* 20 U.S.C. § 1412(a)(5)(A) and OAR 581-015-2240 (providing that a FAPE in the least restrictive environment requires that "[s]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily"). Although a shortened school day is not a per se violation of the IDEA, plaintiffs allege that their shortened school day programs were "inappropriate" and "unnecessary" because their districts shortened school days without satisfying the IDEA's procedural requirements. Specifically, plaintiffs allege that the districts failed to first consider and provide supplementary aids and services that could enable the students to attend a full day, Compl. ¶ 50, 59, 76, 77, 86, 97, and that, in some cases, the districts failed to adequately document the shortened school days in students' IEPs and 504 plans, *id*. ¶¶ 48, 74.

Plaintiffs further allege that, as a result, they have been unable to access an education and have fallen behind "academically and behaviorally." *Id.* ¶ 52. E.O. "has academic needs that are not being met," and he "[has] experienced gaps in his learning." *Id.* ¶¶ 73, 75. He has become socially isolated and has lost his school friends because he was deprived of developing self-regulation skills. *Id.* ¶ 78. J.N.'s academic and behavioral progress was impaired, *id.* ¶ 64, he was "emotionally devastated" from being excluded ("that's [the school] where they hurt me"), *id.*, and

was transferred to a new school where he now sleeps through his classes undisturbed by teachers and "has . . . missed hours of instruction daily even while physically present at school[,]" *id*. ¶¶ 65, 66. J.V. who, in the first grade, was placed on a two-hour day and in a completely isolated 8' x 16' workspace, "regressed in his verbal and social communication skills" and his autistic behaviors worsened. *Id*. ¶¶ 84–86. And, like B.M., who was institutionalized, "some students fall so far behind academically and behaviorally . . . that their districts eventually choose to deny them . . . any education at all." *Id*. ¶ 52.

Accordingly, plaintiffs have alleged they have been denied a FAPE because of procedural inadequacies that resulted in the loss of educational opportunities and the deprivation of educational benefits. *L.M. v Capistrano Unified Sch. Dist*., 556 F.3d 900, 909 (9th Cir. 2009) ("Procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a FAPE[]" under the IDEA); *N. B. v. Hellgate Elem. Sch. Dist., ex rel. Bd. of Directors, Missoula Cty., Mont.*, 541 F.3d 1202, 1207–08 (9th Cir. 2008) (holding that "procedural inadequacies that result in the loss of educational opportunity . . . or that cause[] a deprivation of educational benefits[]" constitute denial of a FAPE under the IDEA).

Defendants argue that E.O.'s currently shortened school day is not an "actual" injury because E.O. has not challenged his current IEP through ODE's administrative remedies. At oral argument, defendants clarified that they are not arguing that E.O.'s claims should be dismissed because he failed to exhaust his administrative remedies, but instead reason that E.O. has not plausibly alleged

injury because, if he were to file a complaint with ODE, he might obtain relief through the administrative process. The Court disagrees. E.O. has adequately alleged denial of a FAPE because he has been deprived of educational benefit due to the loss of instructional time. That E.O. could obtain relief for an injury through some other avenue does not render that injury speculative or implausible. *See Paul G.*, 256 F. Supp. 3d at 1071 (holding that an administrative "finding [of a FAPE denial] is not necessary to plausibly allege injury for the purpose of standing").

Defendants also argue that J.N., J.V., and B.M.'s allegations of future harm are speculative because state and federal laws provide safeguards against the imposition of unlawfully shortened school days.

Defendants contend that J.N., J.V., and B.M.'s allegations of a future FAPE denial are speculative because Oregon's recently-enacted Abbreviated School Day statute, ORS 343.161, prohibits a school district from shortening a student's school day unless that student's IEP team determines that a shortened school day is appropriate based on the student's needs and has "considered at least one option that included appropriate supports for the student and that could enable the student to access" a full-length school day. ORS 343.161(3)(a).

But plaintiffs allege they were placed on shortened school-day schedules and, thus denied a FAPE, even after the Abbreviated School Day statute went into effect on July 1, 2017. In December 2017, E.O. was placed on a half-day schedule, which his district failed to document in his IEP. Compl. ¶ 74. J.N.'s district reduced his school day to one hour in September 2017, *id*. ¶ 59, and increased his school day to

just over two hours in January 2018 without implementing supports, *id.* ¶¶ 60, 61. J.V.'s district lengthened his school day from two to three hours (still denying him a full day) in September 2017 and withdrew the supports that he had used successfully the year before. *Id.* ¶ 88. B.M.'s district allowed him to attend school only one day of the 2018–19 school year, removed him from the roster, and failed to replace the home-tutor when she quit. *Id.* ¶ 103. It does not appear that the Abbreviated School Day statute has stopped school districts from unnecessarily shortening students' school days.

Defendants also contend that the allegations of future FAPE denial are speculative because the IDEA's "stay-put" provision prohibits a district from changing a child's "current educational placement" during administrative or judicial review of a new IEP. *See* 20 U.S.C. § 1415(j). But plaintiffs allege that this provision has perpetuated the harm caused by a district's FAPE denial. Each student alleges that he was effectively "stayed put" in unnecessarily shortened school schedules, separated from peers, and sometimes isolated while waiting for delayed behavioral assessments or while their parents' administrative complaints were pending.

E.O. remained on a half-day schedule against his mother's wishes and without IEP documentation until an attorney intervened, after which the district lengthened his day. *Id.* ¶¶ 73–74, 76. J.N. remained on a one-hour school day against his mother's wishes and without behavioral assessment or plan for five months, *id.* ¶ 59–61, then a two-hour day for months until his mother filed a complaint, *id.* ¶ 62, and now, although attending all day with medication, has yet to receive supports. *Id.* ¶

66. J.V. remained on a two-hour school day against his mother's wishes and without behavioral assessment or supports, *id.* ¶ 83, then sent home with infrequent tutoring sessions while the district evaluated a residential placement for him. *Id.* ¶ 86. J.V. stayed home until his mother retained an attorney. *Id.* ¶ 87. B.M. remained on a thirty-minute school day without the supports he needed, *id.* ¶ 95, then sent home, *id.* ¶¶ 97–99, where he stayed until his mother prevailed in the administrative review process. *Id.* ¶ 102–103. It appears that the stay-put provision has not protected plaintiffs from being placed on unnecessarily shortened school day schedules and instead has the potential to lock students into unnecessarily shortened school day schedules while parents and advocates seek recourse.

The Court concludes that E.O. sufficiently alleges that he suffers an actual injury and that J.N., J.V., and B.M., who have yet to receive the supports they need to succeed at full-day school and whose previously non-compliant districts are not being monitored, are at risk of imminent future harm from again suffering unnecessarily shortened school days.

### 2. *Causation*

To establish causation, the second prong of standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (alterations normalized). "The line of causation between the defendant's action and the plaintiff's harm must be more than attenuated." *Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013) (internal quotation marks omitted).

But a "causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Id.* at 1141–42 (internal quotation marks omitted).

Plaintiffs allege that they have been denied educational instruction and needed supports and that they are inappropriately excluded from the classroom because defendants do not adequately supervise and monitor school districts or enforce the IDEA, Title II, and Section 504.

Defendants argue that the causal chain is too attenuated because plaintiffs' injuries turn on the independent actions of the districts and the parents. Defendants assert that, before a student can be placed on a shortened school day, a district must violate state and federal law and a student's parent must fail to invoke the existing administrative remedies.

A defendant need not be the "sole source" of harm, nor must a plaintiff "eliminate any other contributing causes to establish its standing." *Barnum Timber Co. v. Envtl. Prot. Agency*, 633 F.3d 894, 901 (9th Cir. 2011). Traceability is satisfied when a plaintiff's standing theory of causation "relies . . . on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, ___U.S.___, 139 S. Ct. 2552, 2566 (2019); *see also Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003) (holding that harm to mentally-incapacitated criminal defendants held in county jails was fairly traceable to the failure of the State's mental hospital to timely accept them for treatment). Here, plaintiffs assert that the IDEA imposes an affirmative statutory duty on the State to monitor and assist the districts

and enforce the provision of a FAPE and that their injuries are fairly traceable to the State's failure to do so. Compl. ¶¶ 41, 47, 112–29.

Specifically, plaintiffs allege that the State (1) lacks policies and procedures to require the districts to systematically collect and report data on students with shortened school days, Compl. ¶¶ 115–17; (2) lacks policies and procedures to systematically monitor school districts' compliance with federal and state statutes instead of relying solely on haphazard administrative complaints to identify noncompliant districts and correct violations, *id.* ¶¶ 119–122; and (3) fails to provide the districts "adequate resources, technical assistance, and training to prevent the unnecessary use of shortened school days[,]" *id.* ¶ 123. Plaintiffs further allege that "the State's education funding formula rewards school districts that impose shortened school days by paying them the same amount for providing a student with one of hour of tutoring as it would if that student had received a full day of instruction in school." *Id.* ¶ 53. In sum, plaintiffs argue that the districts' failure to provide a FAPE are a "predictable effect" of Government action, in this case the State's failure to develop and implement effective policies to hold the districts accountable and to provide badly-needed assistance. *See Dept. of Commerce*, 139 S. Ct. at 2566. Plaintiffs also assert that the State cannot simply point to administrative remedies when those remedies have proved inadequate to stop districts from denying FAPE by imposing unlawfully shortened school days.[6]

---

[6] Defendants argue that the Complaint demonstrates that "existing [state administrative review] policies are effective" to prevent IDEA violations by school districts because plaintiffs allege that they "obtained relief from inappropriate use of an abbreviated school day program after filing administrative complaints with ODE." Def.'s Mot. to Dismiss 14 (doc. 33). The Court disagrees. That

The Court agrees. The IDEA expressly provides that the State of Oregon, in exchange for receiving federal funding, is responsible for ensuring that all qualified children with disabilities receive a FAPE. 20 U.S.C. § 1412. The IDEA's monitoring, enforcement, and assistance provisions contemplate that a State has control or should have control over the districts. *See* 20 U.S.C. § 1416(a)(1) & (3) (requiring States to monitor and enforce implementation of the IDEA and to use quantitative and qualitative indicators to ensure that LEAs provide a FAPE in the least restrictive environment); 20 U.S.C. § 1416(e)(1) (requiring States to work with "technical assistance providers" and to identify and implement professional development, instructional strategies, and methods of instruction that are scientifically-based to ensure that a FAPE is provided); *see also Cordero v. Penn. Dep't of Educ.*, 795 F. Supp. 1352, 1362 (M.D. Pa. 1992) (explaining that a State's duty under the IDEA "amounts to more than creating and publishing some procedures and then waiting for the phone to ring[]"). Thus, although school districts formulate and implement IEPs, the State has an affirmative statutory duty to monitor, investigate, and enforce the IDEA requirements and to assist the districts to ensure that they comply with

---

ODE has recognized during administrative review that districts have inappropriately used shortened school days and, therefore, violated the IDEA does not mean that those review procedures are effective to prevent IDEA violations. Indeed, plaintiffs' allegations, Compl. ¶¶ 62–66, 89–90, 102–04, that they experienced unnecessarily shortened school days and were denied needed supports and services before and after administrative review, when accepted as true, leads to the conclusion that the existing review procedures are not effective to prevent IDEA violations by school districts. Moreover, plaintiffs' allegations suggest that, even when ODE recognized a violation and ordered a school district to comply with the IDEA, plaintiffs' injuries were not always remedied. J.N. prevailed in his complaint and even though he attends a full day, has been placed in a separate classroom for students with behavioral needs and has yet to receive any support other than medication, which often causes him to sleep through school. *Id.* ¶ 65. B.M. prevailed in his administrative complaint, yet, his school only allowed him to attend one day, removed him from the roster, failed to sustain his home-tutoring, and discharged him to a residential facility. *Id.* ¶¶ 103–104.

state and federal law. The Court concludes that the plaintiffs sufficiently allege that their harm is fairly traceable to the State's failure to fulfill its statutory duty to ensure that the school districts provide plaintiffs a FAPE.

### 3. *Redressability*

The final standing prong is redressability. "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable judicial decision." *Bellon*, 732 F.3d at 1146. A plaintiff "need not show that a favorable decision will relieve his *every* injury." *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 525 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982)) (internal quotation marks omitted) (emphasis in original). A slowing or reduction in harm may satisfy redressability. *Id.* at 525–26. "Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop." *Id.* at 524.

Plaintiffs seek both declaratory and injunctive relief. They ask the Court to declare the State in violation of state and federal law because it has failed to ensure plaintiffs a FAPE. Plaintiffs also ask the Court to enjoin the State from subjecting plaintiffs to policies and practices that violate their rights under the statutes and to order the State to "develop, adopt, and implement policies and practices" that will

ensure that the districts provide to all eligible children a FAPE in the least restrictive environment. Compl. at p. 48.

Under the IDEA, courts are authorized to fashion the relief that is appropriate, based on the facts in each case. 20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3). This may include injunctive, declaratory, or other relief. *Id.*; *see, e.g.*, *Emma C. v. Eastin*, 673 Fed. App'x 637, 639–40 (9th Cir. 2016) (affirming the district court's jurisdiction under a Consent Decree to order California to develop and implement a statewide plan to satisfy the IDEA's monitoring requirements); *D.L. v. District of Columbia*, 860 F.3d 713, 719 (D.C. Cir. 2017) (upholding, in an IDEA class action, the district court's "programmatic" injunction requiring the District of Columbia to "set compliance benchmarks" and show "annual improvement in the numbers of children identified as needing, evaluated for, and offered special education and related services[]"); *Corey H. v. Bd. of Educ. Of City of Chicago*, 995 F. Supp. 900, 918 (N.D. Ill. 1998) (requiring Illinois, in an IDEA class action, to submit a comprehensive plan for monitoring school districts' compliance with the IDEA's least restrictive environment requirements); *Morgan Hill Concerned Parents Assoc. v. California Dept. of Educ.*, No. 2:11-cv-3471-KJM-AC, 2013 WL 1326301 at *8 (E.D. Cal. Mar. 29, 2013) ("[T]he injury is redressable because the abdication of [California's duty to monitor district compliance under the IDEA] is alleged to be ongoing, and the injunctive relief requested could cause those children currently denied FAPE to be provided FAPE in the future."). Thus, it is within the Court's power to shape relief

to address the particular ongoing systemic deficiencies that plaintiffs allege is the cause of the harm they suffer.

Defendants argue that redressability is not sufficiently alleged because, here, redress turns on the actions or inactions of independent third parties (the districts and the parents) who are not before the Court. As discussed above, regardless of the actions of the districts and the parents, the State is ultimately responsible for ensuring that all children with disabilities receive a FAPE.

Defendants also argue that the requested relief is too broad because it would affect all Oregon children with disabilities, not just plaintiffs, and is too vague because plaintiffs have not identified particular defective policies. The Court disagrees. Plaintiffs challenge a statewide failure to effectively implement the IDEA, Title II, and Section 504, which necessarily affects all Oregon children with disabilities. The ultimate scope of the remedy involves determinations that can only be made after all parties have presented their evidence at trial.

In sum, the individual named plaintiffs sufficiently allege all three standing prongs: injury in fact, traceability, and redressability.

### B. COPAA's Associational Standing

An association has standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," (3) and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v Laidlaw Envtl. Servs. (TOC),*

*Inc.,* 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Defendants do not dispute that plaintiffs have alleged the second and third requirements for associational standing. This Court finds that the interests at stake are germane to COPAA's mission to secure appropriate educational services for children with disabilities and that the requested equitable relief does not require individual members' participation in this suit.

Instead, defendants argue that the Complaint does not demonstrate that COPAA's members would have standing to sue in their own right because the Complaint fails to identify at least one COPAA member who "ha[s] suffered or will suffer harm." Def.'s Mot. to Dismiss 12 (doc. 33) (quoting *Assoc. Gen. Contractors of America v. Dept. of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (alterations normalized). And, although defendants do not dispute that denial of FAPE to a child is also harm to the child's parent, they argue that "the complaint does not allege that any COPAA member is a parent of a child who has been denied FAPE." Def.'s Reply to Mot. to Dismiss 11 (doc. 47).

The Ninth Circuit does not require an association to name a specific member in its complaint "[w]here it is relatively clear . . . that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury[.]" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). Plaintiffs allege that "COPAA's members include parents, attorneys, and advocates of the Named Plaintiffs and members of

the Plaintiff class." Compl. ¶ 131. Under the IDEA, denial of a FAPE to a child is also an injury to a parent. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 531 (2007); *see also Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) (holding that a mother is "a proper plaintiff [under Title II and Section 504], at least insofar as she is asserting and enforcing the rights of her son and incurring expenses for his benefit[]"). Because the named plaintiffs allege that they are either currently being denied a FAPE or at substantial risk of being denied one and because parents of those plaintiffs are among COPAA's members, it is relatively clear that one or more COPAA members has suffered or will suffer harm from the alleged failure of the State to enforce the IDEA, Title II, and Section 504. Thus, COPAA sufficiently alleges standing.

## CONCLUSION

For the reasons stated above, the Court concludes that plaintiffs have plausibly alleged standing. Accordingly, defendants' Motion to Dismiss (doc. 33) is DENIED.

IT IS SO ORDERED.

Dated this  1st  day of September 2020.


_____/s/Ann Aiken_____
Ann Aiken
United States District Judge