*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Thomas Stenson (OR No. 152894)
tstenson@droregon.org
Joel Greenberg (OR No. 943233)
jgreenberg@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR 97205-2748
(503) 243-2081

Hannah Benton Eidsath (CT No. 428982)*
hbenton@youthlaw.org
Seth Packrone (NY Reg. No. 5395769)*
spackrone@youthlaw.org
Nina Monfredo (NY No. 5717624)*
nmonfredo@youthlaw.org
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
(202) 868-4781

Selene Almazan-Altobelli (MD No. 10506)*
selene@copaa.org
Council of Parent Attorneys and Advocates
8 Market Place, Suite 300
Baltimore, MD 21285
(844) 426-7224 ext. 702

Ira A. Burnim (D.C. No. 406154)*
irab@bazelon.org
Lewis Bossing (D.C. No. 984609)*
lewisb@bazelon.org
Bazelon Center for Mental Health Law
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005-4900
(202) 467-5730

Michael Folger (NY No. 5151337)*
michael.folger@probonolaw.com
1 Manhattan West
New York, NY 10001
(212) 735-3000

*Admitted pro hac vice

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON
# EUGENE DIVISION

| | |
|---|---|
| J.N., et al., | Case No. 6:19-CV-00096-AA |
| Plaintiffs, | |
| v. | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| OREGON DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

## TABLE OF CONTENTS

CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1 ............................................1

MOTION ..................................................................................................................................1

MEMORANDUM OF LAW ....................................................................................................1

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND FACTS ..............................................................................................3

        A.      Oregon Students on Shortened School Days ...........................................................4

        B.      ODE has long refused to address known and extensive misuse of SSDs. ..............7

III.    LEGAL BACKGROUND ............................................................................................11

        A.      STANDARD OF REVIEW .....................................................................................11

        B.      STANDING ............................................................................................................12

        C.      THE GOVERNING FEDERAL STATUTES .........................................................13

                1.      The Individuals With Disabilities Education Act ......................................13

                2.      The Americans With Disabilities Act and Section 504 of the
                        Rehabilitation Act of 1973 ........................................................................15

        D.      PRELIMINARY LEGAL DISCUSSION ..............................................................17

                1.      There are no genuine issues of material fact...............................................17

                2.      Plaintiffs have Demonstrated Standing .....................................................17

IV.     ARGUMENT ..............................................................................................................19

        A.      ODE SYSTEMATICALLY FAILS ITS RESPONSIBILITIES UNDER
                THE IDEA..............................................................................................................20

                1.      Oregon Has Failed and Continues to Fail to Monitor the Misuse of
                        SSDs ..........................................................................................................20

                2.      ODE Has Failed and Continues to Refuse to Correct District
                        Noncompliance With Law. .........................................................................25

                3.      ODE Has Abdicated Its Duty to Provide Training and Technical
                        Assistance to School District Staff on SSD ..............................................28

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

    4.    Oregon Education Funding Mechanisms Illegally Promote SSDs. ..........31

B.    OREGON STUDENTS ARE DENIED FAPE IN THE LRE UNDER THE IDEA DUE TO ODE'S FAILURES.....................................................................32

    1.    Oregon Students Placed on SSD Are Denied an Appropriate Education. .............................................................................................33

    2.    Oregon Students Placed on SSDs Are Denied an Education in the Least Restrictive Environment................................................................36

C.    OREGON ENCOURAGES AND ALLOWS DISCRIMINATION IN STATE-FUNDED EDUCATIONAL PROGRAMS IN VIOLATION OF SECTION 504 AND THE ADA ...........................................................................38

    1.    Oregon's SSD Practices Deny Students With Disabilities an Educational Program Designed to Meet Their Needs as Adequately as Those of Students Without Disabilities. ...............................................38

    2.    Oregon Does Not Require Behavioral Evaluations or Supports Before an SSD Is Imposed.......................................................................40

    3.    Oregon Denies Students Equal Opportunities to Receive Educational Services in the Most Integrated Environment in Violation of the ADA and Section 504.....................................................41

D.    OREGON'S SSD PROBLEM WILL NOT BE RESOLVED EXCEPT BY COURT INTERVENTION AND EXTERNAL OVERSIGHT...........................43

    1.    ODE Continues to Deny the Scope of the SSD Problem and Exhibits Extreme Deference to School Districts Inconsistent With Ensuring Students With Disabilities Receive a FAPE. ...........................44

    2.    ODE Continues to Refuse to Enact Binding Rules Regarding SSDs. ......................................................................................................45

CONCLUSION....................................................................................................................47

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

## TABLE OF AUTHORITIES

Page(s)

### CASES

*A.H. by & Through A.H. v. Clarksville-Montgomery County School System,*
    No. 3:18-CV-00812, 2019 WL 483311 (M.D. Tenn. Feb. 7, 2019) .......................... 20, 21

*Adam C. v. Scranton School District,*
    No. 3:07-CV-532, 2011 WL 996171 (M.D. Pa. Mar. 17, 2011) ...................................... 41

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................................... 12

*ARC of Iowa v. Reynolds,*
    559 F. Supp. 3d 861 (S.D. Iowa 2021) ........................................................................... 42

*Armstrong v. Brown,*
    732 F.3d 955 (9th Cir. 2013) ......................................................................................... 16

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ................................................................................... 12, 18

*Armstrong v. Schwarzenegger,*
    622 F.3d 1058 (9th Cir. 2010) ....................................................................................... 16

*Bates v. UPS,*
    511 F.3d 974 (9th Cir. 2007) ................................................................................... 12, 18

*Blackman v. District of Columbia,*
    No. 97-cv-1629, 2006 WL 2456413 (D.D.C. Aug. 24, 2006) ........................................ 46

*Castle v. Eurofresh, Inc.,*
    731 F.3d 901 (9th Cir. 2013) ......................................................................................... 16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...................................................................................................... 11

*Chapman v. Pier 1 Imports (U.S.), Inc.,*
    631 F.3d 939 (9th Cir. 2011) ......................................................................................... 13

*Cordero by Bates v. Pennsylvania Department of Education,*
    795 F. Supp. 1352 (M.D. Pa. 1992) ............................................................................... 20

*Corey H. v. Board of Education of Chicago,*
    995 F. Supp. 900 (N.D. Ill. 1998) ............................................................................ 32, 44

*D.L. v. District of Columbia,*
    860 F.3d 713 (D.C. Cir. 2017) ....................................................................................... 44

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

*D.R. v. Redondo Beach Unified School District*,
    56 F.4th 636 (9th Cir. 2022) ................................................................ 14, 36

*Doe by Gonzales v. Maher*,
    793 F.2d 1470 (9th Cir. 1986), *aff'd in part and modified in part by Honig v. Doe*,
    484 U.S. 305 (1988) ................................................................ 17, 20, 32, 40

*Emma C. v. Eastin*,
    985 F. Supp. 940 (N.D. Cal. 1997) ................................................................ 16

*Endrew Forum v. Douglas County School District RE-1*,
    580 U.S. 386 (2017) ................................................................ 14, 15, 33, 34

*Friends of the Earth, Inc., v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................ 13

*Fry v. Napoleon Community*,
    *Schools*, 580 U.S. 154 (2017) ................................................................ 14

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ................................................................ 12

*Hoeft v. Tucson Unified School District*,
    967 F.2d 1298 (9th Cir. 1992) ................................................................ 14

*Humphrey v. Memorial Hospitals Ass'n*,
    239 F.3d 1128 (9th Cir. 2001) ................................................................ 42

*Idaho Migrant Council v. Idaho Board of Education*,
    647 F.2d 69 (9th Cir. 1981) ................................................................ 16

*J.N. v. Oregon Department of Education*,
    338 F.R.D. 256 (D. Or. 2021) ................................................................ 3

*K.M. ex rel. Bright v. Tustin Unified School District*,
    725 F.3d 1088 (9th Cir. 2013) ................................................................ 16, 41

*Kennedy v. Applause, Inc.*,
    90 F.3d 1477 (9th Cir. 1996) ................................................................ 17

*Kerr Center Parents Ass'n v. Charles*,
    897 F.2d 1463 (9th Cir. 1990) ................................................................ 14

*Kruelle v. New Castle County School District*,
    642 F.2d 687 (3d Cir. 1981) ................................................................ 32

*Larry P. by Lucille P. v. Riles*,
    793 F.2d 969 (9th Cir. 1984) ................................................................ 16

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................................12

*Mark H. v. Lemahieu*,
   513 F.3d 922 (9th Cir. 2008)............................................................................16

*McIntyre v. Eugene School District 4J*,
   976 F.3d 902 (9th Cir. 2020)............................................................................13

*National Ass'n of Optometrists & Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2012)..........................................................................12

*Olmstead v. L.C ex rel. Zimring*,
   527 U.S. 581 (1999) .....................................................................................15, 42

*Orange County Department of Education v. California Department of Education*,
   668 F.3d 1052 (9th Cir. 2011)..........................................................................32

*Reid L. v. Illinois State Board of Education*,
   358 F.3d 511 (7th Cir. 2004)............................................................................46

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ...........................................................................................12

*Steimel v. Wernert*,
   823 F.3d 902 (7th Cir. 2016)............................................................................42

*United States v. Georgia*,
   461 F. Supp. 3d 1315 (N.D. Ga. 2020)............................................................42

*Vaughn G. v. Amprey*,
   117 F.3d 1415 (4th Cir. 1997)..........................................................................46

*W.G. v. Board of* Trustees ,
   960 F.2d 1479 (9th Cir. 1992)..........................................................................35

*Waskul v. Washtenaw County Community Mental Health*,
   979 F.3d 426 (6th Cir. 2020)............................................................................42

## STATUTES

20 U.S.C. § 1400.....................................................................................................13

20 U.S.C. § 1412.................................................................................................*passim*

20 U.S.C. § 1416.................................................................................................*passim*

29 U.S.C. § 794................................................................................................... 2, 15

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

42 U.S.C. § 12101 ................................................................................................42

42 U.S.C. § 12131 ...........................................................................................2, 15

Or. Rev. Stat. Ann. § 326.051 ..............................................................................39

Or. Rev. Stat. Ann. § 339.010 ..............................................................................39

## RULES

Fed. R. Civ. P. 56(a) ......................................................................................11, 17

## REGULATIONS

28 C.F.R. § 35.130 .......................................................................................*passim*

34 C.F.R. § 300.507 ..............................................................................................21

34 C.F.R. § 104.33 ..........................................................................................16, 38

34 C.F.R. § 104.34 ................................................................................................42

34 C.F.R. § 104.35 ................................................................................................40

34 C.F.R. § 104.4 .........................................................................................*passim*

34 C.F.R. § 300.114 ........................................................................................31, 37

34 C.F.R. § 300.119 ..............................................................................................28

34 C.F.R. § 300.120 ..............................................................................................25

34 C.F.R. § 300.149 ..........................................................................................2, 20

34 C.F.R. § 300.151 ..............................................................................................19

34 C.F.R. § 300.600 .....................................................................................*passim*

34 C.F.R. § 300.604 ........................................................................................28, 31

Or. Admin. R. 581-022-2320 ................................................................................39

Or. Admin. R. 581-021-0077 ................................................................................39

## OTHER AUTHORITIES

S. Rep. No. 94-168 (1971), *reprinted in* 1975 U.S.C.C.A.N. 1425............................33

Or. Senate Bill 263................................................................................................7

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Or. Senate Bill 289......................................................................................................................27

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1**

Per Local Rule 7.1, the Parties conferred in good faith through counsel by telephone to resolve the dispute regarding this Motion and have been unable to do so.

**MOTION**

Plaintiffs hereby move the Court to grant summary judgment in favor of Plaintiffs pursuant to Federal Rule of Civil Procedure 56. Plaintiffs seek a judgment that Defendants have violated the rights of all Plaintiffs, including the Plaintiff class, under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and their implementing regulations. Plaintiffs additionally seek a judgment that injunctive relief, including an independent monitor, is necessary to remedy Defendants' ongoing violations of law.

**MEMORANDUM OF LAW**

**I.      INTRODUCTION**

As detailed in the Complaint ("Compl.") (ECF. No. 1) and comprehensively summarized by the Court (ECF. No. 104), this matter challenges the ongoing failure by Defendants, Oregon Department of Education ("ODE"), ODE Director Colt Gill, and Governor Tina Kotek (collectively, "Defendants" or "the State"), to effectively address Oregon school districts' systemic practice of shortening the length of students' school days due to their disability-related behaviors. These students "frequently fall behind academically and miss out on critical social opportunities in which they can practice appropriate behaviors," Compl. ¶ 5, and their needless exclusion causes them to suffer stigma, emotional trauma, humiliation, and shame, *id*. ¶¶ 4, 51. Shortened school days have a "dramatic" impact on students who lose instruction and opportunities for peer

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

interaction; this exclusion "puts them in a position to lag further and further behind their peers in both academic and social emotional skills." Report of the Neutral Fact Finder, ECF No. 157-2 at 5-6. Parents of these students also face dramatic impacts, as they often lose employment opportunities when they must provide care for their children during normal school hours. *Id.* at 46.

Federal law requires ODE to monitor local education agencies ("LEAs") to ensure that every student with a disability receives a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"). 20 U.S.C. § 1416(a)(1)(C); 34 C.F.R. § 300.149; 34 C.F.R. § 300.600(d)(1). ODE must also focus its monitoring activities on improving educational results and functional outcomes for all students with disabilities, and ensuring that other public bodies meet their obligations to improve educational results for these students. 20 U.S.C. § 1416(a)(2); 34 C.F.R. § 300.600(b). Moreover, ODE must ensure that Oregon students with disabilities are not subjected to discrimination through the administration of their educational programs. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a). Among other things, ODE must ensure that Oregon students with disabilities have access to equal educational opportunity as that provided to their peers without disabilities. 28 C.F.R. § 35.130(b)(1)(ii), (iii); 34 C.F.R. § 104.4(b)(1)(ii) (Section 504). The Defendants have failed to carry out these obligations.

Instead, the Defendants have perpetuated and, in some instances, incentivized many school districts to routinely, unnecessarily, and unlawfully subject students with disabilities to shortened school days due to their disability-related behaviors ("SSDs") without first developing, implementing, and revising plans to provide academic and behavioral interventions that will support the students' needs. Compl. ¶ 50; *see, e.g., id.* ¶¶ 1, 12, 61, 77, 83, 97-99, 105-11.

Though the Defendants have long disputed the scope of this problem and the harms it has caused, the Parties agreed to the hiring of a neutral expert to conduct an investigation to settle

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

those factual disputes. Following the completion of the neutral expert's investigation, all material disputes of fact have been resolved. Accordingly, Plaintiffs hereby move for summary judgment to establish that Defendants have violated and are continuing to violate Plaintiffs' rights under the IDEA, ADA, and Section 504. Plaintiffs further move to establish that injunctive relief is necessary to remedy these violations.

## II.    BACKGROUND FACTS

The Named Plaintiffs and Plaintiff Class are "students with disabilities aged 3 to 21 residing in Oregon who are eligible for special education and related services under the IDEA and are currently being subjected to a shortened school day or are at substantial risk of being subjected to a shortened school day due to their disability-related behaviors." Compl. ¶ 31; *J.N. v. Or. Dep't of Educ.*, 338 F.R.D. 256, 275 (D. Or. 2021). Due to their disabilities, they are often limited to "one or two hours of instruction per day" instead of the full day typically lasting six hours. Compl. ¶ 3. Some students receive as little as half an hour of daily instruction. *Id.* ¶¶ 3, 20, 97.

On August 16, 2021, the Parties entered into an Interim Settlement Agreement that required them to jointly select a neutral expert to examine the use of SSDs for Oregon students with disabilities and recommend any actions that ODE should take to ensure that all children placed on SSDs receive "a FAPE in the LRE that is free from discrimination." Interim Settlement Agreement, ECF No. 157-1 at 3. The parties jointly selected Dr. David Bateman as the neutral expert.[1] Dr. Bateman obtained and reviewed evidence, answered questions about the SSD problem, and made recommendations. CSMF ¶ 1. Dr. Bateman "encountered multiple, unanticipated, and unnecessary barriers" in obtaining information from districts. ECF No. 157-2

---

[1] Dr. Bateman was proposed by the State as a candidate for neutral expert. Declaration of Thomas Stenson ("Stenson Decl.") ¶ 58. To complete his investigation and report, Dr. Bateman worked with a team comprised of Jennifer Cline, MA CCC SLP; Sonja de Boer, PHD, BCBA-D; and Stacey Gahagan, Esq. ECF No. 157-2 at 67-70.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

at 17. Although most school districts eventually replied to Dr. Bateman's survey after being served

with subpoenas, a few refused to respond. ECF No. 157-2 at 18, 22. Others provided redacted

Individualized Education Programs ("IEPs") rather than responding to the survey. ECF No. 157-2

at 43.

## A.    OREGON STUDENTS ON SHORTENED SCHOOL DAYS

Approximately 80,000 children with disabilities are enrolled in Oregon schools served

under the IDEA. Op. & Order, ECF No. 123 at 10.[2] Approximately 1,000 students with disabilities

are placed on SSDs because of their disability-related behaviors. CSMF ¶¶ 2-3.[3] This number does

not include frequent "informal removals" of students with disabilities, as Oregon schools collect

insufficient data to indicate when a student is taken out of the classroom and required to remain

elsewhere in the school without instruction, or when school staff calls a student's parent to take

the student home because of the student's behavior. CSMF ¶¶ 5-7.

Between 2017 and 2020, about 140 Oregon school districts placed students on SSDs.

CSMF ¶ 4. These include named Plaintiffs J.N., E.O., J.V., and B.M., all of whom have been

placed on SSDs due to their disability-related behaviors.  Report of Albert William Greenwood,

Ph.D. (January 31, 2020), ECF No. 66-2 at 1.  Plaintiffs J.N. and B.M. still receive SSDs. CMSF

¶ 28.

---

[2] *See also* Stenson Decl. Ex. 37 [U.S. Dep't of Educ., 43rd Annual Report to Congress on the
Implementation of the Individuals with Disabilities Education Act, 2021, at 279 (Jan. 24, 2022)]
(reporting 12,456 Oregon students ages 3 to 5 and 79,037 Oregon students ages 6 through 21
served under IDEA in fall 2019).
[3] The number of Oregon students with disabilities on shortened school days may be much larger.
*See* Stenson Decl. Ex. 38 [Oregon Legislative Assembly, Fiscal Impact of Proposed Legislation
SB 819-A (Feb. 28, 2023)] at 2-3 (another 800 Oregon students attending educational service
districts ("ESDs"), special schools, or private schools that provide fewer instructional hours than
schools in the student's resident district would be considered to be placed on shortened school
days).

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

Although Oregon students without disabilities typically receive six hours of daily instruction, students with disabilities who are subjected to SSDs are sometimes only allowed to attend school for one or two hours of instruction each day, or less. CSMF ¶¶ 8-10. For many students, placement on SSDs start as early as kindergarten, prior to creation of an IEP or the completion of assessments, and continue for multiple years. CSMF ¶ 12, 14-15. The majority of students placed on SSDs are elementary school age. ECF No. 157-2 at 42. Instead of receiving necessary behavioral instruction and supports, ECF No. 157-2 at 12, they are placed in the most restrictive placement. CSMF ¶ 47. Very few students placed on SSDs receive any instruction outside of school. CSMF ¶ 11. Some do not attend school at all. CSMF ¶ 10.

Schools placing students with disabilities on shortened school days do so despite an "absence of logic and evidence-based pedagogical decisions." ECF No. 157-2 at 11. As the parties' neutral expert Dr. David Bateman explains:

> When students are denied access to a full-day of instruction they miss out not only on the educational opportunities provided to the other students, but also the benefits and incidental learning from socialization and regular interactions with other students. These students often fall behind academically and miss out on critical social opportunities in which they can practice appropriate behaviors and implement the strategies they are learning. Instead of receiving this needed instruction and opportunities to practice, they are separated and disconnected from peers who receive the academic, social, and emotional benefits of attending school for a full-day. This isolation perpetuates the stigma, misunderstanding, and fear that often underlies a school district's decision to exclude children with disability-related behaviors from the classroom.

*Id.* at 11-12; *see also id.* at 61 (noting that students who miss 10% of kindergarten lag, on average, almost a year behind in reading by third grade); Decl. of Albert William Greenwood (March 15, 2023) ("Greenwood Decl."), Ex. A [Supplemental Report of Albert William Greenwood, Ph.D.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

(October 31, 2022)] at 8 (noting other costs of SSDs, including potential resistance to returning to a full day, feeling "different," and changes in mindset about the need to follow directions).[4]

Dr. Bateman identified hundreds of students who were receiving SSDs that were not listed or described anywhere on their IEPs. CSMF ¶ 16. Many other students on SSDs lacked other required elements of a proper IEP. CSMF ¶¶ 17-18.

Dr. Bateman's report identifies Functional Behavior Assessments ("FBAs") and Behavior Intervention Plans ("BIPs") as the "essential" tools needed to prevent shortened day placements. ECF No. 157-2 at 51. An effective FBA identifies the child's specific behaviors of concern, and generates reasonable hypotheses about the function or purpose of the behaviors. Report of Albert William Greenwood, Ph.D. (January 31, 2020), ECF No. 66-2 at 4-5. An appropriate and effective BIP relies on information generated from the FBA to identify any necessary changes to the student's environment and replacement behaviors that need to be taught to the student to support the student's behavioral progress. *Id.* at 5. When schools provide these and other behavior supports, students who are at risk of placement on SSDs can attend school for the same amount of time as other students. ECF No. 157-2 at 62.[5] However, Dr. Bateman found that most FBAs and BIPs for students on SSDs in Oregon were "one-page templates with spaces for [IEP] teams to fill in a few words or phrases." ECF No. 157-2 at 44. Many of these students had IEPs that did not include a BIP nor behavioral goals for the student. CSMF ¶ 18. Statewide, there is a lack of training

---

[4] *See also* ECF No. 157-2 at 46 (describing impacts of shortened day placements on students' families, including "parents having to change jobs or hours of work to be during the night, locating childcare services, paying for childcare services, etc."), 61 (students who miss two days of school per month miss 1.5 years of instruction by end of 12th grade).

[5] *See also* Decl. of Albert William Greenwood, Ph.D., in Supp. Pls.' Mot. Class Certification (January 31, 2020), ECF No. 66 at 3 (Named Plaintiffs were placed on SSDs without having first received "effective school-based behavioral supports" including an FBA and BIP) and 5 ("there are at least hundreds of students with significant behavior support needs in Oregon public schools who warrant this [same] level of support").

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

for developing and implementing FBAs and BIPs before placing students on SSDs, and a lack of understanding of the need for behavior goals in IEPs. CSMF ¶ 22.[6]

Dr. Bateman also found no consistent provision of a re-entry plan for students placed on SSDs. CSMF ¶ 19. Some school districts even forced students to "earn" their way back to a full day. ECF No. 157-2 at 46. Dr. Bateman did not find a single IEP that documented a student returning to a full day. CSMF ¶ 19.

**B.    ODE HAS LONG REFUSED TO ADDRESS KNOWN AND EXTENSIVE MISUSE OF SSDS.**

ODE has been on notice of the SSD problem for nearly a decade through formal and informal complaints regarding the persistent and illegal use of SSDs. CSMF ¶¶ 30-42. ODE's knowledge included information provided by Disability Rights Oregon as early as 2013. CSMF ¶ 30. ODE's knowledge also included 2017 public testimony on Senate Bill ("S.B.") 263 which described SSDs as "vexing and longstanding," happening at "unprecedented rates," and "a widespread problem for Oregon students with disabilities." CSMF ¶ 32.[7] Despite this knowledge, ODE has failed to effectively investigate or monitor individual school districts to prevent the misuse of SSDs. *See, e.g.*, CSMF ¶¶ 24, 38, 42, 49-56.

Despite numerous complaints by phone, email, and direct communication with staff about SSDs, ODE never conducted a serious investigation of SSDs. From December 2018 through January 2022, ODE phone logs record 37 different inquiries related to SSDs. CSMF ¶ 33. Other than the Lane and Clackamas investigations that ODE opened over seven months after learning

---

[6] *See also* ECF No. 157-2 at 9, 11-18, 21-22 (describing additional concerns with supports for Oregon students placed on shortened school days).

[7] Unfortunately, S.B. 263 was amended before passage to remove a number of crucial requirements. ECF No. 157-2 at 61 (discussing the original draft bill's requirements of frequent reviews of SSDs). S.B. 263 became, in the words of one ODE official, "[a] bill acceptable to all that does absolutely nothing." Stenson Decl. Ex. 39 [April 2017 Email from ODE staff Mike Franklin re S.B. 263].

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

that students were being subjected to SSDs, discussed *infra*, ODE never opened any independent

investigations of the SSD problems raised in those 37 inquiries. CSMF ¶¶ 34-38. Instead, ODE's

typical response was to provide referrals and information about students' rights, describe the

complaint processes, and in a few cases, connect the caller to district-level authorities. Ex. 5[8]

[Shortened School Day Call Log for Neutral Expert]. For example, ODE staff did not investigate

a Douglas County ESD program even after school officials told ODE that at least 15 students were

on "a reduced school day in some way" due to "behavioral reasons" and described the students as

"feral." CSMF ¶ 39. This was but one of many complaints about the misuse of SSDs made to ODE

over the years, including informal and formal complaints. CSMF ¶¶ 30, 33, 41. From January 2016

to September 2022, ODE received 25 state administrative complaints and four requests for due

process hearings between January 2016 and October 14, 2022, all regarding SSDs. CSMF ¶ 41.

　　　　As other examples, ODE received information indicating inappropriate systemic SSDs in

local school districts such as Medford, Brookings Harbor, North Wasco, and Grants Pass. CSMF

¶ 42. Despite this knowledge, ODE has not taken effective action to reduce the frequency of

inappropriate and harmful SSDs in any of the above-mentioned districts. CSMF ¶¶ 39, 41-46.

Indeed, data shows that these school districts still frequently place students on SSDs.  CSMF ¶¶

43-46.

　　　　Likewise, top ODE officials were informed of the systemic use of SSDs in Lane and

Clackamas Education Service Districts ("ESDs") in October 2021. CSMF ¶ 34. However, those

same top officials failed to investigate either program until June 2022, CSMF ¶¶ 36-37, leaving

affected students to continue suffering the negative impacts of exclusion from a full school day

---

[8] Unless otherwise specified, all Exhibits contained within refer to Exhibits to the Declaration of Thomas Stenson in Support of Plaintiffs' Motion for Summary Judgment ("Stenson Decl.").

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

despite those officials' stated concerns about "the potential for disability discrimination." Ex. 16 [Deposition of Dr. Eric Wells] at 186:24-25.

Similarly, during ODE's investigation of a 2021 state complaint alleging systemic violations of the IDEA, ADA, and Section 504 by both ODE and Klamath Falls City School District ("KFCSD"), ODE officials were informed that KFCSD had created its SSD program by "[m]imick[ing] half day programs from nearby districts." CSMF ¶ 40. ODE did not conduct any investigation of the use of SSD programs elsewhere in nearby districts even though the routine use of SSDs in the Southern Oregon ESD STEPS Plus program was revealed as part of this investigation and later confirmed by ODE. CSMF ¶ 40.

ODE's internal communications also show that the SSD problem was well-known to ODE staff who recognized that districts often lacked the resources to serve students with disabilities effectively, and that Districts don't "always follow[]" the protections against SSDs. CSMF ¶ 31.

ODE has continued to receive documentation of the ongoing problems with the use of SSDs during this litigation. *See* CSMF ¶ 30; Ex. 26 [ODE Overall District Count of SSDs, 2016-2020].

Dr. Bateman's findings are consistent with this history. Dr. Bateman was "unable to locate sufficient guidance, training, or other resources and support provided by ODE to help districts understand the LRE considerations and the role of the IEP team to ambitiously move students back to a full-day." CSMF ¶ 20. He found that the "minimum oversight and guidance" provided by ODE to school districts was due to its perception of "local control" in Oregon. ECF No. 157-2 at 20. Dr. Bateman found that there was "a pervasive lack of understanding of the relationship between SSD and least restrictive environment;" "lack of necessary staffing . . . across the state;" "lack of behavior support resources and training," including training regarding FBAs and BIPs; a

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

need for ODE to monitor the use of SSD, including through data collection; and a need for "clear guidance from ODE."  ECF 157-2 at 50-51, 52-53, 58, 59.

Dr. Bateman made a number of specific recommendations for ODE to implement to address the "prolific use of SSD throughout the state," including the appointment of a Special Master to support implementation. CSMF ¶ 27. In response to Dr.  Bateman's report, ODE began the long overdue process of requesting data about SSDs in October 2022. Ex. 18 [Deposition of Tenneal Wetherell] at 100:1-9. Beyond collecting data for the 2022-2023 school year and issuing new SSD guidance, however, ODE has refused to adopt many of Dr. Bateman's recommendations, including any recommendations that required expenditures. CSMF ¶¶ 48-49. ODE's response to Dr. Bateman's report remains incomplete and uncertain. S*ee e.g.*, Ex. 16 at 220:9-20, 76:22-77:5, 79:7-12; Ex. 18 at 58:12-13, 71:14-16, 82:14-17, 80:17-23, 86:9-20, 211:22-212:2, 252:13-24, 261:6-12.[9] Moreover, the documents that describe ODE's policies and actions following Dr. Bateman's report and the known results of those actions to date both demonstrate that ODE is not effectively addressing the inappropriate use of SSDs for Oregon students with disabilities.

ODE has not yet hired new staff, nor has it undertaken meaningful efforts to understand the staffing capacity necessary to adequately monitor and investigate SSD use. *See, e.g.*, Ex. 18 at 86:18-87:13; Ex. 16 at 77:2-78:4. ODE has not adopted Dr. Bateman's recommendations, ECF No. 157-2 at 50-51, to add additional personnel and resources needed to ensure that students are not illegally placed on SSD. CSMF ¶ 49.  Instead, ODE intends to "realign" the duties of existing

---

[9] Most of the evidence regarding the general supervision system emerged after discovery closed, depriving plaintiffs of an adequate opportunity to fully assess it.  Stenson Decl. ¶¶ 59-60.

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

staff "in order to free them up" to do this work. Ex. 18 at 126:24-127:1; *see also id.* at 127:11-15, 127:18-20.

ODE's monitoring, supervision, and investigation activities since Dr. Bateman issued his report reveal continued deficiencies. For example, ODE's Abbreviated Day protocol ("AD Protocol"), developed as part of its "Emergent Area" monitoring of SSDs for the 2022-2023 school year, lists twenty-five yes/no "Record Review Items" for school districts to answer for each student placed on an SSD.[10] CSMF ¶ 52. However, none of these items include provisions, such as academic testing results, that would allow ODE to assess whether a student is actually making progress towards appropriately ambitious goals. *Id.*

In yet another example of the inadequacy of ODE's monitoring and supervision efforts following Dr. Bateman's report, ODE determined that Klamath County should undergo focused monitoring. Klamath County Findings Report at 2. ODE conducted a focused monitoring visit in October 2022 and produced a report in December 2022. CSMF ¶ 53. In its report, ODE did not actually confirm that any students were on SSDs in Klamath County. CSMF ¶ 54. However, during this same period, Klamath County self-reported it had nine students on SSDs in October, November, and December 2022. CSMF ¶ 56.

## III.    LEGAL BACKGROUND

### A.    STANDARD OF REVIEW

Summary judgment is proper as to a specific claim if there is "no genuine dispute as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine "if

---

[10] This protocol and other data collection related to SSDs requires districts to report only about students receiving SSDs for 30 consecutive days or longer. CSMF ¶ 50. Thus, any student on SSD for 29 days or less, even if a student is on repeated SSD placements that would total more than 30 days, would not be captured by the data collection. Ex. 18 at 82:14-17.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "[O]nly disputes over facts that might affect the outcome of the suit" under governing law may preclude summary judgment. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012).

## B.    STANDING

Plaintiffs have the burden of establishing standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This ensures "that the plaintiff has a concrete dispute with the defendant." *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001). To demonstrate standing, a plaintiff must show: (1) an injury in fact that is concrete and particularized, and actual or imminent; (2) fairly traceable to the challenged conduct of the defendant; and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016) (citing *Lujan*, 504 U.S. at 560). Each element must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At summary judgment, plaintiffs must "'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (citations omitted).

In a class action, standing is satisfied if at least one named plaintiff meets the requirements. *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001)). The named plaintiff "must have personally sustained or be in immediate danger of sustaining 'some direct injury as a result'" of defendants' conduct. *Armstrong*, 275 F.3d at 860 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). Where, as here, the plaintiff seeks prospective injunctive relief, he must show "that he is realistically threatened by a repetition of [the violation]." *Id.* at 860-61 (citation omitted). Should the named plaintiff's standing be found deficient, "a member of the class represented by the named plaintiff" may satisfy the requirement. *Bates*, 511 F.3d at 987 (citing *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)); *see also Armstrong*, 275

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

F.3d at 864 ("overwhelming evidence" of discrimination against class members helps "establish a pattern of discrimination that threatens to recur").

An association has standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," (3) and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc., v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).[11]

### C.    THE GOVERNING FEDERAL STATUTES

#### 1.    The Individuals With Disabilities Education Act

The IDEA, 20 U.S.C. § 1400 *et seq.*, is designed to "ensure that all children with disabilities have available to them a free appropriate public education" that prepares them "for further education, employment, and independent living." *Id.* § 1400(d)(1)(A); *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 910 (9th Cir. 2020). States must implement policies and procedures to ensure that all eligible children with disabilities aged 3 to 21 residing in the state receive a FAPE in the least restrictive environment. 20 U.S.C. § 1412(a)(1)(A), (a)(5). A FAPE consists of "special education," specially designed instruction that meets the unique needs of a child with a disability, *id.* § 1401(29), and "related services," the supportive services "required to assist a child with a disability to benefit from special education." *Id.* § 1401(26). The standard for FAPE is a "demanding" one: students with disabilities must receive an "appropriately ambitious" educational

---

[11] Courts should "take a broad view of constitutional standing in civil rights case, especially where [as here] . . . private enforcement suits 'are the primary method of obtaining compliance with'" federal law. *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (citation omitted).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

program that gives them "the chance to meet challenging objectives." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 402 (2017).

An LRE is, to the maximum extent appropriate, general education in the classroom environment of a student's peers without disabilities. 20 U.S.C. § 1412(a)(5). Removal from the general education classroom "occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* In assessing the propriety of moving a student to a more restrictive placement, courts in the Ninth Circuit consider 1) the relative academic benefits available in the more restrictive placement; 2) the nonacademic benefits of education in the less restrictive placement, like "development of social and communication skills from interaction with nondisabled peers"; 3) any potential negative effect of the student on peers; and 4) the costs of the supplementary aids and services. *D.R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 643 (9th Cir. 2022).

A state receiving funding under the IDEA must formulate an IEP for each eligible child. 20 U.S.C. § 1412(a)(4). The IEP is the "primary vehicle" for ensuring that each child receives FAPE in the LRE. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017) (citation omitted). The IEP sets out a written plan to achieve each child's unique academic and functional goals and includes the special education and related services to be provided "so that [the child] can advance appropriately toward those goals." *Id.* at 159.

"[S]tates have primary responsibility for ensuring that local educational agencies comply with the requirement[s] of the IDEA," *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir. 1992), including that all eligible children receive a FAPE in the LRE. *See, e.g.*, *Kerr Ctr. Parents Ass'n v. Charles*, 897 F.2d 1463, 1470 (9th Cir. 1990). To fulfill these responsibilities, among other things the state must engage in "effective monitoring." 20 U.S.C. § 1416(a)(1)(C),

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

(a)(3)(B).  The state must use data to measure school districts' performance, maintain administrative complaint processes, and take corrective action upon finding any violations of the Act.  *Id.* §§ 1411(e)(2)(B)(i), 1415, 1416(a)(3). [12]  The state's "primary focus" must be on "improving educational results and functional outcomes for all children with disabilities."  *Id.* § 1416(a)(2)(A).  All eligible students must receive a FAPE meeting the "demanding" standard required by *Endrew F.*, 580 U.S. at 402, in the LRE—which, for most children, is the general education classroom.  *Id.* at 401-02 (citing 20 U.S.C. § 1414(d)(1)(A)(i)).

### 2.    The Americans With Disabilities Act and Section 504 of the Rehabilitation Act of 1973

Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, prohibit disability-based discrimination.  Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA requires public schools to provide children with disabilities an equal educational opportunity.  28 C.F.R. § 35.130(b)(1)(ii).  This includes administering services, programs, and activities in the most integrated setting appropriate to the needs of students with disabilities.  *See* 28 C.F.R. § 35.130(d); *Olmstead v. L.C ex rel. Zimring.*, 527 U.S. 581, 592 (1999).  Public schools must also make reasonable modifications to their policies, practices, and procedures when necessary to avoid discrimination, including unnecessary segregation, unless "the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

---

[12] Any noncompliance must be corrected "as soon as possible, and in no case later than one year after the State's identification of the noncompliance."  34 C.F.R. § 300.600(e).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Section 504 also requires entities receiving federal financial assistance to provide aids, benefits, and services to individuals with disabilities in the most integrated setting appropriate to the individual's needs.  34 C.F.R. § 104.4(b)(2).  Section 504 also requires schools to provide children with disabilities a FAPE, special education, and related aids and services "designed to meet the needs of individuals with disabilities as adequately as the needs of nondisabled individuals are met."  34 C.F.R. § 104.33(a), (b)(1).[13]

Although material differences exist between the ADA and Section 504, *see K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013), both obligate states to supervise local school districts to ensure compliance.  *Idaho Migrant Council v. Idaho Bd. of Educ.*, 647 F.2d 69, 71 (9th Cir. 1981) (so holding regarding Title VI of Civil Rights Act, which was the model for Section 504).  This is because "Title II's obligations apply to public entities regardless of how those entities chose to provide or operate their programs and benefits. . . . The same principle applies to [Section 504] violations."  *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013).[14]  Both statutes prohibit states from discriminating when providing educational services and programs to children with disabilities, whether a state does so directly or through other arrangements.  *See* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1).  Further, states may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities.  *See* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4).

---

[13] *See also Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008).
[14] *See also Armstrong v. Brown*, 732 F.3d 955, 960 (9th Cir. 2013); *Armstrong v. Schwarzenegger*; 622 F.3d 1058, 1069 (9th Cir. 2010); *Larry P. by Lucille P. v. Riles*, 793 F.2d 969, 980-81 (9th Cir. 1984); *Emma C. v. Eastin*, 985 F. Supp. 940, 948 (N.D. Cal. 1997).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

### D.    PRELIMINARY LEGAL DISCUSSION

#### 1.    There are no genuine issues of material fact

The named Plaintiffs and the Plaintiff class allege that they are harmed or are at substantial and imminent risk of harm because Defendants unnecessarily segregate them and deprive them of educational services they need and to which they are entitled, in violation of the IDEA, the ADA, and Section 504.  Compl. ¶ 15.  Plaintiffs seek judgment as a matter of law on their claims.

Plaintiffs rely on Dr. Bateman's "statewide evaluation regarding the use[s] of Shortened School Days," including those that "potentially fail to meet the requirements of federal law—namely, the IDEA, the ADA, and/or Section 504."  Report of the Neutral Fact Finder, ECF No. 157-2 at 14-15.  Defendants do not challenge Dr. Bateman's factual findings. Ex. 16 at 36:8-15, 52:20-53:5, 121:19-23; Ex. 18 at 197:13-198:9; 233:13-24. Nor do Defendants dispute Plaintiffs' Expert Dr. Greenwood's factual findings.   Ex. 18 at 54:21-24.   While the parties may urge the Court to draw different conclusions from a common set of facts, there are no genuine disputes of material fact; thus, Plaintiffs' claims may be resolved on summary judgment.  Fed. R. Civ. P. 56(a); *see*, *e.g.*, *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1477-79, *passim* (9th Cir. 1986), *aff'd in part and modified in part by Honig v. Doe*, 484 U.S. 305 (1988); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481-1482 (9th Cir. 1996) (a genuine dispute of material fact only exists when a party produces evidence into the record disputing a fact necessary for resolution).

#### 2.    Plaintiffs have Demonstrated Standing

This Court has twice found that the named Plaintiffs have standing to bring this action.  *See* Op. & Order, ECF No. 104 (Sep. 1, 2020); Op. & Order, ECF No. 123 (Feb. 5, 2021).  In denying Defendants' motion to dismiss, the Court found that (1) Plaintiffs adequately alleged actual injuries, and the risk of imminent future harm, from their SSDs; (2) Defendants' failure to fulfill their statutory duties caused Plaintiffs' harm; and (3) "[I]t is within the Court's power to shape

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

relief to address the particular ongoing systemic deficiencies that plaintiffs allege is the cause of the harm they suffer." Op. & Order, ECF No. 104, at 25-26, *passim*. At class certification, the Court found that Plaintiffs offered "significant factual support for their allegation that six state-level policies and practices related to defendants' failure to identify, correct, and prevent the systemic misuse of shortened school days expose the proposed class members to a significant, imminent risk" of further injury, including denials of FAPE in the LRE and disability-based discrimination. Op. & Order, ECF No. 123, at 29.[15]

Both J.N. and B.M. continue to be placed on shortened days. CSMF ¶ 28. The Court may also consider evidence of injuries to the Plaintiff class described by Dr. Bateman. *See* CSMF ¶¶ 2-19; ECF No. 157-2 at 61 ("many students across Oregon spending years on SSD and missing years of instruction," is "concerning").[16] These class members have standing themselves, *see Bates*, 511 F.3d at 987-88, and evidence about continuing harms to them supports the named Plaintiffs' standing. *See Armstrong*, 275 F.3d at 864 ("Plaintiffs provided overwhelming evidence of discrimination against the named plaintiffs as well as other, individually identified class members. . . . [B]ased on past occurrences, the threat of future injury to the named plaintiffs as well as to the class itself is both real and immediate.").

---

[15] *See* also Op. & Order, ECF No. 123, at 30-31 (named Plaintiffs "have been placed on shortened school day programs due to their disability-related behaviors and that those shortened days violated their rights under federal law. . . . [A]ny who are not currently on shortened programs are at significant risk of being put back on one in the future"). *Cf. Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001) ("[D]eterminations made with respect to class certification may also be relevant to the standing inquiry.").

[16] *See* also Greenwood Decl. Ex. A at 19 ("[A] large number of students placed on [SSDs] (over 60 days) likely did not receive a [FAPE]. . . . because of their extended placement in a highly restrictive environment . . . that limits their exposure to instruction and social contact with peers").

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Plaintiffs have also submitted evidence that "one or more COPAA members has suffered or will suffer harm from the . . . failure of the State to enforce the IDEA, Title II, and Section 504." Op. & Order, ECF No. 104, at 28; CSMF ¶ 29. As such, COPAA also has standing.

As this Court has explained, "statewide policies and practices create common risk of IDEA, ADA, and Section 504 violations, [such] that *all* class members, including the named plaintiffs, have standing to seek injunctive relief against the state based on a significant risk of future FAPE denials by unlawfully shortened school days." Op. & Order, ECF No. 123 at 31. As shown below, this remains the case today.

## IV.    ARGUMENT

Despite being on notice of the misuse of SSDs for years, ODE has failed to ensure a FAPE in the LRE under the IDEA and nondiscrimination under Title II of the ADA and Section 504 for the Named Plaintiffs and Class members due to at least four broad-based deficiencies: (1) the lack of state-level policies or procedures to collect essential information regarding the school districts that impose SSDs and that may need further supervision and monitoring, *id.* ¶¶ 115-18; *see also* 20 U.S.C. §1416(a)(3); 34 C.F.R. § 300.600(d); (2) the State's failure to proactively monitor the districts' legal compliance and correct any noncompliance beyond simply operating its administrative complaint system, Compl. ¶¶ 115, 119-22; 34 C.F.R. § 300.151 *et seq.*; 34 C.F.R. §300.507 *et seq.*; *see also* 28 C.F.R. § 35.130(b)(1)(v), (b)(3), (b)(7)(i); 34 C.F.R. § 104.4(b)(1)(v), (b)(4); (3) the State's failure to enforce federal and state laws and policies and correct violations thereof, Compl. ¶ 119; *see also* 20 U.S.C. § 1412(a)(11)(A); *see also* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4), (b)(7)(i); and (4) the State's failure to provide needed resources, technical assistance, and training to help districts support students effectively for the full school day, Compl. ¶¶ 101, 115, 123-26; *see also* 20 U.S.C. § 1412(a)(12); 34 C.F.R. §

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

300.600(a)(3); *see also* 28 C.F.R. § 35.130(b)(1)(v), (b)(3), (b)(7)(i); 34 C.F.R. § 104.4(b)(1)(v), (b)(4); s*ee also* 20 U.S.C. §§ 1412(a)(1)(A), (5)(A).

To the current day, ODE has failed to correct these critical deficiencies and continues to have policies that promote them despite a known, longstanding, and widespread practice among Oregon school districts of unnecessarily denying students with disability-related behaviors the opportunity to attend a full day of school. In so doing, the State has violated its obligations under the IDEA, the ADA, and Section 504 by failing to ensure FAPE in the LRE and nondiscrimination for students with disabilities. As a result of ODE's ongoing violations, injunctive relief is appropriate.

### A. ODE SYSTEMATICALLY FAILS ITS RESPONSIBILITIES UNDER THE IDEA

#### 1. Oregon Has Failed and Continues to Fail to Monitor the Misuse of SSDs

The ultimate legal test for any state monitoring system is whether it adequately "protect[s] the rights of" students with disabilities. *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1492 (9th Cir. 1986), *aff'd as modified sub nom. Honig v. Doe*, 484 U.S. 305 (1988). Under the IDEA, an SEA has responsibility to respond to "potential legal problems" in the provision of special education by an LEA. *A.H. by & Through A.H. v. Clarksville-Montgomery Cnty. Sch. Sys.*, No. 3:18-CV-00812, 2019 WL 483311, at *10 (M.D. Tenn. Feb. 7, 2019). When an SEA is "well aware" of "ongoing problems but has taken only slight corrective action," it violates the IDEA. *Cordero by Bates v. Pennsylvania Dep't of Educ.*, 795 F. Supp. 1352, 1362 (M.D. Pa. 1992).

ODE, as the SEA for Oregon, must engage in monitoring to ensure that every student with a disability receives a FAPE in the LRE. 34 C.F.R. § 300.149; 34 C.F.R. § 300.600(d)(1); 20 U.S.C. § 1416(a)(1)(C). ODE must focus its efforts on "improving educational results and functional outcomes for all children with disabilities" and ensuring that other public agencies meet

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

their obligations to provide special education. 34 C.F.R. § 300.600(b); 20 U.S.C. § 1416(a)(2). In addition to metrics required for its annual reporting to the U.S. Department of Education, ODE "must use quantifiable indicators and such qualitative indicators as are needed to adequately measure" the performance of school districts. 34 C.F.R § 300.600(c); 20 U.S.C. § 1416(a)(3). ODE must effectively respond to "potential legal problems" in the provision of education to students with disabilities by the districts. *A.H. by & Through A.H. v. Clarksville-Montgomery Cnty. Sch. Sys.*, No. 3:18-CV-00812, 2019 WL 483311, at *10 (M.D. Tenn. Feb. 7, 2019).

Despite its obligations under federal law to monitor the delivery of education services to students, Oregon refused for years to take any action to assess how or to what extent SSDs were being used. *See* Ex. 19 [Def.s' Response to Pl.s' Requests for Production ("RFP") at RFP 15 (September 8, 2020)] (denying they have documents related to any assessment of whether denial of FAPE for students on SSDs occurs on a regular basis in Oregon). Dr. Bateman found that ODE's "monitoring system did not allow for appropriate data gathering and monitoring" and found a complete "absence of monitoring of the use of" SSDs. ECF No. 157-2, at 6, 63; *see also* Ex. 16 at 70:9-22, Ex. 18 at 100:1-22.

Despite Dr. Bateman's report and recommendations, ODE still does not obtain the meaningful data it would need to monitor the provision of FAPE in the LRE to students facing SSDs. For example, ODE's Director of IDEA Programs Dr. Wells testified that, even though "[ODE] believe[s] that before you place a child on an [SSD] placement, functional behavioral assessments and behavior intervention plans should be completed and implemented with fidelity," "it is not a requirement of the statute, and so we can't assess compliance on it." Ex. 16 at 233:16-22. Given that Dr. Bateman found so many students placed on SSDs without necessary FBAs and BIPs documented in their records, this omission is particularly striking.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Assistant Superintendent Wetherell, the ODE official who is ultimately responsible for overseeing the implementation of IDEA, confirmed that ODE would not challenge the decisions of IEP teams about SSDs because "it's not the State's job to tell an IEP team what to do." Ex. 18 at 165:1-2. Indeed, her "assumption" is "that [SSDs] will be utilized effectively by the IEP team when they feel it's necessary." *Id.* at 55:21-56:1. Similarly, Dr. Wells testified that IEP teams "make appropriate decisions for kids, and that can include the use of abbreviated school day program placements . . . ." Ex. 16 at 31:2-7; 41:5-7 ("[P]lacement on an abbreviated school day program is the purview of the IEP team who's making decisions related to FAPE."). Defendants' monitoring system would not even question the decisions of two hypothetical IEP teams from two different districts that reached opposite decisions about the appropriateness of SSDs for the same hypothetical student in the same circumstances. Ex. 18 at Dep. 267:24-268:13. As Ms. Wetherell described, ODE does "not want to be in the business of invalidating an IEP team.  That just doesn't—that's not the space for [ODE] to be in.  IEP teams make those decisions." *Id.* at 268:16-19.

These are examples of ODE's focus on paper compliance at the expense of substantive legal requirements which pervades its entire approach to SSDs. In focusing solely on paper compliance, ODE also ignores whether students on SSDs make appropriate progress. ODE asks IEP teams to confirm that students' IEP goals have changed over three consecutive IEPs. *See* Ex. 16 at 246:14-27:8; Ex. 40 [Oregon General Supervision Framework (September 2022)] at 40. However, ODE's system does not require those goals to change by any specific amount. This means that school districts can indicate compliance with ODE's requirements as long as "each goal is different from what is in the previous two IEPs." *Id.* ODE has no mechanism to monitor whether students on SSDs are meeting challenging goals and objectives as a result of those

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

changes. Ex. 18 at 226:22-25. The system would not catch if there was only nominal change between goals each year. The result is a system that rubber-stamps IEP team decisions with no regard for whether students are making progress appropriate in light of their circumstances.

Rather than adopting Dr. Bateman's recommendation to "purchase, implement, and mandate the use of a Statewide IEP system,"[17] ECF No. 157-2 at 55, ODE's system relies on self-reporting by school districts. Ex. 16 at 211:8-18. Despite Dr. Bateman's findings regarding school districts' inadequate practices concerning SSDs, including their inadequate data collection and storage and their limited understanding of proper standards to apply for students on SSDs, ECF No. 157-2 at 43-48, ODE's system contains no safeguards to ensure that school districts collect and report accurate information.[18]

There is already evidence that ODE's current system is not functioning effectively to permit ODE to monitor the use of SSDs. For example, ODE's focused monitoring of Klamath County School District did not identify any students placed on SSDs. CSMF ¶ 54 ("In 4 instances, ODE was unable to confirm the students' school day/week."). During this same period, however, Klamath County self-reported it had nine students placed on SSDs. CSMF ¶ 55. Such discrepancies make clear that ODE has not been able to accurately collect even basic data related to SSD use through its most intense level of monitoring.

---

[17] Dr. Wells testified that ODE did not plan to adopt this system in the future. Ex. 16 at 84:9-13.

[18] A district that sought to evade Defendants' new data collection could do so by simply not reporting student placement on SSDs in student IEPs. Ex. 18 at 113:1-16.  ODE has not created safeguards to ensure that it is obtaining accurate data from school districts even though Dr. Bateman found ample evidence that some school districts routinely omit this information from IEPs. *See* ECF No. 157-2 at 63. Ms. Wetherell conceded that ODE's system would have no way of identifying such conduct. Ex. 18 at 113:1-16, 114:24-115: 4. While ODE has developed a verification protocol for school districts' self-reported data, Ex. 16 at 211:22-25, ODE cannot verify information that school districts withhold. Ex. 18 at 115:3-4 (testifying that "I'm not able to verify something that's not submitted to me.").

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

ODE's failure to allocate or even assess the necessary staffing additions to effectively monitor conflicts with Dr. Bateman's staffing recommendations. For instance, to prevent the misuse of SSDs in Oregon, Dr. Bateman specifically recommended that ODE create a new dedicated position to serve as a point person on SSDs for school districts and parents.  ECF No. 157-2 at 51. ODE rejected this recommendation, noting only that "it's possible" ODE may hire additional staff and that ODE staff time dedicated to SSDs will "vary from district to district and year to year." Ex. 16 at 76:5-6, 77:2-5.[19] ODE thus continues to treat SSDs as a transient issue despite all evidence that it is a systemic, long-lived problem throughout Oregon. *See*, *e.g.*, CSMF ¶¶ 2-7, 30-33. ODE's rejection of Dr. Bateman's staffing recommendation contrasts with ODE Director Defendant Colt Gill's public testimony on S.B. 819, a legislative bill currently before the Oregon Legislature, "Abbreviated School Day Program Requirements."  On February 7, 2023, Defendant Gill stated that "ODE would require additional resources to implement the investigations required by this bill in order for each eligible child [placed on SSD] to have an educational program that enables the provision of FAPE." Ex. 41 [Defendant Gill Testimony on S.B. 819] at 2.

Moreover, Ms. Wetherell testified that she had not even "contemplated" what, if any, metrics would be used to assess whether SSDs will remain an area of emphasis for monitoring after this current school year. Ex. 18 at 75:3-7.  The AD Protocol that is specific to SSDs will cease to be used when the "Emergent Area" designation expires. CSMF ¶ 52. Thus, ODE may change its focus as soon as the start of the 2023-2024 school year, regardless of how many students are still placed on SSDs. ODE claims that it plans to collect data about SSDs beyond this current year.

---

[19] School and district staffing shortages are one of the oft-cited justifications for the use of SSDs in school districts across Oregon, ECF No. 157-2 at 55, but Dr. Wells testified that he was unaware of any ODE data collection about these shortages. Ex. 16 at 85:7-24.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Ex. 16 at 254:5-255:5.  However, because ODE also states that high numbers of students on SSDs will not trigger an investigation, it is unclear how, if at all, ODE plans to use that data to hold school districts accountable. Ex. 18 at 272:9-12.

### 2.   ODE Has Failed and Continues to Refuse to Correct District Noncompliance With Law.

An SEA "must" investigate evidence of placements inconsistent with FAPE and LRE requirements and redress violations found by "[r]eview[ing] the public agency's justifications for its actions and [a]ssist[ing] in planning and implementing any necessary corrective action." 34 C.F.R. § 300.120(b). Instead, ODE repeatedly failed to act after the use of SSDs by numerous school districts was brought to its attention over nearly a decade, exactly the sort of evidence that should have resulted in ODE investigating these practices.

Central to ODE's failure is its denial of responsibility to effectively monitor local districts and enforce federal law, which it detailed in a letter to Dr. Bateman: "Oregon is a local control state.  Oregon law gives LEAs significant control over their governance and operations. . . . As a result, individual LEAs may implement different practices, policies, and procedures regarding [the use of SSDs]." Ex. 42 [Or. Dep't of Ed., Letter to Dr. Bateman (Jan. 21, 2022)] at 3. As Dr. Bateman found, ODE and district staff attributed the "minimum oversight and guidance by the ODE" to this view of local control. ECF No. 157-2 at 20.

Multiple audits of how ODE delivers educational services generally in Oregon have noted how ODE's monitoring and supervision is ineffective due to local control concerns.[20] ODE's

---

[20] *See, e.g.*, Ex. 43 [Or. Sec. of State, Report 2022-16, *State Leaders and Policymakers Must Address Persistent System Risks to Improve K-12 Equity and Student Success*, May 2022] at 5, http://records.sos.state.or.us/ORSOSWebDrawer/Recordhtml/8794669 ("[A] lack of intervention by ODE, despite significant problems at the school and district level, has been a larger problem than infringement on local control."); *id.* at 12 (complaining that ODE has "not gone beyond checkbox oversight of" how districts obey certain funding conditions).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

deference to school districts—and the school districts' opinion of ODE's willingness or capacity to oversee them—was clearly corroborated by what Dr. Bateman encountered while conducting his investigation. His efforts to obtain voluntary responses from school districts, even with help from ODE, were "not very well received." ECF No. 157-2 at 18. As a result, ODE had to serve federal court subpoenas to all 197 school districts. *Id.* Even facing federal subpoenas, some districts "still refused to respond to the survey." *Id.* Others provided information that was so heavily redacted that it was uninformative. *Id.* Through interviews with officials from both ODE and school districts, Dr. Bateman identified local control concerns as a central reason for ODE's lack of oversight and enforcement. *See, e.g.*, ECF No. 157-2 at 20, 36-37. ODE's related resistance to requiring districts to compel staff training, to use a statewide IEP system, or to participate in a meaningful monitoring and enforcement system is a symptom of its improper deference to school districts at the cost of continued harm to students. *See, e.g.*, Ex. 18 at 101:20-22; Ex. 16 at 36:4-7 ("[R]elated to us being a local control state, [ODE] would not assume that districts are doing the wrong thing by default and say there's a problem unless and until we have evidence of it.").

    In fact, ODE deference to local control has meant that it has waited to investigate or address district violations of student rights until action became politically expedient. For example, in October 2021, ODE was informed about a program in the Clackamas ESD that placed a group of students with disabilities on a shortened in-person school week. CSMF ¶ 34. Clackamas cited a staffing shortage as its primary rationale and justified this systemic SSD program by stating that Lane ESD had a similar program. Ex. 17 at 1. In response, ODE informed the district this program may lead to "legal issues," *id.*, but did not open an investigation until almost eight months later in June 2022. CSMF ¶ 36. Even then, it was not ODE's knowledge of the illegal use of SSDs that

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

prompted this investigation but "significant statewide attention" from the media and legislature. *Id.*; Ex. 16 at 183:14-25.

ODE's approach to enforcement has not changed since Dr. Bateman's report. Even when ODE has concerns, Dr. Wells testified that he "do[es]n't think it's necessary to go look at every instance where there is any concern." Ex. 16 at 187:24-25. For example, Dr. Bateman identified a district-based program in which entire groups of students were placed on SSDs, sometimes for years at a time. ECF No. 157-2 at 63.[21] Despite being informed about this district's SSD program through the Bateman Report, Dr. Wells testified that ODE had not contacted that district or opened an investigation as of January 2023, over six months after Dr. Bateman's report. Ex. 16 at 132:20-24, 131:1-25.

Just as ODE's approach to local control has not changed since the Bateman Report, school districts continue to resist ODE's limited efforts to collect data needed to enforce the law. In January 2023, there were still districts who had not responded to multiple requests for SSD data dating back several months. Wetherell Ex. 6 at 1. Sometimes the district response is more extreme. For example, Ms. Wetherell testified that "there are times when districts refuse to talk to me without their lawyer present." Ex. 18 at 102:12-13. Despite this resistance, ODE's new monitoring system continues to grant the districts substantial deference. *See, e.g.*, Ex. 16 at 35:23-36:7; Ex. 18 at 101:13-22.[22]

---

[21] Oddly, ODE identified this school district as an "exemplar" for Dr. Bateman's investigation. ECF No. 157-2 at 63.

[22] Similarly, in information provided to the Oregon legislature in February 2023, Defendant Gill stated, "Our current system for ensuring school districts are standard is one of reliance on local control . . . ." Ex. 44 [S.B. 289: Standard, Nonstandard or Conditionally Standard Districts, Senate Education Committee, Information from Colt Gill (Feb. 7, 2023)] at 1.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

ODE also continues to willfully ignore data that demonstrates a need for further investigation. What little data is available about SSDs in Oregon following Dr. Bateman's report demonstrates that ODE has had little (if any) impact on the SSD problem. The Bateman Report found that 685 students with disabilities were on SSDs in 2017-2018, 1029 in 2018-2019, and 986 in 2019-2020. ECF No. 157-2 at 23. ODE's most recent data collection confirms that the SSD problem remains widespread in Oregon. *See* Ex. 32. The reported number of students with disabilities on SSDs has actually increased month-to-month since implementation began, with 747 students in October 2022, 848 students in November, and 850 students in December. *See* Ex. 32. Significantly, ODE still collects no data that would allow it to understand the use and frequency of informal removals as a way to shorten the school days of students with disabilities. However, when confronted, Dr. Wells denied that the rising numbers of students on SSDs indicates a problem. Ex. 16 at 45:5-7. Ms. Wetherell at least conceded that the increase in students on SSDs was concerning, Ex. 18 at 262:3-5, but she stressed that the numbers would not, on their own, lead to an investigation. Ex. 18 at 272:9-12.

### 3.    ODE Has Abdicated Its Duty to Provide Training and Technical Assistance to School District Staff on SSD

An SEA must provide school district staff "with technical assistance and training necessary to assist" the school district staff in providing a FAPE in the LRE. 34 C.F.R. § 300.119(b); *see also, e.g.*, 34 C.F.R. § 300.604(a)(1); 34 C.F.R. § 300.600(a)(3) (listing different types of technical assistance). Dr. Bateman's report documents ODE's abdication of its role in providing training and technical assistance to school districts, at one point criticizing the "vacuum of leadership around SSD [and] lack of consistent state training," leading to districts "placing children with behavior issues on SSD." ECF No. 157-2 at 63. Dr. Bateman could not "locate sufficient guidance, training or other resources . . . to help districts understand the LRE considerations and the role of

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

the IEP team to ambitiously move students back to a full day." CSMF ¶ 20. "Very few, if any, districts" according to the Bateman Report, viewed "ODE as a source of guidance or a resource for training and support . . . ." ECF No. 157-2 at 63.

In the past, some of the limited trainings provided by ODE actually encouraged the use of SSDs. For instance, ODE education specialist Lisa Bateman offered voluntary trainings on SSD usage that identified "behaviors of concern," "parent insistence," and "stamina issues" as "common scenarios" for reducing a school day. ECF No. 96 at 381; *see also* Ex. 45 ["The Shortened School Day in Oregon Schools,"] at CPAA-ODE-8962; Ex. 46 [Oregon Dep't of Educ., Review: Abbreviated School Day] at 8-10.  By introducing these ill-defined concepts and tacitly endorsing them as acceptable reasons for SSDs, this training effectively encouraged the use of SSDs. Indeed, Dr. Bateman's report specifically found that "stamina" was one of the two most common reasons for placing a student on SSDs. ECF No. 157-2 at 45, 61.

To ensure that districts cease the illegal use of SSDs, Dr. Bateman recommended that ODE provide high-quality, mandatory trainings on ways to prevent the inappropriate placement of students on SSDs, including setting behavior goals, using FBAs, and developing BIPs. ECF No. 157-2 at 42, 51. To date, ODE has rejected this recommendation. Ex. 16 at 72:7-11, 73:1-3. Though ODE has the authority to mandate statewide trainings, it will not mandate any training on SSDs. Ex. 16 at 71:8-21; Ex. 18 at 212:13-17. This means that educators and administrators across Oregon may participate in such training, but only "if they choose to avail themselves of it" or "if it's a current priority for them in their system." Ex. 16 at 73:22-23. ODE continues to leave the districts to voluntarily seek out these trainings as Dr. Bateman found. ECF No. 157-2 at 43.

Dr. Wells claims that ODE has trained on its SSD guidance. Ex. 16 at 242:11-12.  However, ODE's trainings have been structurally inadequate in terms of length, frequency, and accessibility;

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

as a result, they are unlikely to improve practices at the district level. *See, e.g.*, ECF No. 157-2 at 6, 42-43; Ex. 18 at 215:17-19, 216:17-20. Instead of training on how to modify the SSD decision process, conduct FBAs, or develop BIPs, ODE's voluntary training presentations provide a superficial overview of ODE's October 2022 guidance. *See generally* Ex. 47 [Abbreviated School Day Program Placements (Oct. 23, 2022)]. School districts continue to receive little training, guidance, or substantive support, such as coaching or modeling, to change how or why they place students on SSDs.

Additionally, ODE continues to provide voluntary trainings, primarily through the ODE/COSA Fall 2022 Special Education Conference, a training model that Dr. Bateman had already identified as inadequate to address the misuse of SSDs. ECF No. 157-2 at 42-43. During the 2022 Conference, no sessions were offered on behavior goals, FBAs, or BIPs, which Dr. Bateman deemed "essential" for preventing inappropriate SSD placements. *See* Ex. 48 [ODE/COSA 2022 Special Education Conference Schedule] at 2; ECF No. 157-2 at 51. This approach is generally consistent with the other trainings touted by ODE. *See, e.g.*, Ex. 49 [2023 OACOA/OASE Winter Conference Agenda] at 2.[23]

Ms. Wetherell claims that the district personnel who attend ODE's trainings are "learning" and "becoming clear" about SSDs. Ex. 18 at 195:4-5. However, the basis for this claim is unclear. What is clear is that SSD use has not declined since ODE offered the relevant trainings. *See* Ex. 32 (850 students on SSDs reported to ODE in December 2022). It is also clear that ODE has no intent to "universally require" training for school districts. *See* Ex. 16 at 73:1-3. As a result, Dr.

---

[23] Ms. Wetherell testified that ODE provided an SSD training to principals at the COSA 2022 Annual Principals Conference. She estimated that roughly 25 to 30 principals attended the one-hour session, which was held at the same time as a "multitude of trainings." Ex. 18 at 215:17-19, 216:20.

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

Wells, despite being Director of IDEA Programs for ODE, did not know which school districts have received SSD trainings, including which school districts were required to attend as part of corrective action. *Id.* at 74:5-12.

Compounding the problems created by ODE's refusal to mandate training on SSD, ODE fails to provide effective technical assistance to support districts in improving their practices. Dr. Bateman specifically found that "there is a lack of behavior support resources . . . [and] that almost every district noted the lack of mental health services and resources to access . . . ." CSMF ¶ 25. ODE still does not provide schools assistance of the types identified in the IDEA. 34 C.F.R. § 300.604(a)(1); *see also* Ex. 19 at RFP 13 (responding that ODE had no documents responsive to Plaintiffs' request for documents showing "providers, experts, consultants, or other resources made available by Defendants to support [school districts] in meeting the behavioral and emotional needs of students receiving [SSDs]").

### 4.    Oregon Education Funding Mechanisms Illegally Promote SSDs.

Though an SEA may not fund education for students with disabilities in a way that "result[s] in placements that violate" LRE requirements, 34 C.F.R. § 300.114(b), ODE's funding practices encourage local districts to place students on SSDs. Oregon distributes federal special education funding to each school district proportionate to "the LEA's number of children receiving special education services." CSMF ¶ 57. When a student is placed on SSDs, the school district continues to receive full funding, as if that student were being educated for a full day. CSMF ¶ 58. Effectively, SSDs have no impact on school district state and federal funding but reduce staff costs for the district. This funding mechanism creates a financial incentive to reduce instructional time at the expense of the students, who routinely receive substantially less education than their peers without disabilities.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

Dr. Bateman also found that districts often use "permanent programs that have been established to operate year-round" for large groups of students with behavior needs, allowing for exactly these financial savings. ECF No. 157-2 at 45-46, 80. Dr. Bateman specifically found that districts had created programs in which half the students attended in the morning and the other half in the afternoon, thus allowing those districts to use half the staff to serve the same number of students. *Id.* Dr. Wells admitted that Oregon's current funding system does create such financial incentives. Ex. 16 at 98: 1-12 (agreeing that, "from a purely economic standpoint" school administrators could collect full funding for students on SSD). Dr. Bateman specifically recommended that Oregon reduce education funding to LEAs proportionately with the actual time of instruction to the student, but ODE has not adopted that recommendation. ECF No. 157-2 at 57; Ex. 16 at 92:1-9. While Dr. Wells denies that any district would ever shorten school days to realize a financial benefit, *id.* at 96:12-17, Dr. Bateman found clear signs that some school districts were operating SSD programs that allowed them to employ half as many staff as would be required if they provided a full day of education to students with disabilities. ECF No. 157-2 at 45-46, 63, 79-80.

### B.    OREGON STUDENTS ARE DENIED FAPE IN THE LRE UNDER THE IDEA DUE TO ODE'S FAILURES

Defendants' primary responsibility under the IDEA is to ensure that children with disabilities actually receive an appropriate education. *See* 20 U.S.C. § 1412(a); *Doe*, 793 F.2d at 1492; *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 697-98 (3d Cir. 1981) (rejecting Delaware's contention that no relief could be had against it for denial of special education because "it functions solely as a supervisory agency" and rejecting premise that "the state agency [can] disclaim[] responsibility and point[] back to the local education authorities"); *Corey H. v. Bd. of Educ. of Chi.*, 995 F. Supp. 900, 902 (N.D. Ill. 1998); *Orange Cnty. Dep't of Educ. v. Cal. Dep't*

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

*of Educ.*, 668 F.3d 1052, 1063 (9th Cir. 2011); S. Rep. No. 94-168, at 24 (1971), *reprinted in* 1975

U.S.C.C.A.N. 1425, 1448. Students with disabilities must receive an "appropriately ambitious"

educational program that gives them "the chance to meet challenging objectives." *Endrew F.*, 580

U.S. at 402.

### 1.    Oregon Students Placed on SSD Are Denied an Appropriate Education.

The IDEA "demands more" than "instruction that aims so low [as to] be tantamount to

'sitting idly . . . awaiting the time when they were old enough to "drop out."'" *Endrew F.*, 580

U.S. at 403 (citation omitted).  Rather, the IDEA "requires an educational program reasonably

calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

There should be a "cogent and responsive explanation" for decisions made, to show that the IEP

is "reasonably calculated" for the student's progress. *Id.* at 404.

Denial of a full day of school, especially for long periods of time and in the absence of

findings that SSDs will not interfere with a student's educational progress, is highly likely to

violate FAPE. ECF No. 157-2 at 5 (finding that students placed on SSDs are positioned to lag

further and further behind); Greenwood Decl., Ex. A at 19 ("in my opinion a large number of

students placed on shortened days for extended periods of time (over 60 days) likely did not receive

a free and appropriate public education (FAPE)"); Ex. 50 [Deposition of John Hess] at 121:13-17.

Dr. Bateman additionally found that many of the students on SSDs lacked behavioral supports or

goals in their IEPs even though they had been placed on SSDs due to their behavior. CSMF ¶ 18.[24]

---

[24] *See also* Ex. 51 [U.S. Dep't of Educ., Dear Colleague Letter on the Inclusion of Behavioral
Supports in IEPs (Aug. 1, 2016)], at 6 (IEP team must "consider and, when determined necessary
for ensuring FAPE, include or revise behavioral supports in the IEP of a child . . .  exhibiting
behavior that impedes his or her learning or that of others"); Ex. 52 [U.S. Dep't of Educ.,
Questions and Answers:  Addressing the Needs of Children with Disabilities and IDEA's
Discipline Provisions (Jul. 19, 2022)], at 6 (IEP teams may address behavior through behavioral

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

Following Dr. Bateman's report, there is no material dispute of fact that many Oregon students who have been excluded from education through SSDs are not receiving an appropriate education under the meaning of IDEA, including due to inconsistency with federal regulations or state standards.

Indeed, little in the record suggests that the services provided to students on SSDs were "reasonably calculated" in any manner or that the students subject to SSDs were making meaningful academic or behavioral progress. ECF No. 157-2 at 11 (describing the "absence of logic and evidence-based pedagogical decisions" supporting the use of shortened school days). Dr. Bateman's repeated finding that students remained on SSDs for years, often with little sign of progress towards participation in a full day of school, strongly indicates that SSDs inhibit rather than promote student progress. *See, e.g.,* CSMF ¶ 19. When Dr. Bateman described long-term effects of SSDs, he noted that students "who miss 10% of kindergarten lag, on average, almost a year behind in reading by third grade," and that students "who miss two days of school per month will miss 1.5 years of instruction by the end of 12th grade." ECF No. 157-2 at 61.

ODE's newly promulgated general supervision system still sidesteps its main legal obligation to ensure that students with disabilities on SSDs actually meet challenging IEP goals and objectives, *see Endrew F.*, 580 U.S. at 400, [25] because it focuses on paper procedural compliance satisfied by minimal self-reported SSD data. In maintaining this system, ODE continues to deny that the number of students on SSDs, in and of itself, could signify a systemic

---

goals, and include in student's IEP supports and services needed to enable child to advance appropriately toward meeting those goals).

[25] *See also* Ex. 53 [U.S. Dep't of Educ., Questions and Answers (Q&A) on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District Re-1 (Dec. 7, 2017)], at 6 (IEPs must ensure that "children with disabilities have the chance to meet challenging objectives, as reflected in the child's IEP goals").

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

problem. *See, e.g.*, Ex. 16 at 45:5-7, 45:15-18, 198:5-9; Ex. 18 at 75:13-15, 246:11-17. Dr. Wells

testified that he would not view SSDs as a "problem solely because of a number" even if 100% of

Oregon students with disabilities in Oregon were on SSDs. Ex. 16 at 46:8-13. ODE has built its

system on the faulty premise that IEP teams' decisions are unassailable if they are reached through

appropriate procedures under the IDEA, *see, e.g.*, Ex. 18 at 75:16-19, 109:6-18, 113:25-114-3.[26]

This complete reliance on procedural compliance alone has made, and continues to make, ODE's

system of oversight insensitive to how many students with disabilities are subjected to SSDs, how

long they remain placed on SSDs, and whether these students receive FAPE.

     These harms are compounded by ODE's knowledge, through Dr. Bateman's findings, that

many students in Oregon are placed on SSDs without even the most rudimentary procedural

protections in their written IEP. Dr. Bateman found a variety of procedural violations for students

with disabilities who were placed on SSDs. He found some students who were placed on SSDs

without any IEP; others who were placed on SSDs despite their IEPs not documenting that their

school days were shortened; and still others whose IEP improperly authorized SSDs. CSMF ¶¶ 15-

18; see also ECF No. 157-2 at 63.[27] ODE cannot reasonably argue that these students' programs

---

[26] ODE's attitude is echoed in Dr. Bateman's finding that Oregon school districts that placed students on SSDs "viewed the decision as appropriate as long as they followed the right procedures." ECF No. 157-2 at 6.

[27] *See also* ECF No. 157-2 at 44 (most IEP reviewed included "no written plans regarding how that student's SSD will be reviewed, nor any delineated timeframe, description of data to be collected and analyzed, or review dates"); *see also W.G. v. Bd. of Trs.* ("*Target Range*"), 960 F.2d 1479, 1484 (9th Cir. 1992) ("[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of FAPE."). Here, among other things Dr. Bateman found that the "vast majority" of IEPs reviewed from the 2017-18 and 2018-19 school years did not include evidence that parents were notified or acknowledged their children's SSD placement, ECF No. 157-2 at 44—indicating a serious infringement upon their ability to participate in the IEP process.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

are "reasonably calculated" to permit them to make appropriate progress toward challenging goals and objectives.

**2.    Oregon Students Placed on SSDs Are Denied an Education in the Least Restrictive Environment.**

Dr. Bateman explains that SSDs are a highly restrictive placement that "severely restricts the student's opportunity to receive an appropriate education with their peers and benefit from the modeling and incidental learning inherent to inclusive settings." ECF No. 157-2 at 155; *see also* Greenwood Decl. Ex. A at 19 (describing SSD as a "highly restrictive environment—at home for much or most of the day, isolated from teachers, classmates, and other individuals who could support [students]—that limits their exposure to instruction and social contact with peers"). ODE concedes that "any abbreviated school day placement [is] generally considered more restrictive than any full school day placement." ODE, Abbreviated School Day Programs: Considerations for IEP Teams at 7, Fig. 3. CPAA-ODE-35294. In a single year, then, Oregon allowed one thousand students to be placed in what ODE itself considers the most restrictive educational environment.

The propriety of removing a student with a disability from a general education placement depends on a consideration of the relative academic and non-academic benefits of the two placements; any potential negative effect of the student on peers; and the costs of the supplementary aids and services. *D.R.*, 56 F.4th at 643. The use of SSDs in Oregon fails this test. Instead of weighing these considerations, Dr. Bateman found that districts focus on two rationales for SSDs: stamina and safety. ECF No. 157-2 at 45, 61. These vague rationales do not relate to any consideration of academic or nonacademic benefit for the student. ECF No. 157-2 at 11-12 (discussing benefits of being in a full day of school). Dr. Bateman also found that districts made no effort to make up for the instruction students miss while placed on SSDs. *Id.* at 62. Long-term SSD placements also eliminate opportunities for positive socialization, the "nonacademic

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

benefits" described by the Ninth Circuit, for those students who most desperately need them. *Id.* at 11 (discussing the "benefits and incidental learning from socialization and regular interactions with other students").

Indeed, Dr. Bateman found that many districts lacked a basic understanding of the IDEA's LRE mandate, and this lack of understanding kept students on SSD placements: "The districts did not often demonstrate an understanding that the IEP and program should be developed and calculated to allow these students to aggressively work toward moving the student along the LRE continuum toward more time with peers." *Id.* at 6. Dr. Bateman could not identify "guidance, training, or other resources and support provided by ODE to help districts understand the LRE considerations and the role of the IEP team to ambitiously move students back to a full-day." CSMF ¶ 20.

A crucial part of the LRE analysis is that students should not be removed from a less restrictive environment unless "education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2)(ii). As discussed in Dr. Bateman's report, Oregon state and local officials rarely make efforts to identify and provide the needed aids and services. Dr. Bateman's team "discovered[,] and [their] qualitative data confirmed, districts are placing students on [SSDs] without ever attempting, much less demonstrating, a child cannot access a full-day without supplemental aids and services." ECF No. 157-2 at 79-80. By contrast, two Oregon school districts "could not think of any examples of students they were unable to serve" with such supports. *Id.* at 62. As discussed above, Defendants have not adequately addressed the statewide shortage of behavioral and mental health services that might help districts support students with disabilities with appropriate supplemental aids and services. ECF No. 157-2 at 48, 78 (discussing lack of mental and behavioral supports); Greenwood

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

Decl. Ex. A at 11 (agreeing that in his experience in Oregon "finding resources to help support students with extreme needs and behavior is an ongoing challenge").

### C.    OREGON ENCOURAGES AND ALLOWS DISCRIMINATION IN STATE-FUNDED EDUCATIONAL PROGRAMS IN VIOLATION OF SECTION 504 AND THE ADA

Section 504 and the ADA impose related, but distinct, obligations on Oregon, including a unique Section 504 definition of FAPE and LRE. A claim under Section 504 or the ADA requires a showing that the students are students with disabilities, that they are otherwise qualified to participate in their educational programs, and that they have been subject to discrimination based on disability.  For Section 504, plaintiffs must additionally prove that the educational agency receives federal funds. The only one of these prongs in question is whether ODE discriminates against students with disabilities.[28]

#### 1.    Oregon's SSD Practices Deny Students With Disabilities an Educational Program Designed to Meet Their Needs as Adequately as Those of Students Without Disabilities.

Oregon authorizes the use of SSD placements exclusively for students with disabilities, imposing a unique and discriminatory burden these students. Ex. 16 at 130:12-18. Under Section 504, a FAPE means an educational program designed to meet the needs of students with disabilities "as adequately as the needs" of other students. 34 C.F.R. § 104.33(b)(1)(i). The selective use of SSDs for students with disabilities under Oregon law presents a clear instance of discrimination against students with disabilities. Oregon recognizes that a core element of an effective school

---

[28] ODE concedes that it receives federal funds and the definition of the class requires that members actually have disabilities and be eligible for education services in Oregon.  As the Court has previously explained, ODE is "a public entity covered by Title II [of the ADA] and a recipient of federal financial assistance subject to Section 504," and thus is subject to those laws' requirements. Op. & Order at 12. *See* ECF No. 109, Answer ¶ 20 (admitting that the State of Oregon receives federal financial assistance). There is no dispute that at least one Named Plaintiff is a qualified individual with a disability under the ADA and Section 504. Answer ¶¶ 13, 15-16.

CONFIDENTIAL AND PRIVILEGED
ATTORNEY WORK PRODUCT

program is attending some minimum number of hours per school year and accordingly requires that districts provide specified hours of instructional time to students without disabilities. Or. Rev. Stat. Ann. § 339.010(1); Or. Admin. R. 581-022-2320 (setting academic school year standards); Or. Admin. R. 581-021-0077(1)(e) (regular attendance means not more than eight unexcused half-day absences or the equivalent thereof in a four-week period). Nevertheless, Oregon permits large numbers of students with disabilities to be denied, without adequate justification, this same instructional time.

A student who remains on SSDs for months or years will not receive minimum required instructional time nor meet mandatory attendance standards. Or. Rev. Stat. Ann. § 339.020(1), .095. An Oregon student should receive at least 900 hours of instruction per year in their elementary education years, 990 hours in ninth, tenth and eleventh grade, and 966 hours in their twelfth-grade year. Or. Admin. R. 581-022-2320; Or. Rev. Stat. Ann. § 326.051(1)(c). Students on SSDs are inappropriately deprived of the instructional hours other students receive. Few of ODE's publications and none of their actual enforcement actions regarding SSDs identify specific compensatory education awards or other appropriate steps to ensure that students with disabilities receive required instructional time. *See, e.g.,* Ex. 18 at 163:24-164:18; Ex. 16 at 104:9-12 (ODE has not issued guidance regarding mandatory compensatory education for SSDs); ECF No. 157-2 at 62 (noting school districts generally "did not provide any additional instruction outside of the student's SSD" and questions on this point were "typically met with incredulity as to why that would be an expectation"). This denial of instructional time causes significant harm to students with disabilities: Dr. Bateman cited the harm of "an educational program that put them in a position to lag further and further behind their peers in both academic and social emotional skills."  ECF No. 157-2 at 5-6.

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

## 2. Oregon Does Not Require Behavioral Evaluations or Supports Before an SSD Is Imposed.

Oregon further denies students with disabilities educational programs designed to meet their needs as adequately as those of their peers without disabilities by continuing to permit and endorse the failure to provide required behavioral assessments under Section 504 before students are placed on SSDs. Under Section 504, before initial placement of a student with disability and "any subsequent significant change in placement," an educational agency must "conduct an evaluation" of the student. 34 C.F.R. § 104.35(a); *Doe v. Maher*, 793 F.2d 1470, 1487 (9th Cir. 1986). The educational agency must rely on tests and evaluations tailored to assess specific areas of need, using validated tests and trained examiners. 34 C.F.R. § 104.35(b). Placing a student on an SSD because of the student's behavior therefore may only occur after a proper behavioral evaluation, such as a Functional Behavioral Assessment, by a trained evaluator.[29] No other process identified or used by Oregon education agencies meets this standard. ECF No. 157-2 at 51 (describing FBAs and BIPs as "essential tools necessary to ensure" placement in LRE and prevent return to SSDs); ECF No. 66-2 at 1 (all named plaintiffs were put on SSDs "without first . . . performing a functional behavioral assessment"); Greenwood Decl. Ex. A at 12 ("[F]ailure to complete forms to help staff conduct a functional behavior assessment or develop a behavior plan . . . infect[s] the entire process of developing in-school behavior supports for a student"); *id.* at 16 (FBA and BIP "are essential tools in developing behavioral supports"). And, where the FBA shows that challenging behavior is caused by or related to the student's disability,

---

[29] *See* Ex. 54 [U.S. Dep't of Educ., Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline under Section 504 of the Rehabilitation Act of 1973 (Jul. 2022) (hereinafter "OCR 504 Guidance")] at 10 ("If the school does not assess a student's challenging behaviors during the evaluation process . . . the Section 504 team would lack the information needed to design a program that will meet the student's individual educational needs, and the student could be denied FAPE.").

any placement decision must identify individualized behavior supports to meet the student's needs.[30]

Defendants do not contest that ODE does not require FBAs—or any evaluation—prior to an SSD placement. Ex. 16 at 227:12-24 (explaining that ODE does not require districts to report whether a student has a BIP or FBA "because first there is no statutory requirement or a requirement in IDEA for a child to have a functional behavioral assessment or behavior intervention plan before any given placement"). ODE's failure to require evaluation of a student's needs and provision of behavior supports aligned with that evaluation before an SSD placement directly violates Section 504.

### 3. Oregon Denies Students Equal Opportunities to Receive Educational Services in the Most Integrated Environment in Violation of the ADA and Section 504.

Educational opportunities for students with disabilities in Oregon who receive SSDs are markedly unequal to those afforded other students. Discrimination under the ADA and Section 504 includes denying students with disabilities the "equal opportunity" to benefit from public programs or services, including by providing services in a setting other than the "most integrated" setting appropriate for that individual. 28 C.F.R. § 35.130(b)(1)(ii), (iii) (equal opportunity to benefit); 28 C.F.R. § 35.130(d) (most integrated setting).[31] By providing direct financial aid to school districts that engage in prohibited discrimination, Defendants violate the ADA and Section 504. 28 C.F.R. § 35.130(b)(1)(v) (aid to another agency that discriminates); *Adam C. v. Scranton Sch. Dist.*, No. 3:07-CV-532, 2011 WL 996171, at *4 (M.D. Pa. Mar. 17, 2011); 34 C.F.R. §

---

[30] *See* Ex. 54 at 10 (information obtained through behavioral assessment can be used to develop a behavioral intervention plan (BIP)).

[31] S*ee also* 28 C.F.R. § 35.130(b)(1)(i) (denial of benefit); 28 C.F.R. § 35.130(b)(3) (methods of administration); 34 C.F.R. § 104.4(b)(1)(ii); *see, e.g.*, *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1100 (9th Cir. 2013) (articulating ADA's unique role in special education, independent of IDEA).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

104.4(b)(5). Dr. Bateman's report and evidence elsewhere in the record confirms massive, explicit exclusion of Plaintiff class members from public education services. It also confirms that ODE and Oregon school districts have excluded the Plaintiff Class because of their disability-related behaviors. Ex. 16 at 130:12-18 (SSDs only imposed on students with disabilities).[32]

Students with disabilities also experience disability discrimination through their routine placement in the least integrated setting—being entirely removed from the public-school environment where they would be surrounded by peers without disabilities. Under the ADA, recipients of public programming—including students—must be served in the "most integrated setting."[33] Similarly, Section 504 requires that students be educated alongside students without disabilities to the maximum extent possible. 34 C.F.R. § 104.34(a).

Statewide practices that drive students with disabilities out of the classroom violate the ADA and Section 504, including because "[c]hildren with disabilities in particular need . . . in-person instruction." *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 880 (S.D. Iowa 2021). A reduction in hours of service to a person with disabilities that increases isolation at home violates *Olmstead. See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 463 (6th Cir. 2020) (state practices violated ADA integration mandate by reducing hours of service that would allow person with disabilities to leave their home); *Steimel v. Wernert*, 823 F.3d 902, 914 (7th Cir. 2016) (same).

---

[32] *See Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001) (failure to accommodate disability-related conduct may constitute discrimination because "[c]onduct resulting from a disability is considered to be part of the disability . . . .").

[33] *See United States v. Georgia*, 461 F. Supp. 3d 1315, 1324 (N.D. Ga. 2020); *see also Olmstead*, 527 U.S. at 600 (noting that Congress, in enacting the ADA, "explicitly identified unjustified segregation of persons with disabilities as a form of discrimination"); 42 U.S.C. § 12101(a)(3) (finding that discrimination against individuals with disabilities "persists in such critical areas as . . . education").

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

While the Plaintiff Class experiences significant harm through ODE's system of IDEA supervision focusing solely on paper compliance, the same system inflicts additional harm by failing to consider ODE's obligations altogether under the ADA and Section 504. Ex. 18 at 133:16-134:9. Even though ODE has clear obligations to ensure students with disabilities receive equality of opportunity under the ADA and Section 504, ODE has not taken any steps to enforce these statutes. ODE still refuses to track students placed on SSDs who may have disabilities but lack an IEP, claiming that these students are not receiving SSDs within the meaning of Oregon law. *See* Ex. 16 at 130-12-18; Ex. 18 at 119:20-120:24.  When asked whether ODE's new monitoring system tracked data related to Section 504, Ms. Wetherell testified that compliance with Section 504 was the province of a different department that she could not identify. Ex. 18 at 133:16-23. Dr. Wells' testimony that placement of 100% of Oregon students with disabilities on SSDs would not, by itself, constitute a problem, Ex. 16 at 46:8-13, further demonstrates ODE's flagrant disregard for the mandates of equal opportunity and integration that are pillars of the ADA and Section 504. As Dr. Bateman found, "[t]his isolation perpetuates the stigma, misunderstanding, and fear that often underlies a school district's decision to exclude children with disability-related behaviors from the classroom." ECF No. 157-2 at 12.

### D. OREGON'S SSD PROBLEM WILL NOT BE RESOLVED EXCEPT BY COURT INTERVENTION AND EXTERNAL OVERSIGHT.

Plaintiffs agree with Dr. Bateman that ODE must make changes to prevent the inappropriate use of shortened day placements and informal removals in Oregon schools. CSMF ¶ 27. Injunctive relief is needed to address the problems identified in Dr. Bateman's report, which violate the rights of the named Plaintiffs and the Plaintiff class.  A remedial order should include the appointment of an external monitor, which is necessary to fix the deep-seated problems with SSDs in Oregon. ODE's implementation of its general supervision system so far demonstrates that

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

ODE is either unwilling or unable to take the necessary steps to ensure that school districts stop inappropriately placing students on SSDs.

Injunctive relief is appropriate where state agencies flout their IDEA obligations. *See D.L. v. Dist. of Columbia*, 860 F.3d 713, 730 (D.C. Cir. 2017) (explaining that an injunction requires the Defendant "to do nothing more than what is required under IDEA"). Courts regularly impose remedial measures where violations of IDEA are systematic. Indeed, courts have found remedies like monitoring necessary where an SEA has repeatedly failed to address known violations of IDEA. *See, e.g.*, *Corey H. v. Bd of Educ. of Chicago*, 995 F. Supp. 900, 902-03, 915 (N.D. Ill. 1998) (injunctive relief necessary where State was out of compliance with IDEA's LRE requirements, the state lacked procedures for identifying adequate placement options and lacked monitoring to address inappropriate placements, and delays in placements were continuous and recurring because the state's system could not rectify compliance issues).

> **1.    ODE Continues to Deny the Scope of the SSD Problem and Exhibits Extreme Deference to School Districts Inconsistent With Ensuring Students With Disabilities Receive a FAPE.**

Despite a decade-long history of state complaints and Dr. Bateman's findings, CSMF ¶¶ 30, 2-26, Dr. Wells, ODE's Director of IDEA Programs, still "do[es] not believe" that "there is any sort of overuse of shortened school days in Oregon." Ex. 16 at 28:20-24. This sort of willful ignorance by ODE decisionmakers and policy experts prevents ODE from taking necessary steps to address the use of SSDs.

As discussed above, rather than ensuring that students are receiving opportunities to meet challenging goals and objectives, ODE's system asks districts merely whether student IEP goals are changing from year to year—not whether the substance of the goals is challenging to help meet the student's unique needs. Ex. 40 at 40; Ex. 16 at 204:18-20, 243:14-244:13. Rather than mandate substantive trainings that directly address school districts' well-known failures to take appropriate

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

steps before placing students on SSDs, ODE's new trainings focus on procedural compliance and leave it up to districts to decide whether they attend. *See* Ex. 16 at 73:22-25. Finally, rather than mandate compensatory education when districts inappropriately place students on SSDs, ODE leaves this to the discretion of the same IEP teams that inappropriately placed those students on SSDs. Ex. 18 at 163:11-164:18. Far from demonstrating that ODE is on a path towards solving Oregon's SSD problem, the minimal impact of its system of general supervision confirms the need for immediate court intervention and external oversight.

### 2.    ODE Continues to Refuse to Enact Binding Rules Regarding SSDs.

Without a court order requiring ODE to undertake reforms, ODE can revise or rescind its policies and practices that specifically address SSDs at any time. Tellingly, ODE refuses to enact Dr. Bateman's recommendation that they establish clear consequences for school districts that fail to follow ODE's "guidance" on SSDs. ECF No. 157-2 at 57; Ex. 16 at 92:1-9. When asked about this, Dr. Wells testified that ODE could not require districts to comply with guidance because they could only require actions through "rules," and that ODE would not issue rules because that was "not [Dr. Bateman's] recommendation." *Id.* at 93:3-94:11. In this limited view, ODE's responsibilities are defined by the letter of Dr. Bateman's recommendations rather than their substance. This further demonstrates the need for court intervention.

Court-ordered monitoring is necessary because the design of ODE's system is flawed and fails to provide students with FAPE. ECF No. 157-2 at 11-14, 20, 21-22, 64-65. ODE officials continue to deny its obligation to monitor school districts beyond procedural compliance. *See*, *e.g.*, Ex. 16 at 45:23-46: 2; Ex. 18 at 268:16-19. Dr. Wells testified that, under ODE's system, even a school district placing 100% of its students on SSDs would not raise alarm. Ex. 16 at 46:8-15. All this underscores the lack of procedures, investigation, development, and coordination between ODE and other entities that is necessary to protect the rights of Plaintiff class members. Among

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

other things, the Court should appoint a monitor to help it oversee its remedial Order. *See Reid L. v. Illinois State Bd. of Educ.*, 358 F.3d 511, 514 (7th Cir. 2004) (explaining rationale for remedial order, including monitoring); *see also, e.g., Blackman v. Dist. of Columbia*, No. 97-cv-1629, 2006 WL 2456413 (D.D.C. Aug. 24, 2006) (approving consent decree to remedy systemic IDEA violations in the District of Columbia and appointing a monitor); *Vaughn G. v. Amprey*, 117 F.3d 1415, at *1 (4th Cir. 1997) (recounting the "decade long struggle" between students and the Baltimore City Public School system, which led to a series of consent decrees and appointment of a court monitor).

*CONFIDENTIAL AND PRIVILEGED*
*ATTORNEY WORK PRODUCT*

## CONCLUSION

Pending permission from the Court, this motion contains 15,210 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, exhibits, and certificates of counsel.

For the above reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,                    Dated: March 16, 2023

  */s/ Thomas Stenson*
Thomas Stenson (OR No. 152894)             Ira A. Burnim (D.C. No. 406154)*
tstenson@droregon.org                      irab@bazelon.org
Joel Greenberg (OR No. 943233)             Lewis Bossing (D.C. No. 984609)*
jgreenberg@droregon.org                    lewisb@bazelon.org
Disability Rights Oregon                   Bazelon Center for Mental Health Law
511 SW 10th Avenue, Suite 200              1090 Vermont Avenue NW, Suite 220
Portland, OR 97205-2748                    Washington, DC 20005-4900
(503) 243-2081                             (202) 467-5730

Hannah Benton Eidsath (CT No. 428982)*     Michael Folger (NY No. 5151337)*
hbenton@youthlaw.org                       michael.folger@probonolaw.com
Seth Packrone (NY Reg. No. 5395769)*       1 Manhattan West
spackrone@youthlaw.org                     New York, NY 10001
Nina Monfredo (NY No. 5717624)*            (212) 735-3000
nmonfredo@youthlaw.org
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425         *Admitted pro hac vice
Washington, DC 20006
(202) 868-4781

Selene Almazan-Altobelli (MD No. 10506)*
selene@copaa.org
Council of Parent Attorneys and Advocates
8 Market Place, Suite 300
Baltimore, MD 21285
(844) 426-7224 ext. 702                    *Attorneys for Plaintiffs*