ELLEN F. ROSENBLUM
Attorney General
CARLA A. SCOTT #054725
Senior Assistant Attorney General
NINA R. ENGLANDER #106119
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.state.or.us
       Nina.Englander@doj.state.or.us

Attorneys for Defendants Oregon Department of Education, Colt Gill and Tina Kotek

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| J.N., by and through his next friend, Cheryl Cisneros, E.O., by and through his next friend, Alisha Overstreet; J.V., by and through his next friend, Sarah Kaplansky; B.M. by and through his next friend, Traci Modugno; on behalf of themselves and all others similarly situated, and<br><br>COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,<br><br>        Plaintiffs,<br>   v.<br><br>OREGON DEPARTMENT OF EDUCATION,<br><br>COLT GILL, in his official capacities as Director of Oregon Department of Education and Deputy Superintendent of Public Instructions for the State of Oregon, and<br><br>TINA KOTEK, in her official capacities as Governor and Superintendent of Public Instruction for the State of Oregon,<br><br>        Defendants. | Case No.  6:19-cv-00096-AA<br><br>DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

## TABLE OF CONTENTS

CERTIFICATION OF COMPLIANCE WITH LR 7-1 ................................................... 1

MOTION ..................................................................................................................... 1

MEMORANDUM OF LAW ....................................................................................... 1

    I.      INTRODUCTION ............................................................................ 1

    II.     FACTUAL BACKGROUND ............................................................ 3

          A.      Procedural Posture and Neutral Expert Report. ........................ 3

          B.      ODE is implementing a newly redesigned system of general supervision that was designed with national experts in IDEA monitoring and compliance ......................................................... 6

          C.      ODE adopted a new general supervision rule. ............................ 7

          D.      ODE has a robust system of integrated monitoring and technical support ......................................................................................... 7

          E.      ODE is implementing a comprehensive systemic approach to address abbreviated school days that incorporates the key components of the Neutral Expert Report. ................................. 9

                1.      Guidance, professional development and technical assistance ......................................................................... 10

                     a.      High-quality, proactive guidance on SSD ...................... 10

                     b.      Training ........................................................................... 12

                     c.      Allocation of $5 million for new regional and statewide technical assistance centers. ............................. 12

                     d.      Creation of an abbreviated school day action team and hiring new ODE staff. ................................. 14

                2.      Monitoring and data collection. ........................................ 14

                     a.      Immediate data and monitoring. ..................................... 14

                       i.      Selection of SSD as a monitoring priority. ........... 14

                       ii.     Short-term data collection ..................................... 15

                   b.      Long-term formal data collection. ................................... 16

                3.      ODE's implementation of additional recommendations ............. 16

           F.      ODE has developed processes and supports to ensure meaningful parent participation. ................................................................... 17

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

III.    SUBSTANTIVE LEGAL FRAMEWORK ............................................................. 18

    A.    The IDEA requires states to offer a FAPE and procedural
        safeguards at the local level. ................................................................ 19

        1.    The SEA is responsible for general supervision. ........................ 19

        2.    FAPE is an individualized determination that is delivered
            by LEAs ...................................................................................... 19

        3.    The IDEA requires states to establish processes to
            challenge the denial of FAPE. ................................................... 20

        4.    Oregon has a comprehensive framework for complying
            with the IDEA. .......................................................................... 22

    B.    The ADA and the RA prohibit discrimination on the basis of
        disability in public facilities and federally funded programs ................ 23

IV.    STANDARD FOR MOTION FOR SUMMARY JUDGMENT .......................... 24

V.    ARGUMENT ................................................................................................... 25

    A.    The Court should grant Defendants' motion for summary judgment
        because Plaintiffs' systemic IDEA claim relies on a negligence
        theory that has been squarely rejected by recent Ninth Circuit
        cases. ..................................................................................................... 25

    B.    The Court should grant Defendants' motion for summary judgment
        because undisputed present facts demonstrate that Plaintiffs' IDEA
        claims fail. ............................................................................................. 26

        1.    IDEA compliance and any injunctive relief must be
            evaluated on present facts. ......................................................... 26

        2.    ODE is actively monitoring the use of SSDs through its
            newly designed system of general supervision and new data
            collections, among other tools. ................................................... 27

        3.    ODE actively investigates and corrects district
            noncompliance regarding SSDs. ................................................ 30

            a.    ODE provides technical support and lower-level
                interventions before corrective actions and
                investigations become necessary. ..................................... 31

            b.    ODE investigates and requires robust corrective
                actions when necessary. .................................................... 32

            c.    ODE follows up on corrective actions to ensure
                compliance. ....................................................................... 33

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

d.      The Court should reject Plaintiffs' various
        arguments regarding correcting district
        noncompliance. ................................................................ 34

4.      ODE is exhibiting proactive leadership and providing
        extensive training and technical assistance to school
        districts ........................................................................... 35

5.      Oregon's funding mechanism does not violate the IDEA. ........... 37

6.      Current facts demonstrate that ODE is meeting its
        obligation to ensure the availability of FAPE by operating a
        system of general supervision that complies with the IDEA ........ 40

C.      Plaintiffs are not entitled to summary judgment on their ADA and
        RA claims ......................................................................................... 43

D.      The Court should reject Plaintiffs' request for a court monitor ................ 45

VI.     CONCLUSION ................................................................................................ 46

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

# TABLE OF AUTHORITIES

## Cases

*Adams v. State of Oregon*, 195 F.3d 1141 (9th Cir. 1999) ............................................................ 43

*Alexander v. Choate*, 469 U.S. 287 (1985)................................................................................ 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 24

*Chafin v. Chafin*, 133 S. Ct. 1017 (2013) .................................................................................. 27

*Christopher M. v. Corpus Christi Ind. School Dist.*, 933 F.2d 1285 (5th Cir. 1991) ................. 43

*Christopher S. ex rel. Rita S. v. Stanislau Cnty. Off. of Educ.*, 384 F.3d 1205 (9th Cir. 2004)................................................................................................................................ 20, 21

*Church of Scientology of Cal. v. United States*, 506 U.S. 9 (1992)............................................ 27

*Doe by Gonzales v. Maher*, 793 F.2d 1470 (9th Cir. 1986)....................................................... 19

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017) ........................................ 19

*Everett H. ex rel. Havey v. Dry Creek Joint Elem. Sch. Dist.*, 5 F. Supp. 3d 1184 (E.D. Cal. 2014)...................................................................................................................... 21

*Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017).................................................................. 24

*Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313 (S.D.N.Y. 2005)............................................................................................................. 23

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423 (1974) ............................................................................. 46

*Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298 (9th Cir. 1992)..................................... 21, 22

*Honig v. Doe*, 484 U.S. 305 (1988). ................................................................................ 19, 20, 21

*Lucht v. Molalla River School Dist.*, 225 F.3d 1023 (9th Cir. 2000)..................................... 23, 24

*Martinez v. Newsom,* 46 F.4th 965 (9th Cir. 2022)..................................................................... 25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................... 24

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015).................................................................. 46

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................................................................................ 46

*O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056 (9th Cir. 2007) ................................................ 24

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................... 26

*Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985)........................................................................................................................ 21

*Union Pac. R.R. Co. v. Mower,* 219 F.3d 1069 (9th Cir. 2000)...................................... 46

*Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) ....................................................... 24

**Statutes**

ORS 183.605 ...................................................................................................................... 22

ORS 327.103 ...................................................................................................................... 35

ORS 332.072 ...................................................................................................................... 34

ORS 343.161 ................................................................................................................. 4, 23

**United States Code**

20 U.S.C. § 1401 ............................................................................................................... 20

20 U.S.C. § 1407 ............................................................................................................... 19

20 U.S.C. § 1412 ........................................................................................................... 6, 19

20 U.S.C. § 1414 ............................................................................................................... 20

20 U.S.C. § 1415 ......................................................................................................... 20, 21

20 U.S.C. § 1416 ............................................................................................................... 19

20 U.S.C. §§ 1401 ............................................................................................................. 19

20 U.S.C. §§ 1412 ............................................................................................................. 26

20 U.S.C. §§ 1414 ............................................................................................................. 20

29 U.S.C. § 794 ................................................................................................................. 23

42 U.S.C. § 12132 ............................................................................................................. 23

**Rules and Regulations**

28 C.F.R. § 35.130 ............................................................................................................ 23

34 C.F.R. § 300.114 .......................................................................................................... 37

34 C.F.R. §§ 300 ............................................................................................................... 21

34 C.F.R. 300.149 ............................................................................................................. 19

FRCP 56........................................................................................................................ 1, 24

Page v

FRCP 65 ................................................................................................................ 45, 46

OAR 137-003-0501 .................................................................................................. 22

OAR 581-015-2000 .................................................................................................. 38

OAR 581-015-2015 ......................................................................................... 6, 7, 22

OAR 581-015-2030 .................................................................................................. 22

OAR 581-015-2190 .................................................................................................. 17

OAR 581-015-2190-2225 ......................................................................................... 22

OAR 581-015-2190-95 ............................................................................................. 22

OAR 581-015-2195 .................................................................................................. 17

OAR 581-015-2200 .................................................................................................. 22

OAR 581-015-2310 .................................................................................................. 22

OAR 581-015-2340 .................................................................................................. 22

OAR 581-015-2360 .................................................................................................. 22

OAR 581-015-2365 .................................................................................................. 22

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

### Table of Acronyms and Terms

| | |
|---|---|
| **Abbreviated School Day** | "[A]ny school day during which a student receives instruction or educational services for fewer hours than other students who are in the same grade within the same school." ORS 343.161 (1) (a) |
| **Abbreviated School Day Program** | "[A] education program:<br><br>In which a school district restricts a student's access to hours of instruction or educational services; and<br><br>That results in a student having an abbreviated school day for more than 10 school days per school year." ORS 343.161 (1) (b) |
| **ADA** | Americans with Disabilities Act |
| **BIP** | Behavior Intervention Plan |
| **FAPE** | Free Appropriate Public Education |
| **FBA** | Functional Behavior Assessment |
| **IDEA** | Individuals with Disabilities Education Act |
| **IEP** | Individualized Education Program |
| **LEA** | Local Educational Agency |
| **LRE** | Least Restrictive Environment |
| **OCR** | Office of Civil Rights |
| **ODE** | Oregon Department of Education |
| **OESO** | ODE's Office of Enhancing Student Opportunities |
| **RA** | Rehabilitation Act |
| **SEA** | State Educational Agency |
| **SSD** | Shortened School Day, defined by the Neutral Expert and the Interim Settlement Agreement as "any school day during which a student within the [plaintiff class] receives instruction or educational services in school for fewer hours than other students who are in the same grade within the same school." |
| **TA** | Technical Assistance |

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

**CERTIFICATION OF COMPLIANCE WITH LR 7-1**

Per Local Rule 7-1, undersigned counsel certifies that the parties made a good faith effort through a telephone conference to resolve the dispute and have been unable to do so.

**MOTION**

Defendants' cross-move for summary judgment on the following grounds:

1. Pursuant to FRCP 56(c), Defendants move for summary judgment because Plaintiffs' theory of liability is based on allegations that amount to no more than negligence, and negligence is insufficient as matter of law to establish a systemic denial of a free appropriate public education (FAPE) in the least restrictive environment (LRE) under the Individuals with Disabilities in Education Act (IDEA), the Americans with Disabilities Act (ADA), or the Rehabilitation Act (RA).

2. Pursuant to FRCP 56(c), Defendants are entitled to summary judgment because the undisputed current facts show that Defendants are complying with their obligation to ensure the availability of FAPE in the LRE under the IDEA, ADA, and RA.

This motion is supported by the Declarations of Eric Wells, Tenneal Wetherell, Elizabeth Jankowski, Mark Mayer, Marinda Peters, and Nina Englander, and the following memorandum of law.

**MEMORANDUM OF LAW**

**I.    INTRODUCTION**

The IDEA requires the Oregon Department of Education (as the State Educational Agency, or SEA) to implement a comprehensive system of general supervision to monitor and provide technical assistance to school districts (the Local Educational Agencies, or LEAs), who are at the front lines of implementing the IDEA's mandate to meet the individualized needs of Oregon's 80,000 students experiencing disabilities.  The undisputed evidence shows that ODE's implementation of its newly redesigned system of general supervision readily satisfies its

statutory obligations and allows ODE to monitor, evaluate, and intervene at various levels to ensure that LEAs are appropriately serving all students with disabilities in Oregon.

To be entitled to summary judgment, Plaintiffs must prove denial of a free appropriate public education (FAPE) due to systemic violations of the IDEA, ADA, and RA as a matter of law on undisputed material facts.  But Plaintiffs' theory of liability against Defendants for systemic violation of these statutes rests on allegations of negligence.  And, as explained in Defendants' pending motion for judgment on the pleadings (*see* ECF Nos. 165 & 172), negligence is insufficient as a matter of law to entitle Plaintiffs to systemic relief on any of their claims.  For this reason alone, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion should be granted.

Even if negligence could amount to a systemic violation of the IDEA, ADA, or RA, Defendants counter Plaintiffs' asserted negligence-based facts with undisputed material facts showing the extensive actions Defendants have taken and are taking to ensure they are meeting or exceeding their duty as the SEA to ensure the opportunity for students with disabilities to receive a FAPE from the LEA.  Plaintiffs' scattershot facts throughout their brief nit-pick the comprehensive systems Defendants have put in place and actions they are taking.  Plaintiffs want a perfect system, which (while admirable) is not required by the IDEA, RA, or ADA.  As explained below, Plaintiffs' motion often mischaracterizes and overstates the requirements these statutes place on Defendants as an SEA, takes deposition testimony out of context, and misapplies facts to reach untenable legal conclusions.

To meet its duty to ensure the availability of FAPE under these statutes, Defendants have several systems, processes, and supports in place, including:

- Implementation of a newly redesigned system of general supervision that was designed with national experts in IDEA, general supervision, monitoring and compliance;

Page 2 -    DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

- Adoption of a new administrative rule to strengthen oversight and monitoring;

- Implementation of a comprehensive approach to address the use of abbreviated school days by Oregon school districts, including issuance of guidance, data collection, widespread training and professional development, hiring new staff, and investment of resources into new technical assistance networks.

These systems and actions, described in more detail below, establish that Defendants are meeting their duties under the IDEA, ADA, and RA. Plaintiffs' own expert opined that ODE is taking significant proactive steps to address the inappropriate use of shortened school days for children with disabilities in Oregon and that recent guidance issued by ODE will be extremely helpful for school districts. The undisputed evidence in the record shows that ODE's proactive implementation of additional comprehensive actions will address misuse of shortened school days for students with disabilities by Oregon school districts. Defendants are thus entitled to summary judgment in their favor. Alternatively, if the Court finds that ODE is not entitled to summary judgment due to disputed material facts, Plaintiffs' motion should also be denied on that basis.

## II.    FACTUAL BACKGROUND

### A.    Procedural Posture and Neutral Expert Report.

This case was filed in January 2019 and alleges that Oregon public schools—which are not named as Defendants in this case—have inappropriately used "shortened" or "abbreviated" school days for students with disability-related behaviors, thereby denying those students a FAPE as required by the IDEA, RA and ADA. The term "abbreviated school day" is defined in Oregon law as "any school day during which a student receives instruction or educational services for fewer hours than other students who are in the same grade within the same school."

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ORS 343.161 (1) (a).[1]  The Neutral Expert Report similarly defines "Shortened School Day" as "any school day during which a student within [the Plaintiff class] receives instruction of educational services in school for fewer hours than other students who are in the same grade within the same school."  Neutral Expert Rep. at 89 (ECF No. 157-2 at 90);[2] *accord* Interim Settlement Agreement at 2 (ECF No. 157-1 at 3).  Shortened school day (SSD) and abbreviated school day are used synonymously and interchangeably herein.

Plaintiffs challenge "four broad-based deficiencies" in Oregon's administration of special education: (1) lack of state-level policies or procedures to collect information regarding school districts that impose SSDs and may need further supervision and monitoring, (2) failure to proactively monitor the districts' legal compliance and correct any noncompliance beyond simply operating its administrative complaint system, (3) failure to enforce federal and state laws and policies and correct violations thereof, and (4) failure to provide needed resources, technical assistance, and training to help districts support students effectively for the full school day.  Pl. Mot. Summ. J. at 19 (ECF No. 176 at 27).

The parties engaged in motion practice in 2019 and 2020.  In August 2021, the parties reached an Interim Settlement Agreement.  (ECF No. 157-1).  Pursuant to this agreement, the parties agreed to attempt to resolve this case with a phased approach.  (ECF No. 157-1).  In the first phase, the parties agreed to fact-finding by a Neutral Expert regarding use of SSD and the preparation of a report with findings and "advisory recommendations."  (ECF No. 157-1 at 5). The Neutral Expert provided the Neutral Expert Report to the parties on June 30, 2022, and, in

---

[1] An "abbreviated school day program" is "an education program: (A) In which a school district restricts a student's access to hours of instruction or educational services; and (B) That results in a student having an abbreviated school day for more than 10 school days per school year."  ORS 343.161 (1) (b).

[2] Throughout this Motion, Defendants pin cite to the internal page number of the cited document and provide a parallel pin citation to the pdf page number of the ECF.

Page 4 -   DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

July 2022, the parties engaged in additional settlement conferences but were unable to resolve this matter.  (ECF No. 157).

ODE takes seriously the findings and advisory recommendations in the Neutral Expert Report and is actively working to develop and implement many of the key recommendations to address the concerns and issues identified.  As described more fully below, these actions include issuance of comprehensive guidance on the use of abbreviated school days and pervasive training and technical assistance to address misuse.

There are, however, important limitations to the Neutral Expert Report.  Wells Decl. ¶ 5.  First and foremost, the Neutral Expert Report assessed Oregon's monitoring processes under the IDEA prior to the completion and implementation of ODE's redesigned general supervision framework.  *Id.* ¶ 6.  Oregon's oversight of special education has fundamentally changed since issuance of the Neutral Expert Report nearly ten months ago.  *Id.*  Any factual findings and recommendations related to how Oregon is meeting its requirements under the IDEA apply to a system of general supervision that Oregon is no longer implementing.  *Id.*

Second, as Plaintiffs' own experts opined, some of the advisory recommendations were confusing, not useful, not implementable, and/or not a high priority.  *See* Englander Decl. Ex. 1 at 6 (Hess Dep. 22:8), *Id.* at 8 (Ex. 3 to Hess Dep. (email from Dr. Hess stating: "I've gone through Bateman's recommendations…don't agree w[i]th many of them" and naming one of the recommendations as "way off base")); Englander Decl. Ex. 2 (Greenwood Dep. 61:22-66:12, 67:25-69:10).  ODE is therefore using its expertise to adopt, adapt, and prioritize the recommendations that will have the greatest impact on improving outcomes for Oregon's students with disabilities.  Wells Decl. ¶ 5

Lastly, the Neutral Expert Report acknowledges that there are significant limitations in the quality of the data collected, undermining the data's utility and reliability.  *Id.* ¶ 7.  For this

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

reason, and as discussed further below, ODE is implementing data collection processes that will include important safeguards to ensure that pertinent data is valid and reliable.

**B.     ODE is implementing a newly redesigned system of general supervision that was designed with national experts in IDEA monitoring and compliance.**

Under the IDEA framework, the SEA is responsible for "general supervision" of education programs throughout the state. 20 U.S.C. § 1412 (a) (11).  ODE defines "general supervision" as "a system that enables the Department to monitor whether the requirements of the Individuals with Disabilities Education Act (IDEA), Oregon Revised Statutes (ORS), and Oregon Administrative Rules (OAR) are being effectively implemented by school districts and programs in compliance with legal and regulatory requirements."  OAR 581-015-2015(1).

In late 2019, ODE began redesigning its general supervision system, starting with regional stakeholder engagement sessions throughout the state.  Wells Decl. ¶ 8.  ODE ultimately contracted with a vendor called WestEd to complete this work.  *Id.*  WestEd is a research, development, and services agency that houses the National Center for Systemic Improvement, the national center funded by the U.S. Department of Education's Office of Special Education Programs to support each SEA's development, implementation, and improvement of general supervision systems.  *Id.*  ODE contracted with these national experts to redesign its system of general supervision to ensure that it meets federal requirements and incorporates best practices. *Id.*  In September 2022, ODE rolled out and began implementing its newly revised system of general supervision.  *Id.* ¶ 9.  ODE continues to receive technical assistance from the National Center for Systemic Improvement as it implements this system.  *Id.* ¶¶ 10-11.  Towards that end, ODE is in the process of finalizing a competitive bidding process for a contract to upgrade the technological infrastructure that supports ODE's system of general supervision.  *Id.* ¶ 11.  Part of that process includes executing an additional agreement with WestEd's experts in organizational change management to complete a scope of work that will facilitate continued buy-in of ODE's stakeholders and external partners.  *Id.*  Because National Center for Systemic Improvement staff

Page 6 -    DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
             PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

at WestEd are the national experts in general supervision and the IDEA, ODE is confident that their work with Oregon's system of general supervision will enable the State to provide oversight and monitoring of special education that complies with its legal duties. *Id.* ¶ 12.

C.      **ODE adopted a new general supervision rule.**

ODE recently adopted new tools to strengthen its oversight and general supervision. One of these tools is OAR 581-015-2015, the state-level administrative rule that gives ODE authority to enforce general supervision requirements when lower-level interventions prove inadequate to address identified special education issues. Wetherell Decl. ¶ 4. One of the goals of this rule was to bolster ODE's authority under state law to investigate school districts outside of the complaint or monitoring processes, as well as to strengthen ODE's enforcement mechanisms with respect to noncompliant districts. *Id.* To ensure the opportunity for stakeholder buy-in, ODE developed an engagement framework and worked closely with external partners in gathering input related to implementing OAR 581-015-2015. *Id.* ODE shared the purpose and intent of the rule with stakeholders and education partners and then engaged further to ensure they understood the rule and its requirements. *Id.* ODE held public engagement sessions and used multiple mechanisms of outreach to make Oregonians aware of opportunities for input. *Id.*

D.      **ODE has a robust system of integrated monitoring and technical support.**

Integrated monitoring is a required component of an effective state system of general supervision. Musgrove Decl. ¶¶ 36, 46-51 (ECF No. 67). As required by the IDEA, ODE focuses its accountability and supports on the IDEA requirements that are most closely related to improving outcomes for students experiencing disabilities. Wells Decl. ¶ 15. ODE's system of general supervision is organized into monitoring priority areas that encompass student results and the IDEA requirements that contribute to improved results: Least Restrictive Environment (LRE), Individualized Education Program (IEP) development, Free Appropriate Public Education (FAPE), Discipline, Secondary Transition, and an annual Emergent or Emergency

Page 7 -    DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
             PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Priority Area.  *Id.*  As discussed in further detail below, for the 2022-23 school year, ODE

selected Abbreviated School Day Program Placements as the Emergent or Emergency Priority

Area.  *Id.* Ex. 4.  ODE conducts monitoring and provides technical support at each level of the

general supervision framework.  *Id.* ¶ 16.

      Within its general supervision framework, ODE has three levels of monitoring:

- Universal monitoring is conducted annually and applies to all 197 school districts
  each year.  At this level, ODE evaluates several data points to inform each LEA's
  level of risk for potential noncompliance with the IDEA.  Based on that evaluation,
  ODE determines appropriate follow up, including the selection of specific districts for
  focused monitoring.  *Id.* ¶ 17.[3]

- Cyclical monitoring uses a cohort model pursuant to which every school district is
  subject to additional monitoring at least once every three years.  Cyclical monitoring
  ensures that ODE monitors each LEA to examine LEA compliance with federal and
  state special education requirements related to selected priority areas—with a focus
  on indicators most closely associated with improving educational results—and allows
  for collection of monitoring data needed for State Performance Plan/Annual
  Performance Reports reporting from each district.  *Id.* ¶ 18.

- Focused monitoring accountability and support activities are individualized and take
  place outside of the three-year monitoring cycle and in addition to any universal
  activities.  Focused support activities include, among other things, on-site monitoring
  of school districts, review of school districts' files and procedures, classroom

---

[3] As part of its universal monitoring and supports, ODE receives and responds to phone calls and emails from parents, school districts, advocates, and others. ODE provides technical assistance to inquiries by providing access to resources and information for problem solving and next steps. Wells Decl. ¶ 22.  ODE tracks these inquiries and responses in a contact log; Between December 1, 2018, through the end of January 2022, ODE logged 1,200 contacts onto the contact log.  *Id.*

Page 8 -    DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
               PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

observations, and staff interviews.  Focused monitoring can also be used to

investigate emerging state priorities, such as abbreviated school day program

placements.  *Id.* ¶ 19.

ODE utilizes a cadre of District Support Specialists to provide support for all LEAs.

These staff members are deeply connected with their assigned districts to support their

implementation of the IDEA, submission of data, and ongoing compliance and improvement.  *Id.*

21.  District Support Specialists provide professional development, support problem solving

between parents and school districts, and help districts, parents, and stakeholders to navigate the

state's special education system.  *Id.*  They also provide consultation, either at the request of the

school district or because consultation may be required for monitoring and oversight, such as in

the case of corrective action arising from an administrative complaint.  District Support

Specialists provide referrals to partner agencies for consultation and on-going coaching specific

to need.  *Id.*

**E.    ODE is implementing a comprehensive systemic approach to address abbreviated school days that incorporates the key components of the Neutral Expert Report.**

ODE is actively implementing a comprehensive systematic framework to ensure that

shortened school days are used appropriately and to provide district and student-level supports.

Wetherell Decl. ¶ 6.  ODE intentionally designed this system to ensure that there is fidelity in its

implementation and that the system, once fully implemented, will continue to provide

meaningful mechanisms to address and prevent the inappropriate use of shortened school days

now and into the future.  *Id.*  In doing so, ODE incorporated the key recommendations of the

Neutral Expert Report, including the recommendations that Plaintiffs' expert identified as

highest priority.  *See* Greenwood Supp. Report at 3 (ECF No. 180 at 3).  ODE has already made

significant progress towards implementing this systematic approach.

1.      **Guidance, professional development and technical assistance.**

a.      **High-quality, proactive guidance on SSD.**

The Neutral Expert Report's first recommendation was that ODE issue comprehensive guidance on the use of SSDs for students with disability-related behaviors.  Neutral Expert Report at 50-51 (ECF No. 157-2 at 51-52).  The Neutral Expert Report recommended the inclusion of specific components including: (1) the relationship between SSDs and least restrictive environment; (2) how to calculate the amount of time a child is in school; (3) how to correctly document a student's setting particularly when a child is on SSD; (4) clarification that districts may not use transportation needs and/or administrative convenience to dictate the timeframe of students with disabilities attendance; (5) how to document and report Informal Removals for partial school days; and (6) the use of Functional Behavioral Assessments, Behavior Implementation Plans, and behavior goals.  *Id.*

In October 2022, ODE released comprehensive guidance entitled Abbreviated School Day Programs: Considerations for IEP Teams (hereafter "guidance"), which addresses the above criteria.  Wetherell Decl. ¶ 8 and Ex. 3.  Plaintiffs' expert repeatedly lauded this guidance, calling it "proactive," "detailed" and "high-quality" and opining that it will "absolutely" be "extremely helpful for districts and schools."  Englander Decl. Ex. 2 (Greenwood Dep. 18:21-22, 16:12-14, 13:18-25).  Plaintiffs' expert further explained that the guidance provides "a really nice map" for how school teams "could approach shortened school days," "what methods to use and what constitutes best practice."  *Id.* at 14:15-21.

The guidance clearly states ODE's position that SSDs "[u]nder all but the rarest circumstances, a student's placement on an abbreviated school day program should be for a very limited amount of time."  Wetherell Decl. Ex. 4 at CPAA-ODE-035321 (emphasis in original).  In addition, the guidance emphasizes that:

Page 10 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
              PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

- "It is essential that school districts maintain this presumptive right to a full school day as the central principle guiding decisions related to abbreviated school day programs and that decisions to place a student on an abbreviated day are, accordingly, made only when that student's unique needs that arise from the nature of their disability require it." *Id.* at CPAA-ODE-035297 (emphasis in original).

- "When a student has been placed on an abbreviated school day program, it is the school district's responsibility to closely monitor that student's progress, meet regularly related to the student's abbreviated school day program placement, and continue to work to return the student to a full school day as soon as possible. Abbreviated school day program placements should generally be considered a short-term solution to enable the school district to establish or modify the services and supports available within a full day program to meet the student's needs." *Id.* at CPAA-ODE-035303 (emphasis added).

- "Decisions to place a student on an abbreviated school day program may only be made by the appropriate IEP team, in light of the student's individual and unique circumstances, and consistent with the Least Restrictive Environment (LRE) requirements of the IDEA and the requirements of ORS 343.161." *Id.* at CPAA-ODE-035297.

The guidance contains extensive information and resources regarding how to support student behavior through functional behavior assessments (FBAs) and behavior intervention plans (BIPs). *Id.* at CPAA-ODE-035309-17. It also includes a series of ten guiding questions related to the child's behavior for IEP teams to work through prior to considering placement on an abbreviated school day program. *Id.* at CPAA-ODE-035320. When those questions cannot be answered affirmatively, the guidance recommends that the IEP team "adjust services and

Page 11 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

supports available to the student <u>within a full school day</u> in order to enable the provision of FAPE." *Id.* (<u>emphasis</u> in original).

To address the recommendation in the Neutral Expert Report, Rep. at 57 (ECF No. 157-2 at 58), ODE provided express guidance with respect to how to document informal removals. Wetherell Decl. Ex. 3 at CPAA-ODE-035322-23. In addition, ODE is in the process of developing additional formal guidance on informal removals and improper use of exclusionary practices applied to students. ODE expects to roll out this guidance in May 2023. *Id.* ¶ 9.

### b.      Training.

ODE is doing active and pervasive outreach and training on the new abbreviated school day guidance, including FBAs, BIPs, and behavioral goals. *Id.* ¶ 10. Since October 2022, ODE has conducted over 20 formal trainings throughout the state on key topics and interventions to address any inappropriate use of SSD, with several additional trainings scheduled over the next two months. *Id.* ¶ 10 and Ex. 4. ODE's recent training and outreach on abbreviated school days have included presentations at monthly special education directors' meetings; trainings and workshops at conferences for school administrators, parent advocacy groups, state interagency coordinating councils, and others; publicizing the information on ODE's website; and distributing guidance and pertinent training documents through statewide listservs. *Id.* ¶ 10. In addition, ODE mandates trainings based on needs identified through monitoring of school districts and noncompliance identified through dispute resolution. *Id.* These mandatory trainings may include topics such as how to prevent putting students on inappropriate SSD, or on how to effectively use FBAs and BIPs. *Id.*; *see also* Jankowski Decl. ¶ 8.

### c.      Allocation of $5 million for new regional and statewide technical assistance centers.

Consistent with the recommendations in the Neutral Expert Report, ODE is utilizing state administration dollars from the IDEA to support LEA capacity to address SSDs and disability-

related behavior.  Specifically, ODE has allocated approximately $5 million in the next biennium to establish new regional and state-level support systems.  Wetherell Decl. ¶ 12.

ODE allocated $2.5 million to develop a Regional Special Education Support Network which will provide regional experts trained by ODE to support all areas of general supervision, including monitoring the implementation of abbreviated school day program placements.  *Id.* ¶ 13.  The regional networks will provide additional personnel distributed regionally throughout the state to focus on critical areas of need, provide targeted support reflective of regional needs, and seek to build capacity at the local level through resource development and provision, technical assistance, coaching, and professional development.  *Id.*  These networks will provide individualized technical assistance and support through numerous avenues—including hands-on training, one-to-one coaching, phone call support, and on-demand technical assistance—to support problem solving at the local level and within the individual context of the student.  *Id.* The goal of these networks is to ensure that the abbreviated day guidance trickles down to school district staff and other frontline workers who directly engage with students with disabilities on a daily basis.  *Id.*  Plaintiffs' expert opined that this kind of dissemination of the guidance is important and effective.  *See* Englander Decl. Ex. 2 (Greenwood Dep. 22:10-23).  ODE is on track to complete the contract and begin training by September 2023.  Wetherell Decl. ¶ 13.

ODE has allocated an additional $2.5 million for a Statewide Technical Assistance Center, which will focus on providing training and supports for disability-related behaviors.  *Id.* ¶ 14. The statewide center will provide intensive support and build capacity of staff to work with students with disability-related behavior needs.  *Id.*  The statewide center will serve as an additional resource for LEAs and the regional special education support network when local and regional capacity is not sufficient to meet local need.  *Id.*  ODE intends to have a competitive bidding process and award the contract for the statewide center in the 2023-24 school year.  The service would begin in the 2024-25 school year.  *Id.*

Page 13 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

####     d.    Creation of an abbreviated school day action team and hiring new ODE staff.

In response to the Neutral Expert Report's recommendation that ODE designate a centralized point of contact at SSD, ODE is creating an abbreviated school day action team comprised of a District Support Specialist lead, a research analyst (to be hired) and an administrative support staff person. *Id.* ¶ 15. This team will monitor and review data regarding abbreviated school day program placements, follow up with school districts regarding areas of concern, and identify areas of intervention where additional training and/or corrective action are warranted. *Id.* In addition, this team will serve as the primary point of contact on abbreviated school days, both internally at ODE and externally for stakeholders, school districts, and parents. *Id.* ODE is also hiring new positions to enhance its ability to effectively implement its system of general supervision. *Id.* ¶ 16. Among those positions will be a new General Supervision Coordinator—who will coordinate and streamline ODE's various monitoring activities, help ODE to learn and iterate, review and analyze data, and propose systematic adjustments as needed—and a new multilingual parent liaison to start in the 2023-24 school year. *Id.*

####     2.    Monitoring and data collection.

The IDEA does not require states to collect data on the use of SSD. *See* Musgrove Decl. ¶¶ 54, 58 (ECF No. 67). Nonetheless, consistent with the recommendations in the Neutral Expert Report and that of Plaintiffs' Expert, *see id.* ¶ 58, ODE has taken several proactive measures to collect data regarding the use of abbreviated school day program placements in Oregon.

####     a.    Immediate data and monitoring.

####     i.    Selection of SSD as a monitoring priority.

To address the Neutral Expert Report's concern that some school districts are inappropriately placing students with disabilities on SSD, and consistent with the recommendation of Plaintiffs' Expert, Musgrove Decl. ¶ 47 (ECF No. 67), ODE selected SSD as

Page 14 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

a monitoring priority for the 2022-23 school year by identifying abbreviated school day program placements as the Emergent/Emergency Area monitoring priority.  Pursuant to this monitoring, every school district in the state must complete a validated self-assessment and perform a thorough IEP review for every student placed on an abbreviated school day.  Wells Decl. ¶ 24. This review is subject to specific protocols developed by ODE to allow for an in-depth understanding on why each student has been placed on an abbreviated school day program and provide appropriate technical assistance and corrective action.  *Id.*  These protocols require school districts to provide information about whether each student is actually making progress towards meeting their goals.  *Id.* ¶ 25.

ODE has hired two new District Support Specialists who are dedicating a significant portion of their time to validating the monitoring data received from each school district to verify its accuracy, identify noncompliance where it exists, and determine what, if any, corrective actions and technical assistance may be appropriate.  *Id.* ¶ 26.  ODE will continue to use the abbreviated school day program protocols, or individual standards drawn from it, in future school years, as it deems appropriate.  *Id.* ¶ 27.  Based on the results of the focused monitoring and the short-term data collection discussed below, ODE will decide whether abbreviated school day program placements will continue to be the emergent/emergency monitoring priority next school year or beyond.  *Id.*

### ii.    Short-term data collection.

In response to the concerns identified in the Neutral Expert Report, ODE promptly acted to require school districts to provide monthly data submissions regarding every student with disability in the district who has received an abbreviated school day program placement for more than 30 school days, starting in the 2022-23 school year.  *Id.* ¶ 28.  ODE selected 30 days because the Neutral Expert Report identified 30 days as an appropriate monitoring threshold. *See* Ex. 157-1 at 164; *id.* at 137-38.  District Support Specialists are actively working to assist

Page 15 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

districts in understanding how to submit their data, ensure the data is accurate, and monitor data for potential concerns and follow-up to discuss policy and practice shifts as needed.  Wells Decl. ¶ 28.  The short-term data collection is a preliminary approach to track this data as the agency develops a long-term collection process and protocols.  The preliminary process will inform the long-term process for the collection of data and give LEAs the opportunity to provide feedback and input about implementation of the final data collection.  *Id.* ¶ 29.

### b. Long-term formal data collection.

ODE is in the process of developing a formal data collection on abbreviated school day program placements, with the goal of launching this data collection in the 2023-24 school year. *Id.* ¶ 30.  ODE anticipates that the long-term data collection will be a permanent data collection on every student placed on an abbreviated school day program.  *Id.*  ODE's abbreviated school day action team, discussed above, will be on point for reviewing and validating the data collected and implementing next steps.  *Id.*

### 3. ODE's implementation of additional recommendations.

To address the Neutral Expert Report's identification of staffing shortages as a challenge for school districts, ODE is convening an annual statewide summit (anticipated to begin in the 2022-23 school year) for Oregon's approved educator preparation providers to develop and support preparation pipeline to address workplace shortages of special education staff.  Wetherell Decl. ¶ 17.  ODE is partnering with the Teacher Standards and Practices Commission and the Educator Advancement Council to coordinate this summit, which be held in late May or early June 2023.  *Id.*  In addition, ODE is participating in legislative workforce committees to provide support at the legislative level for additional funding and resources for special education teachers, special education instructional assistants, and other school staff.  *Id.*

The Neutral Expert Report also recommended that ODE purchase, implement, and mandate the use of a statewide IEP system, a tool that would further standardize the IEP process

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

across all districts, streamline ODE's access to and evaluation of student IEPs, enable seamless

transfer of student records between school districts, and promote consistency and compliance

in special education services.  ODE agrees with the Neutral Expert Report that a statewide IEP

system in Oregon could be beneficial.  *Id.* ¶ 18.  Adoption of such a system, however, is not

something that ODE can do unilaterally.  Instead, it requires legislation and funding.  *Id.*  ODE is

therefore initiating an engagement process with external partners to gather stakeholder input on

the use of a statewide IEP system.  *Id.*  This engagement process could culminate in a legislative

proposal to adopt a statewide IEP system.  *Id.*

###    F.    ODE has developed processes and supports to ensure meaningful parent participation.

ODE believes that parents and guardians play a critical role in the education of students

with disabilities and should be major partners in the process to plan and implement educational

options for their children.  Wells Decl. ¶ 31.  ODE has therefore developed processes to provide

parents and guardians a meaningful opportunity to effectively support student progress.  *Id.*

Oregon Administrative Rules require school districts to provide one or both parents of a

child with a disability with an opportunity to participate in meetings with respect to the

identification, evaluation, IEP and educational placement of their child, and the provision of a

free appropriate public education to their child.  *See* OAR 581-015-2190, OAR 581-015-2195.

ODE identified meaningful parent participation as a central theme in the abbreviated school day

guidance, which emphasizes the need for parent input in the process throughout.  Wells Decl.

¶ 33.  Additionally, as part of the abbreviated school day program protocol, ODE included

multiple standards to assess whether parents were able to meaningfully participate in the process.

*Id.* ¶ 34.

ODE is committed to continuing to invest in its ability to support parents and families.

ODE recently developed a new resource to guide parents seeking support.  *Id.* ¶ 35 and Ex. 5.

Dr. Greenwood opined that this guidance is a "helpful tool" that identifies "the procedural steps

Page 17 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

to enable a parent to have resources to meaningfully participate" in a student's education. Englander Decl. Ex. 2 (Greenwood Dep. 74:10-15). ODE also recently developed two new mechanisms parents can use to seek support for special education matters: (1) a primary ODE email inbox for special education questions, and (2) a new form parents can use to seek support. Wells Decl. ¶ 35 and Ex. 6. An ODE District Support Specialist is specifically tasked with monitoring and responding to the inbox and submitted forms in a timely manner. Dr. Greenwood testified that the email inbox, in particular, is a "great" tool because "it is important for parents to be able to access ODE or another entity directly with concerns and questions. Greenwood Dep. 76:16-22; *id.* 19-21. In addition to ODE's District Support Specialists who are available to respond to parent concerns, as noted above, ODE is in the process of hiring a multilingual parent liaison who will primarily work to support parents and families as they navigate special education concerns. Wells Decl. ¶ 36.

## III.    SUBSTANTIVE LEGAL FRAMEWORK

Oregon accepts federal funding for special education under the IDEA. In exchange, federal law requires the SEA, here ODE, to ensure that eligible students have an opportunity to receive a FAPE from their LEA, here school districts and educational service districts. Individualized assessment of the appropriate FAPE for each eligible student is the foundation of the IDEA.

Oregon implements the IDEA through an extensive framework of substantive and procedural provisions designed to ensure the availability of a FAPE. The LEAs deliver the services and are required to tailor an individualized education program (IEP) to meet the specific needs of each student. As required by the IDEA and its implementing regulations, administrative review processes are available for students to challenge their IEPs and to ensure that the IEP is appropriate to the student's needs and appropriately implemented.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**A.    The IDEA requires states to offer a FAPE and procedural safeguards at the local level.**

**1.    The SEA is responsible for general supervision.**

Under the IDEA framework, the SEA is responsible for "general supervision" of education programs throughout the state and is "responsible for ensuring that" the IDEA requirements are met.  20 U.S.C. § 1412 (a) (11); *see also* 20 U.S.C. § 1416 (a) (1) and 34 C.F.R. 300.149.  The SEA fulfills this responsibility by, among other things, engaging in rulemaking to ensure that state rules, regulations, and policies for special education conform to the requirements of the IDEA.  20 U.S.C. § 1407.  The IDEA framework requires the states to provide "assurances to the Secretary [of Education] that the State has in effect policies and procedures to ensure that the State meets" specific conditions.  20 U.S.C. § 1412 (a).  One such condition is that "[a] free appropriate public education is available to all children with disabilities residing in the State between ages 3 and 21."  20 U.S.C. § 1412 (a) (1).

**2.    FAPE is an individualized determination that is delivered by LEAs and defined in each student's IEP.**

Providing a FAPE is necessarily carried out directly by LEAs, typically schools or school districts.  The specifics of a FAPE are set out in the IEP.  20 U.S.C. §§ 1401 (9) (D).  The creation of an IEP, as well as its substantive content, is unique to a specific student and must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).  The process is inherently individualized – "[a] focus on the particular child is at the core of the IDEA," and "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created."  *Id.* at 999, 1001.  As the Ninth Circuit has explained, the "IEP is a written program of educational goals and services, tailored to meet the child's unique needs, that is developed at an IEP meeting according to the proper procedures."  *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1479-1480 (9th Cir. 1986), *aff'd as modified sub nom. Honig v. Doe*, 484 U.S. 305 (1988).

Page 19 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

A FAPE includes both "special education" and "related services." 20 U.S.C. § 1401 (9). Special education is "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401 (29). Related services are "supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401 (26). Each student's IEP must describe the student's current educational status and annual goals, specifically identify special educational services or other aids that are needed, and address placement in the least restrictive environment appropriate for receiving instruction. 20 U.S.C. § 1414 (d) (1) (A).

The IEP team includes teachers, school officials, and the student's parents or guardians. 20 U.S.C. § 1414 (d) (1) (B). Parents play a critical role in the IEP process. Indeed, a key motivation for the original enactment of the IDEA was to prevent unilateral action by schools without notice to parents. *Honig*, 484 U.S. at 311 (noting that "Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation"). Parents must be afforded an opportunity to participate in the creation of the IEP, annual reviews, and any meetings involving potential modifications. 20 U.S.C. §§ 1414 (a) – (d). LEAs must give parents notice if a change in services occurs amounting to a change in "placement"—which may include placing the student on a shortened school day program. 20 U.S.C. §§ 1414 (d) (1) (B) – 1415(f).

### 3.    The IDEA requires states to establish processes to challenge the denial of FAPE.

A parent may challenge a substantive or procedural violation of the IEP process, such as use of an inappropriate shortened school day program or lack of notice. 20 U.S.C. § 1415 (b) (6) (parent may dispute "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child"); *see also Christopher S. ex rel. Rita S. v. Stanislau Cnty. Off. of Educ.*, 384 F.3d 1205, 1210 (9th Cir. 2004) (describing procedural safeguards). The IDEA requires states to establish two distinct

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

mechanisms for administrative review of IEP decisions, whether substantive or procedural, and other grievances related to special education.  The IDEA mandates a hearing procedure to be conducted by an independent hearings officer.  20 U.S.C. § 1415 (f).  This process is commonly referred to as the "due process hearing" procedure.  *See Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992).  The Secretary's rules also require the SEA to conduct its own administrative review of grievances by investigating allegations and promptly reporting the results.  34 C.F.R. §§ 300.151 – 300.153.  To differentiate between the two processes, many cases use the acronym CRP (Complaint Resolution Procedure) for the latter complaint system. The CRP process is available for systemic complaints and is not necessarily adversarial.  *See Christopher S.,* 384 F.3d at 1210-11 (discussing exhaustion of systemic claims); *Everett H. ex rel. Havey v. Dry Creek Joint Elem. Sch. Dist.*, 5 F. Supp. 3d 1184, 1188 (E.D. Cal. 2014) (describing the CRP as "more informal, and less adversarial" than a due process proceeding).

A change in a student's IEP "placement" triggers available options for review and remedy and the placement cannot be changed while review is pending.  20 U.S.C. § 1415 (j) (commonly referred to as the "stay put" provision); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373 (1985) ("We think at least one purpose of [the stay put provision] was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings."). The stay put provision protects the student's right to continuation of the current IEP placement during administrative review, appeal to a trial court, and further appellate review in the judicial system.  *See Honig*, 484 U.S. at 323 (concluding that IDEA stay put provision "is unequivocal" and "states plainly that during the pendency of any proceedings initiated under the Act [absent agreement of all parties] 'the child *shall* remain in the then current educational placement'" (emphasis in original)).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**4.    Oregon has a comprehensive framework for complying with the IDEA.**

Oregon's IDEA framework is primarily set forth in Oregon Revised Statutes Chapter 343 and Oregon Administrative Rules Chapter 581, Division 15.  *See* OAR 581-015-2015.  Oregon LEAs must comply with a detailed process for developing an IEP, including parent participation, team considerations and special factors, review and revision, and much more.  *See* OAR 581-015-2190-2225.  As required by the IDEA, Oregon LEAs must provide parents with an opportunity to participate in the creation of the IEP, the annual IEP review, and any subsequent meetings to modify the IEP.  OAR 581-015-2190-95.  Each student's IEP must describe the student's current educational status and annual goals, specifically identify special educational services or other aids that are needed, and address placement in the least restrictive appropriate setting for receiving instruction.  OAR 581-015-2200.  State rules also implement the notice requirement for a change in services amounting to a change in placement.  OAR 581-015-2310.

Parents who believe their child's IEP is substantively or procedurally defective may use the review processes described above.  The formal "due process" hearing includes the right to counsel and the right to "present evidence and confront, cross-exam, and compel attendance of witnesses."  OAR 581-015-2360.  The Oregon Office of Administration Hearings (OAH) is an independent agency that conducts due process hearings through an impartial Administrative Law Judge (ALJ).  OAR 581-015-2340 and 137-003-0501; *see also* ORS 183.605 (establishing OAH); and OAR 581-015-2365 (criteria for ALJ).

The CRP is known in Oregon as the "state complaint process."  OAR 581-015-2030.  The state complaint process, conducted by ODE, is available for any eligible complaint.  ODE uses a contract investigator to review the complaint, collect evidence and issue a proposed determination.  The Assistant Superintendent in the Office of Enhancing Student Opportunities typically issues the final order on behalf of ODE.  This procedure is not an adversarial proceeding and is not a substitute for a due process hearing.  *See Hoeft*, 967 F.2d at 1308

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

("complementary"); *Lucht v. Molalla River School Dist.*, 225 F.3d 1023, 1028 (9th Cir. 2000) ("alternative" method to address an IDEA complaint).

Among the policies and procedures enforced by the State is the shortened school day statute passed by the Oregon Legislative Assembly in 2017. That statute prohibits LEAs from using shortened school days unilaterally. ORS 343.161 (2). It permits use of shortened school days, but only if the student's IEP team makes an individualized decision based on the student's need and after the student's parents have had an opportunity to meaningfully participate in a meeting to discuss the placement; and the IEP team can document that it considered at least one option that included appropriate supports for the student and that could avoid the abbreviated school day placement. ORS 343.161(3).

### B.    The ADA and the RA prohibit discrimination on the basis of disability in public facilities and federally funded programs.

The ADA prohibits a public entity from discriminating on the basis of disability and requires reasonable modifications to policies, practices or procedures when necessary. The ADA applies more broadly than the IDEA and prohibits discrimination in public programs and places of public accommodation. *See* 29 U.S.C. § 794 (a) ("[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance"); 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from . . . services, programs, or activities of a public entity"); *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 333-334 (S.D.N.Y. 2005) (explaining that "denial of *access* to an appropriate educational program on the basis of a disability is a Section 504 issue, whereas dissatisfaction with the *content* of an IEP would fall within the purview of the IDEA" (emphasis in original)). The ADA requires public entities to make certain "reasonable" modifications to existing policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130 (b) (7); *Fry*

Page 23 -   DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (quoting *Alexander v. Choate*, 469 U.S. 287, 299-300 (1985)).

Section 504 of the RA likewise prohibits discrimination on the basis of disability, but applies only to federally funded programs.  Plaintiffs' claim under the RA is otherwise analytically indistinguishable from their ADA claim.  *See, e.g., O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (setting out elements of causes of action under both statutory schemes); *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) (when analyzing discrimination claims brought under either Title II of the ADA or Section 504 of the RA, the courts may consider case law construing either statute "because there is no significant difference in the analysis of rights and obligations created by the two Acts").

## IV.    STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.56(a).  The initial burden for a motion for summary judgment rests with the movant, who must demonstrate the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once this burden is satisfied, the non-movant must demonstrate, through probative evidence, the existence of a triable fact.  *Id.*  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

To defeat summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.* at 587.  "[T]he mere existence of *some* alleged factual dispute between the parties

Page 24 -   DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
                 PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact*."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

## V.    ARGUMENT

### A.    The Court should grant Defendants' motion for summary judgment because Plaintiffs' systemic IDEA claim relies on a negligence theory that has been squarely rejected by recent Ninth Circuit cases.

Plaintiffs' systemic IDEA claim fails as a matter of law for the same reasons sets forth in Defendants' briefing in support of their pending motion for judgment on the pleadings, which Defendants incorporate in their entirety by reference here.  *See* ECF Nos. 165 & 172.  To summarize:

- The Ninth Circuit has never recognized the type of negligence-based systemic IDEA claim Plaintiffs allege here.[4]  And the Ninth Circuit's recent decision in *Martinez v. Newsom,* 46 F.4th 965 (9th Cir. 2022), now forecloses such a claim as a matter of law. *Martinez* unequivocally held that, to obtain systemic relief under the IDEA for denial of FAPE, the alleged injury must be caused by (i.e., be fairly traceable to) an *affirmative* state action that itself violates the IDEA.  This injury requirement is a both a pleading requirement and a jurisdictional hurdle.

- If a negligence-based systemic IDEA claim were viable on its own, the systemic exception to exhaustion would be superfluous.

- None of the cases Plaintiffs cited in their opposition to Defendants' motion for judgment on the pleadings alter that *Martinez* now controls here with respect to the requirements for pleading and proving a systemic IDEA claim for denial of FAPE.

---

[4] Plaintiffs' motion for summary judgment at pages 19-20 confirms that their theory of liability remains solely based on negligence.

Page 25 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

- The ADA and RA claims likewise fail given that the gravamen of all three claims is the systemic denial of FAPE.

    **B.**    **The Court should grant Defendants' motion for summary judgment because undisputed present facts demonstrate that Plaintiffs' IDEA claims fail.**

As noted above, under the IDEA, a state must have "in effect policies and procedures to ensure that…[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21" and that "[t]o the maximum extent appropriate, children with disabilities…are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. §§ 1412 (a) (1), (5).

As Plaintiffs' expert explained, a state meets it obligation to ensure the availability of FAPE in the LRE by "operating a supervisory system that contains each of [eight required] components and utilizing them to effectively prevent, detect and correct noncompliance." Musgrove Decl. ¶ 37 (ECF No. 67); *see also* Pl. Mot. for Class. Cert. at 14 (ECF No. 64 at 19) ("[I]n order to ensure that students receive FAPE in the LRE without discrimination, state must operate a general supervision system that relies on eight essential components.").  As explained in detail below, undisputed present facts demonstrate that ODE is, in fact, actively implementing a newly redesigned system that readily satisfies each of these essential components.

    **1.**    **IDEA compliance and any injunctive relief must be evaluated on present facts.**

To prevail, Plaintiffs must rely on current—not historical—facts.  *See Papasan v. Allain*, 478 U.S. 265, 277-78 (1986) (under the Eleventh Amendment, courts may only remedy *ongoing* violations of law).  There are also constitutional prohibitions against issuance of advisory opinions not based on present, concrete facts.  Federal courts may not decide questions that

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

cannot affect rights of litigants in cases before them or give opinions advising what the law would be on a hypothetical state of facts. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013); *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

Plaintiffs' Motion for Summary Judgment relies on stale facts: namely, the Neutral Expert Report's findings and recommendations issued nearly ten months ago. *See* Pl. Mot. Summ. J. at 17 (ECF No. 176 at 25) (arguing that there are no genuine issues of material fact based on the Neutral Expert's Report). Since the issuance of the Neutral Expert Report, however, ODE has completed and implemented its redesigned general supervision framework and taken numerous additional proactive steps to address the findings of the Neutral Expert Report. To prevail on their claims, Plaintiffs must demonstrate that ODE's *present* system of general supervision and current policies and practices do not comply with the IDEA. Plaintiffs concede, however, that they have not fully assessed this new system, *see* Pl. Mot. Sum. J. at 10, n.9 (ECF No. 176 at 18 n.9) and submit no expert testimony or evidence that ODE's system of general supervision is legally deficient. To the contrary, for the reasons explained below, ODE's evidence demonstrates that it is fully complying with its legal obligations.

>    **2.    ODE is actively monitoring the use of SSDs through its newly designed system of general supervision and new data collections, among other tools.**

As part of its implementation of its newly redesigned system of general supervision, ODE is monitoring the use of abbreviated school days by every school district in Oregon by:

- Issuance of "proactive," "detailed," and "high-quality" guidance on abbreviated school days that will "absolutely" be "extremely helpful for districts and schools." Greenwood Dep. 18:21-22, 16:12-14, 13:18-25. This guidance provides "a really nice map" for how school teams "could approach shortened school days," what methods to use and what constitutes best practice." Greenwood Dep. 14:15-21. This guidance satisfies Plaintiffs' expert's high priority recommendation that ODE issue "[m]ore centralized guidance and

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

sources of expertise to promote consistency and build district capacity across the state to provide behavior supports to students with disabilities who are being considered for a shortened school day." Greenwood Decl. at 3 (ECF No. 180 at 3).

- Selection of abbreviated school day program placements as a monitoring priority and requiring that every school district in the state participate in focused monitoring related to abbreviated school day placements for every child placed on or receiving an abbreviated school day program. ODE's monitoring protocols require that each school district conduct an individualized review of the case files and IEP to ensure that specific criteria are met and to report that information to ODE for validation and follow up. *See* Wells Decl. ¶ 25 and Ex. 4 at CPAA-035327. These protocols provide for the individualized review that is needed to determine the appropriateness of an SSD for each individual student with disabilities and provide information about whether each student is making progress toward meeting their goals. *Id.* ¶ 25.

- For the current school year, requiring that every school district provide monthly data submissions regarding every student in the district who has received an abbreviated school day for more than 30 school days. Wells Decl. ¶¶ 28-29; *see also* Neutral Expert Report at 137-38, 164 (ECF No. Ex. 157-1 at 138-39, 165) (identifying 30 days as an appropriate monitoring threshold).

- Development of a long-term validated data collection for abbreviated school days to launch in the 2023-24 school year. Wells Decl. ¶ 30.

- Active and pervasive outreach and training on the abbreviated school day guidance, focused monitoring and data collections. Wetherell Decl. ¶¶ 10-11.

Plaintiffs' arguments regarding ODE's alleged failure to monitor for shortened school days are based on a misunderstanding of the IDEA and are without any factual basis. For example, Plaintiffs argue that ODE is failing to effectively monitor school districts because ODE

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

is not in the business of overruling the decisions of individual IEP teams. *See* Pl. Mot. for Sum. J. at 22-23 (ECF No. 176 at 30-31). That argument fails for several reasons. First, it ignores the structure of the IDEA which mandates that an IEP must be unique to a specific student, and it is the IEP team—and not ODE—that knows the individual child and determines FAPE.

Second, it ignores the undisputed evidence in the record. The testimony of Plaintiffs' own expert belies Plaintiffs' argument that ODE "rubber-stamps IEP team decisions" and focuses on "paper compliance." Pl. Mot. Summ. J. at 22-23, 43 (ECF No. 176 at 30-31, 51). Dr. Greenwood opined that he was "impressed by the thoroughness of ODE's investigation of IEP content and process in its recent complaint resolutions. It seemed clear there was a commitment on the part of ODE to help districts create a quality IEP." Greenwood Supp. Expert Report at 32 (ECF No. 180-1 at 33); *see also id.* (ODE's "position that effective support for students, and specifically behavioral support, could be achieved in large part through a fundamentally sound, high quality IEP" was "evident in the number of corrective actions focusing on the district's IEP process."). In addition, ODE's monitoring protocols enable ODE to complete a robust and meaningful review of the IEP process to ensure that students are making progress toward their goals. *See* Wells Decl. ¶¶ 24-25.[5]

---

[5] Plaintiffs take out of context Ms. Wetherell's testimony that "it's not the State's job to tell an IEP team what to do." Pl. Mot. Summ. J. at 22 (ECF No. 176 at 30). In fact, Ms. Wetherell explained that "in overarching compliance monitoring scenarios" ODE has not had "full engagement with every single child's IEP team, because that's not part of the process of engagement for that part of the monitoring." Wetherell Dep. 164:5-10. Therefore, Ms. Wetherell testified that she would direct the school district to "have an IEP meeting with every single child within this context and make a determination with that IEP team based on that child's individual circumstances." *Id.* at 164: 11-14. The school district would then report that information to ODE regarding "what decision they made with every single child" and, as appropriate, Ms. Wetherell would "look at the IEP team minutes and meetings" and "ask them more questions about that process." *Id.* at 164:22-165:1. Within that context, "it's not the State's job to tell an IEP team what to do. If the IEP team made a decision and I can see that the decision was made, then I would -- then I would check into those individual circumstances." *Id.* at 165:1-5. This testimony, situated in context, demonstrates that ODE performs a rigorous follow up to verify IEP team decisions without usurping the role of the IEP teams to make the individualized decision for each child.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Moreover, and importantly, this argument contradicts Plaintiffs' earlier arguments in this case, where they stated that "[t]o be clear, Plaintiff do *not* ask the Court to 'determine whether the IEP team for each putative class member has reached the correct decision.'"  Pl. Reply in Supp. of Mot. for Class Cert. at 18 (ECF No. 101 at 22) (emphasis in original).  At the class certification stage, Plaintiffs made clear that they were asking this Court to determine whether Defendants are required to use the State's general supervision system to identify, correct, and prevent the misuse of shortened school days [and] to determine whether Defendants are failing to do so."  *Id.*  The undisputed evidence in the record demonstrates that ODE's newly redesigned general supervision system satisfies ODE's legal obligation to identify, correct, and prevent the misuse of shortened school days.

Plaintiffs ignore this evidence, however, and instead pivot to raising various arguments that are not supported by law, the record in this case, or the testimony of their own experts.  For example, Plaintiffs criticize ODE's system of general supervision for relying on self-reporting from the districts, Pl. Mot. Summ. J. at 23 (ECF No. 176 at 31), but ignore that their own expert explained that self-assessments are a valid and important part of integrated monitoring, Musgrove Decl. ¶ 46 (ECF No. 67).  Plaintiffs also ignore that ODE is implementing extensive safeguards with respect to data collection and validation.  Wells Decl. ¶¶ 24-26.  In addition, Plaintiffs argue that the State is not committing sufficient funding or resources to the issue, Pl. Mot. Summ. J. at 24-25 (ECF No. 176 at 32-33), ignoring the undisputed evidence that ODE is investing significant resources into systems and resources to address the use of abbreviated school days by school districts in Oregon now and into the future.  *See, e.g.*, Wetherell Decl. ¶¶ 12-17; Wells Decl. ¶¶ 10-11.

### 3.    ODE actively investigates and corrects district noncompliance regarding SSDs.

As Plaintiffs' expert explained, "[w]hen a state finds noncompliance during its monitoring, it must generate written reports that require evidence of correction.  To improve

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

correction efforts, it may be necessary for the state to provide both internal technical assistance—to build its own capacity to support districts' implementation of corrective action—and external technical assistance and professional development—to equip district personnel to properly implement state policies and procedures and effective instructional practices." Musgrove Decl. ¶ 51 (ECF No. 67). The undisputed evidence shows that ODE is using its system of general supervision to identify school district noncompliance, issue effective corrective action—including the provision of extensive technical assistance—and ensure compliance.

> ### a.    ODE provides technical support and lower-level interventions before corrective actions and investigations become necessary.

When ODE identifies LEA noncompliance with the IDEA through any activity, it makes a written finding of noncompliance notifying the LEA of the noncompliance, describing the noncompliance, and requiring the LEA to, as soon as possible, but no later than one year from identification: (1) Correct any instances of noncompliance for individual students and provide documentation to ODE; (2) Correct any noncompliant policies, procedures, or practices; and (3) Demonstrate, through data collected subsequent to the initial identification of noncompliance, that the LEA is implementing the regulations correctly for a period of time to be set by ODE. *See* Wells Decl. Ex. 1. ODE sets specific parameters for correction and follows up until the LEA is implementing the regulations correctly. Wetherell Decl. ¶ 19.

In addition, however, Oregon's system of general supervision is framed through the lens of technical support to ensure compliance at the district and IEP team level before corrective action or formal investigations become necessary. *Id.* ¶ 20. ODE works in partnership with districts to identify and verify correction of noncompliance to increase the likelihood of systemic change through training and technical assistance. *Id.* This practice aligns with the opinions of Plaintiffs' experts, who testified that "build[ing] relationships with school and district staff" is essential to effective monitoring and corrective action, Musgrove Decl. ¶ 50 (ECF No. 67), and that ODE must strike "a delicate balance" between providing "proactive leadership and

Page 31 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

discipline," Englander Decl. Ex. 2 (Greenwood Dep. 68:20-21). As Dr. Greenwood opined, it is important that ODE have "a cooperative relationship" with school districts. Greenwood Dep. 69:2. ODE agrees with Plaintiffs' experts that strong relationships with IEP teams and school districts are an essential piece of effective general supervision. Wetherell Decl. ¶ 20. ODE therefore works to provide proactive training and technical assistance, and when ODE has a concern regarding a school district, it first works to resolve the issues with school districts at the lowest level possible through phone calls, meetings, outreach, information gathering, and confirmation of compliance. *Id.*

### b.    ODE investigates and requires robust corrective actions when necessary.

If a district is unable or unwilling to partner with ODE to make necessary corrections, ODE will unilaterally investigate, make findings of noncompliance where warranted, and require corrective action. *Id.* ¶ 21. ODE will also compel correction through enforcement actions where necessary. For example, ODE recently conducted investigations pursuant to which it determined that two ESDs had implemented programs with significant and widespread noncompliance by shifting students to a combination of virtual and in-person instruction, without considering each student's individual needs. *Id.* ¶ 21, Exs. 5 and 6. ODE's required corrective actions included short correction timelines and mandatory training of school district staff. *Id.* ¶ 21, Exs. 7 and 8. ODE also identified noncompliance issues that would not result in a significant denial of instruction and ordered the programs to correct those in timelines specific to each violation. *Id.* ¶ 21. Plaintiffs' expert lauded these corrective action documents, testifying that ODE appropriately "required districts to increase staff awareness of the appropriate sequence, including within the escalation cycle, for providing behavior support." Greenwood Supp. Expert Report at 32 (ECF No. 180-1 at 33); Englander Decl. Ex. 2 (Greenwood Dep. 40:22-41:4). In its corrective action plans, ODE focuses on reparation of harm for students when their rights are violated and ensuring that similar violations do not occur in the future. Wetherell Decl. ¶ 22.

Page 32 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
           PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

###### c. ODE follows up on corrective actions to ensure compliance.

After ODE issues corrective actions, it follows up to ensure district compliance. For example, in March 2022, ODE released Findings of Fact, Conclusions, and Final Order in a case filed through Oregon's administrative complaint system, which involved the Klamath Falls City School District's placement of students on reduced-day schedules due to disability-related behaviors without providing appropriate behavioral services and supports. Jankowski Decl. ¶ 4 and Ex. 1. As a result of this final order, Klamath Falls City School District was required to implement significant corrective actions, and ODE provided extensive monitoring and technical assistance to ensure successful implementation of required actions. *Id.* ¶ 4. This included multiple on-site monitoring visits by ODE and comprehensive mandatory training on, among other topics, positive behavior interventions and supports for students with disability-related behaviors. *Id.*; *see also id.* Exs. 2, 3, 4. At the on-site visits, ODE confirmed that—of the 23 students originally identified as being inappropriately placed on a SSD—only two students remained on an abbreviated school day program placement. *Id.* ¶ 7. One of these students continued to have an abbreviated school day program placement due to parent request. *Id.* For the second student, the IEP team made the decision for the student to remain on an abbreviated school day schedule using guidance from ORS 343.161. *Id.* File reviews indicate that both students had step-up plans in their files, and the district was in compliance with other abbreviated school day requirements for these two students. *Id.*

In addition, the school district successfully complied with ODE's required corrective action to develop and implement a series of mandatory high-quality district-wide special education trainings for all building and program administrators, special education staff, and related services providers employed by the district. *Id.* ¶ 8. These trainings included key topics such as parent participation requirements; special considerations for students with complex needs, including students who may meet criteria for more than one disability; provision of FAPE

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

in the Least Restrictive Environment (LRE), the relationship of non-participation justification, placement decisions; and the requirements of SB 263; strategies for identifying and implementing appropriate behavioral supports for students with disabilities. *Id.*

The district also made several systemic changes required by ODE's corrective action, including hiring and placing additional behavioral support specialists across the district. *Id.* ¶ 9. Each building in the district now has a behavioral support team with protocols and forms for working with students exhibiting disability-related behaviors. *Id.* ¶ 9. The goal of these teams is to accommodate and solve problems at the building level. *Id.* ¶ 9. District special education leadership personnel report that building administrators have been remarkably helpful in this process. *Id.* ¶ 9. The district implemented numerous additional actions, including doubling staff for this student population and receiving in-person technical assistance. *Id.* ¶ 9. This evidence shows that ODE's monitoring and oversight is effective at ensuring that districts are properly implementing the IDEA and enhancing the outcomes for students with disabilities. *See* Musgrove Decl. ¶ 60 (ECF No. 67) ("state must have a graduated enforcement system with sanctions for individual and systemic noncompliance, guidelines for implementing those sanctions, and clear, written timelines on what happens when there is noncompliance").

### d. The Court should reject Plaintiffs' various arguments regarding correcting district noncompliance.

The Court should reject Plaintiffs' argument that ODE is failing to identify and correct district noncompliance. Plaintiffs' first argument is that ODE is denying its responsibility to monitor school districts because ODE notes correctly that Oregon is a local control state. *See* Pl. Mot. Sum. J. at 25-26 (ECF No. 176 at 33-34). It is undisputed that Oregon is a local control state and, by statute, "[a]ll school districts [in Oregon] are bodies corporate, and the district school board is authorized to transact all business coming within the jurisdiction of the district and to sue and be sued. Pursuant to law, district school boards have control of the district schools and are responsible for educating children residing in the district." ORS 332.072.

Page 34 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Further, Oregon law provides that "[a]ll school districts are presumed to maintain a standard school district until the school district has been found to be deficient by the Superintendent of Public Instruction, pursuant to standards and rules of the State Board of Education." ORS 327.103. In short, ODE must operate within the constraints of Oregon law and must comply with the IDEA. The State's evidence demonstrates that ODE is doing just that.

Plaintiffs criticize ODE for its position that it is "not necessary to go look at every instance where there is any concern" regarding a potential shortened school day. Pl. Mot. Summ. J. at 27 (ECF No. 176 at 35). But Plaintiffs' own expert opines that "in an effective system of Focused Monitoring, findings of district noncompliance are based on data that is triangulated, i.e., confirmed by multiple data sources. This process maximizes the state's resources, emphasizes its priorities, and increases the probability of improved student learning and behavioral outcomes." Musgrove Decl. ¶ 48 (ECF No. 67). This testimony is consistent with the approach taken by ODE, which maximizes the state's resources and oversight to have the greatest benefit for the most children and does not, as Plaintiffs would suggest, spend ODE's limited resources launching an investigation in response to each and every concern raised.

### 4.     ODE is exhibiting proactive leadership and providing extensive training and technical assistance to school districts

As Plaintiffs' own expert opined, the current evidence in the record demonstrates that ODE is showing proactive leadership to prevent the misuse of SSD for students with disability-related behaviors. *See* Greenwood Dep. 60:9-61:17.

ODE has done numerous in-depth trainings relating to abbreviated school days. Wetherell Decl. ¶ 16. These interactive trainings are tailored to needs of the specific audience. *Id.* In the last six months alone, ODE has done 20 formal trainings on a range of key topics related to this lawsuit—including abbreviated school days and functional behavior assessment and behavior support planning—for a wide range of audiences including school district leadership teams, the Annual Principals' conference, and others. *Id.* Ex. 4. ODE has received

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

feedback through multiple avenues, including from school districts, that the guidance and trainings are extremely helpful and offer practical support and resources. *Id.* ¶ 11. In addition, ODE is in the process of creating teaching modules that break down the abbreviated school day guidance into six components. *Id.* ¶ 10. These modules are part of ODE's "train the trainer" strategy to ensure that the abbreviated day guidance is effectively disseminated to frontline staff and school districts working directly with students. *Id.*; *see* Englander Decl. Ex. 2 (Greenwood Dep. 22:10-14). Plaintiffs nitpick the "length, frequency and accessibility" of the trainings that ODE is offering. Pl. Mot. at 29 (ECF No. 176 at 37). The IDEA does not include any such prescriptive requirements, and the undisputed record shows that ODE is engaging in extensive outreach and training to address, among other things, key resources for behavioral interventions.

In addition, as described above, ODE has allocated approximately $5 million in the next biennium to establish technical assistance networks focused on providing technical assistance and supports in two key areas: (1) at the regional/local level and (2) specific to disability-related behaviors. Wetherell Decl. ¶¶ 12-14. The Regional Special Education Support Networks will provide technical assistance relating to shortened school days and build capacity at the local level through resource development, technical assistance, coaching, and professional development. *Id.* ¶ 13. Plaintiffs' expert emphasized the efficacy of this type of localized technical assistance. *See* Englander Decl. Ex. 2 (Greenwood Dep. 70:15-18). The Statewide Technical Assistance Center will focus specifically on training and supports for disability-related behaviors. Wetherell Decl. ¶ 14. The statewide center will provide intensive support and build capacity of staff to work with students with disability-related behavior needs and will serve as an additional resource for LEAs. *Id.* ODE's extensive training and monitoring actions are consistent with the key actions identified by Plaintiffs' expert. *See* Greenwood Decl. at 3 (ECF No. 180 at 3).

The Court should reject Plaintiffs' various arguments that ODE is not meeting its obligations with respect to training and technical assistance. These arguments rely on stale facts

Page 36 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

and ignore the present evidence. *See* Pl. Mot. Summ. J. at 28-29 (ECF No. 176 at 36-37) (restating stale facts from Neutral Expert Report to argue that ODE lacks sufficient guidance and training). Moreover, even when Plaintiffs cite to stale facts, they misstate them. For example, Plaintiffs cite to a single slide from presentations given over four years ago to argue that ODE "tacitly encouraged the use of SSDs" for children with disabilities by identifying "common scenarios" for reducing a school days to include issues such as "stamina" and "behaviors of concern." *See* Pl. Mot. Summ. J. at 29 (ECF No. 176 at 37) (citing Stenson Decl. Ex. 45 (presentation from 2018); *Id.* Ex. 46 (presentation from 2019); ECF No. 96 at 381 (presentation from 2018-2019)). Contrary to encouraging the use of SSD, this slide transparently identifies common reasons reported to ODE for the use SSDs. The training slides make clear, however, that these are not justifications for placement on a SSD and, instead, that all placement decisions must be individualized based on the unique student's needs. *See, e.g.*, Stenson Decl. Ex. 46 at CPAA-ODE-006647-652 (emphasizing importance of behaviors supports and measurable IEP goals).

### 5. Oregon's funding mechanism does not violate the IDEA.

Plaintiffs argue that Oregon's funding mechanism illegally motivates school districts to put students on SSDs because a school district does not receive less funding as a consequence for providing less instructional time to those on SSDs. Plaintiffs cite 34 C.F.R. § 300.114(b), which provides that a "State funding mechanism must not result in placements that violate the requirements [regarding LRE]." But Plaintiffs fail to prove that Oregon's funding mechanism in fact results in placements that violate LRE requirements.

First, Plaintiffs ignore that ODE has an administrative rule that allows it to reduce funding if a district does not take require corrective action with respect to, among other things, inappropriate use of SSDs. ODE has determined that, as a policy matter well within its discretion, reducing a school district's funding should be a last resort, used only after other

Page 37 - DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

efforts to address identified inappropriate use of shortened school days has been identified.  That policy is now set forth in ODE's general supervision rule, OAR 581-015-2000(12), which allows ODE to reduce funding if a school district does not take required corrective action.[6]

ODE experts Dr. Wells and Ms. Wetherell aptly explained the rationale for this policy in their depositions.  Dr. Wells testified:

Q.    [Dr. Bateman's] next recommendation on that same page says: Establish and provide to districts clear consequences, in the form of withholding funding, to LEAs who do not follow ODE guidance on shortened school days and who do report shortened school days or accurately -- I assume that's do not report use of school days or accurately report use of school days. Has ODE implemented that recommendation?

A.     No.

Q.    Why has ODE not implemented that recommendation?

. . .

A.    So there are a couple of issues that I think come to mind as I'm reading through and reflecting on this. One is generally I don't think it's a good idea to remove resources away from schools when they're struggling due to limited resources to begin with. Much of the Bateman report talks about how we need to find ways to get additional resources into schools, and then to recommend that we take resources away as an enforcement mechanism seems punitive and draconian.  Which isn't to say that we don't have enforcement mechanisms that allow the use of withholding funds, but we look at it as a last resort.

Stenson Decl. Ex. 16 (Wells Dep. 92:1-25); *see also* Stenson Decl. Ex. 18 (Wetherell Dep. 172:7-9) (testifying that "withholding [of funding] would be really the end game here, the very last kind of dollar strategy I could use).  And Plaintiffs' own expert supports this policy choice. *See* Englander Decl. Ex. 2 (Greenwood Dep. 69:5-9) (expressing "caution about that

---

[6] OAR 581-015-2000(12) provides: "School districts and programs that do not complete corrective actions and/or correct noncompliance may be subjected to enforcement measures, including but not limited to additional reporting requirements, technical assistance, a corrective action plan or improvement plan, conditions on funding, and/or withholding funds, in whole or in part, by the Department."

Page 38 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

[recommendation]" and agreeing with ODE's concern about removing funds from a school that is already struggling to meet the needs of students with disabilities).

Second, Plaintiffs' argument relies on deposition testimony of Dr. Wells taken out of context. *See* Pl. Mot. Summ. J. at 32 (ECF No. 176 at 40) (asserting that "Dr. Wells admitted that Oregon's funding system does create such financial incentives" to place students on shortened school days). The full colloquy surrounding this "admission" by Dr. Wells illustrates the absurdity of Plaintiffs' argument:

> Q.      [Plaintiffs' counsel] So consider a hypothetical of a school administrator who is totally amoral and who has no moral compunction about whether or not students get good educations or not. Would you agree with me that from a purely economic sense that it would make sense to do exactly what I propose, which is to collect the same amount of special education funding and provide half the education to students if -- within the bounds of that hypothetical?
>
> A.      Within the bounds of that hypothetical, assuming that that was possible under Oregon practice, then from a purely economic standpoint there would not be a reason to do that, to not -- sorry, there would not be a reason to keep him from doing -- them from doing that.
>
> . . .
>
> Q.      So you'll agree with me then that it is in fact possible that the ludicrous postulate that you put forward -- that a special education director or a school administrator could in fact be making decisions around shortened school days for financial reasons?
>
> . . .
>
> A.      I -- I think what's ludicrous is the theory of a perverse incentive, not the actions of the administrators. And so I -- you know, I don't believe there's any administrator in Oregon who would reduce all of their kids' school schedules to an abbreviated school day so they could reduce their staff levels. And I don't believe there's anybody who could reasonably believe that.

Stenson Decl. Ex. 16 (Wells Dep. 97:22-101:15).

The only other evidence Plaintiffs cite in support of their funding argument is that Dr. Bateman found some signs that some school districts were operating shortened school day programs that required less staff than would be needed if they were providing full days. But Dr. Bateman did not conclude that these programs exist *as a result* of ODE's funding mechanism.

Page 39 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs fail to point to any causal nexus to Oregon's funding mechanism and these programs. In any event, given ODE's clear authority in its administrative rule to withhold funds if a district does not take required corrective action with respect to inappropriate use of shortened school days, any incentive that Plaintiffs may allege once existed is now effectively cut off.

Plaintiffs have not proven that Oregon's funding mechanism violates the IDEA.

### 6. Current facts demonstrate that ODE is meeting its obligation to ensure the availability of FAPE by operating a system of general supervision that complies with the IDEA

As explained above, ODE is operating a supervisory system that contains each of the required components and is working diligently to implement this system to effectively prevent, detect and correct noncompliance. ODE's system of general supervision is consistent with the key components identified by Plaintiffs' expert; for example:

- A state's monitoring system should collect and analyze data in a manner that allows the State to identify problems and trends and develop targeted strategies for intervention and follow up. Musgrove Decl. ¶ 35 (ECF No. 67). Oregon's revised system of general supervision is specifically designed to allow the state to use the significant data available to take data-driven actions to identify and address issues of concern. Wells Decl. ¶ 13. One example is the programmatic risk assessment that allows ODE to select school districts for focused monitoring based on various data elements that ODE has determined are relevant. *Id.* Another example is the ability to determine an emergent or emergency area for closer examination on an annual basis which, for the 2022-23 school year, is abbreviated school day placements. *Id.* Oregon's integrated monitoring system and data collections enable ODE to identify patterns of noncompliance and address systemic issues that impact the provision of FAPE in the LRE for students with disabilities. *Id.* For example, in installing its redesigned general supervision system this year, ODE required 63 districts to complete cyclical monitoring as part of Cohort A. *Id.*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Preliminary analysis of that data suggests that Oregon's school districts are substantially compliant with the IDEA, with higher performance in some areas compared to others. *Id.*

- Meaningful engagement with stakeholders is critically important and ensures the best outcomes for students with disabilities. Musgrove Decl. ¶ 45 (ECF No. 67). ODE agrees wholeheartedly with Dr. Musgrove and, toward that end, hired the current Assistant Superintendent of the Office of Enhancing Student Opportunities with the express charge of engaging in extensive stakeholder outreach and incorporating the results of that outreach into ODE's system of general supervision. Wetherell Decl. ¶ 5. To effectuate meaningful stakeholder involvement, ODE developed and implements a community engagement framework to create a systematic process to effectively approach engagement. *Id.* Ex. 2. ODE engages regularly with stakeholders—including parents, principals, teachers, advocates, early childhood and higher education leaders, administrators, paraprofessionals, related service providers, and others—to foster effective implementation of ODE rules, guidance, policies and procedures. *Id.* ¶ 5.

- An SEA should provide clear guidance to school districts to achieve positive outcomes and prevent noncompliance. Musgrove Decl. ¶ 51 (ECF No. 67). As discussed at length above, ODE has developed comprehensive, clear guidance related to the issue presented in this case, is actively disseminating and training on that guidance, and has systems in place to provide technical assistance and professional development on the issues addressed in the guidance. Wetherell Decl. ¶¶ 7-16.

- In addition to corrective action, States must provide supports that will help school districts take necessary preventative steps to achieve authentic, positive change for students. States should therefore allocate sufficient funding for the express purpose of providing technical assistance and professional development. Musgrove Decl. ¶¶ 67-68

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(ECF No. 67).  As discussed above, ODE is investing significant funding for these express purposes.  *See* Wetherell Decl. ¶¶ 12-14.

- ODE wholeheartedly agrees with Dr. Musgrove that "[g]eneral supervision is an ongoing process that requires *every* state to constantly reevaluate the status of special education services and where changes are needed."  Musgrove Decl. ¶ 34 (ECF No. 67) (emphasis in original).  For this reason, ODE is continuing to iterate and improve its system of general supervision based on what it learns through implementation, and has committed additional resources to support organizational change, both at the SEA and LEA levels, as we continue to iterate and improve.  Wells Decl. ¶ 14.

Through all facets of its general supervision system—including guidance, training, corrective actions and technical assistance—ODE has made clear its position that, while some children may require an abbreviated school day program placement to receive FAPE, under all but the rarest circumstances, a student's placement on an abbreviate school day program should be for a very limited amount of time.  *See, e.g.*, Wetherell Decl. Ex. 3 at CPAA-ODE-035321 (so stating).  This position recognizes that there is no magic threshold at which point the number of students with disabilities on SSDs is lawful or unlawful.[7]  Instead, the State's role is to provide technical assistance and other monitoring and supports to effectively help IEP teams make

---

[7] The Court should reject Plaintiffs' out of context and inaccurate citations to deposition testimony on this point.  Plaintiffs argue that: "Dr. Wells' testimony that placement of 100% of Oregon students with disabilities on SSDs would not, by itself, constitute a problem, Stenson Decl. Ex. 16 at 46:8-13, further demonstrates ODE's flagrant disregard for the mandates of equal opportunity and integration that are pillars of the ADA and Section 504."  Pl. Mot. Summ. J at 43 (ECF No. 51).  To the contrary, the testimony is clear that Dr. Wells was rejecting the premise of the question because, under the IDEA, the individualized needs of each child must be considered in any placement decision and, as such, "it's a fundamentally flawed approach to say that there's a problem solely because of a number."  Stenson Decl. Ex. 16 at 46:11-13.  Instead, "you would need to look at the individual circumstances for the child for whom the program was developed." *Id.* 46:13-15; *see also id.* at 44:19-20 ("We consider in special education a child's unique circumstances and what they need individually."); *id.* at 45:13-15 (We make individual decisions for individual kids in light of their circumstances.).

Page 42 -  DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

appropriate decision in light of each individual child's needs with the overarching understanding that, as a general rule, SSDs should be used for a limited amount of time for most students. The State's position is consistent with Ninth Circuit precedent, which recognizes that a shortened school day due to disability, in and of itself, does not violate the IDEA. *See Adams v. State of Oregon*, 195 F.3d 1141, 1150 (9th Cir. 1999) (reduction in educational service hours, "even when based upon misconduct arising from a child's disability, does not necessarily violate the IDEA"); *see also Christopher M. v. Corpus Christi Ind. School Dist.*, 933 F.2d 1285, 1291 (5th Cir. 1991) ("to presume that every child's school day should be of uniform length is at odds with the conception of individually tailored education" and IDEA's preference for mainstreaming "does not imply any presumption in favor of the generally-administered length of programming").

The Court should reject Plaintiffs' blanket arguments that Oregon students placed on SSD are denied an appropriate education in the LRE. *See* Pl. Mot. Summ. J. at 33-37 (ECF No. 41-45). Plaintiffs' arguments again rely primarily on the stale findings of the Neutral Expert Report and not on current facts. To the extent that Plaintiffs address current evidence, they repeat their refrain that ODE's system "focuses on paper compliance." *Id.* at 34. This argument, however, ignores the robust and aggressive procedures that ODE has installed to ensure compliance with the IDEA and ODE's commitment to meaningful parent engagement. The undisputed evidence in the record demonstrates that ODE is satisfying its obligation to operate an effective system of generally supervision. As such, Defendants are entitled to summary judgment on Plaintiffs' IDEA claims.

### C. Plaintiffs are not entitled to summary judgment on their ADA and RA claims.

Plaintiffs argue that Defendants are violating the ADA and RA because ODE does not require LEAs to provide FBAs before a child is placed on what Plaintiffs describe as a shortened

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

school day.  Pl. Mot. Summ. J. at 40-41 (ECF. No. 176 at 48-49).  Plaintiffs are incorrect.  First, to support their factual assertion that ODE has conceded it does not require FBAs before a shortened school day placement, Plaintiffs rely incorrectly on deposition testimony speaking only to IDEA requirements.  Pursuant to the ADA and RA, ODE does require school districts to provide a behavioral assessment before placing a child on a shortened school day, when such a placement constitutes a significant change in placement.  It does so in three primary ways.

First, ODE provides technical assistance to school districts about the requirements of the ADA and RA.  In doing so, ODE relies on guidance from the U.S. Department of Education's Office for Civil Rights (OCR)—including that guidance cited by Plaintiffs—to emphasize the effective use of FBAs and BIPs when confronted with a gap in knowledge or significant changes in placement as they relate to Section 504 or Title II of the ADA.  *See* Pl. Mot. Summ. J. at 40 n.29 (ECF No. 176 at 48 n. 29).  Declaration of Marinda Peters (Peters Decl.) ¶ 3.

Second, ODE provides education and resources to parents about parental rights and procedural safeguards based on local, state, and federal complaint processes.  ODE may also contact a district based on parent outreach to offer targeted guidance with references to federal civil rights law and OCR guidance.  *Id.* ¶ 4.

Third, ODE enforces a process for parents to bring complaints about alleged violations of the ADA and RA.  Again, ODE follows OCR guidelines during that process and resolves complaints concerning the ADA and RA in accordance with federal laws, regulations, and guidance.  If a school district places a student on a shortened school day when it is a significant change in placement without an FBA or BIP, ODE redresses that through an order that requires the district to conduct the necessary behavioral assessment in accordance with the ADA, RA, and OCR guidance.  Declaration of Mark Mayer ¶ 4.

The remainder of Plaintiffs' ADA and RA claims rely on only a negligence-based theory that ODE has failed to ensure FAPE in the LRE for class members.  Because the crux of this

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

argument is the systemic denial of FAPE, the ADA and RA claims fail for the reason the IDEA claims fail. *See* § V.A. above (incorporating by reference Defendants' pending motion for judgment on the pleadings).

**D.    The Court should reject Plaintiffs' request for a court monitor.**

Plaintiffs are not entitled to injunctive relief because they have not prevailed on the merits of any of their claims, which, as set out above, either fail as a matter of law or involve material issues of disputed fact. Their request for injunctive relief and a court monitor should be rejected and, in any event, are premature as any injunctive relief must be tied specifically to the violations found.

Plaintiffs' arguments in support of their request for a court monitor ignore or misstate the undisputed evidence demonstrating the significant and meaningful systemic actions that ODE is taking to address inappropriate use of SSD in Oregon. Indeed, Plaintiffs' own expert repeatedly praised the quality of recent actions implemented by ODE and agreed that ODE is taking "significant steps" to address inappropriate use of abbreviated school days in Oregon. Englander Decl. Ex. 2 (Greenwood Dep. 77:2-5). Under these circumstances, where ODE is working diligently and in good faith to implement its newly redesigned system of general supervision and systemic framework for addressing misuse of abbreviated school days, neither injunctive relief nor a court monitor are necessary or appropriate.

In addition, their vague injunction request violates Rule 65(d). Plaintiffs ask the Court for a remedial order "requiring ODE to undertake reforms" which includes "the appointment of an external monitor….to help it oversee its remedial Order." Pl. Mot. Summ. J. at 43, 45 (ECF No. 176 at 51, 53). Plaintiffs provide no meaningful discussion of what the monitor would be expected to do nor the content of such a remedial order. Rule 65(d) "requires that injunctions be specific" including by being "specific in terms" and describing "in reasonable detail … the act or acts sought to be restrained." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Supp. 2d 1197, 1226 (C.D. Cal. 2007) (quoting Fed. R. Civ. P. 65(d)). The "one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 444 (1974)). Relatedly, if a court determines that injunctive relief is warranted, such relief must be tailored to remedy the specific harm. *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("We have long held that injunctive relief must be tailored to remedy the specific harm alleged." (quotation marks omitted)). Plaintiffs' broad request that the Court appoint a monitor to provide external oversight of Defendants' activities fails to provide any meaningful discussion of what the role and scope of the court monitor's work would entail. Therefore, their motion fails to seek a lawful injunction under Rule 65(d).

## VI.    CONCLUSION

For the above-stated reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and Court grant Defendants' Cross-motion for Summary Judgment.

DATED April <u>13</u>, 2023.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General

<u>    *s/ Nina R. Englander*    </u>
CARLA A. SCOTT #054725
Senior Assistant Attorney General
NINA R. ENGLANDER #106119
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.state.or.us
Nina.Englander@doj.state.or.us
Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000