Thomas Stenson (OR No. 152894)
tstenson@droregon.org
Joel Greenberg (OR No. 943233)
jgreenberg@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR 97205-2748
(503) 243-2081

Hannah Benton Eidsath (CT No. 428982)*
hbenton@youthlaw.org
Seth Packrone (NY No. 5395769)*
spackrone@youthlaw.org
Nina Monfredo (NY No. 5717624)*
nmonfredo@youthlaw.org
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
(202) 868-4781

Selene Almazan-Altobelli (MD No. 10506)*
selene@copaa.org
Council of Parent Attorneys and Advocates
8 Market Place, Suite 300
Baltimore, MD 21285
(844) 426-7224 ext. 702

Ira A. Burnim (D.C. No. 406154)*
irab@bazelon.org
Lewis Bossing (D.C. No. 984609)*
lewisb@bazelon.org
Bazelon Center for Mental Health Law
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005-4900
(202) 467-5730

Katherine Giordano (NY No. 5952270)*
Katherine.giordano@probonolaw.com
1 Manhattan West
New York, NY 10001
(212) 735-3000

*Admitted pro hac vice

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| J.N., et al., | Case No. 6:19-CV-00096-AA |
| Plaintiffs, | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| v. | Request for Oral Argument |
| OREGON DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................. 3

   A.  SSDs in Oregon ............................................................................................. 3

      1.  SSDs are a longstanding problem in Oregon and high numbers of students remain on SSDs to this day. ................................................................................. 3

      2.  ODE has been aware of the statewide SSD problem for years. ..................................... 7

   B.  Dr. Bateman's Report and ODE's Partial Reforms in Response ......................................... 9

      1.  Dr. Bateman's report confirmed Plaintiffs' allegations and documented the prevalence of SSDs in Oregon. ...................................................................................... 9

      2.  Dr. Bateman documented the significant investments ODE would need to make to correct the SSD problem and recommended that ODE make extensive reforms. .......... 10

      3.  The reforms that ODE has undertaken in response to Dr. Bateman's report have not eliminated or significantly reduced the number of class members who are unnecessarily subjected to SSDs. ...............................................................................12

   C.  Senate Bill 819 ............................................................................................. 12

III.   LEGAL STANDARD ........................................................................................... 13

   A.  Federal Rule of Civil Procedure 12(h)(3). ......................................................... 13

   B.  Mootness and Voluntary Cessation ................................................................. 14

IV.   ARGUMENT ......................................................................................................... 15

   A.  Plaintiffs allege violations of federal law, and S.B. 819 does not address Defendants' obligations under federal law.................................................................................. 16

   B.  Defendants' nascent implementation of S.B. 819 does not moot Plaintiffs' claims because the harms alleged in the complaint are ongoing. ................................................ 17

1.    Significant numbers of students still experience the harms of SSDs under S.B. 819... 18

2.    S.B. 819 does not contain sufficient enforcement mechanisms to limit the number of students on SSDs moving forward................................................................................. 20

C.    Similarly, Defendants' voluntary policy changes regarding SSDs do not moot Plaintiffs' claims. ...................................................................................................................... 23

V.    CONCLUSION.................................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

*Am. Diabetes Ass'n v. United States Dep't of the Army*,
   938 F.3d 1147 (9th Cir. 2019) ............................................................... 28, 31

*Armster v. U.S. Dist. Ct.*,
   806 F.2d 1347 (9th Cir. 1986) ..................................................................... 28

*Augustine v. United States*,
   704 F.2d 1074 (9th Cir. 1983) ..................................................................... 13

*Bayer v. Neiman Marcus Grp., Inc.*,
   861 F.3d 853 (9th Cir. 2017) ....................................................................... 14

*Bell v. City of Boise*,
   709 F.3d 890 (9th Cir. 2013) ................................................................. 15, 31

*Board of Trustees of Glazing Health & Welfare Trust v. Chambers*,
   *941 F.3d 1195 (9th Cir. 2019)* ................................................................... 16

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019) ........................................................... 18, 19, 20

*DL v. D.C.*,
   860 F.3d 713 (D.C. Cir. 2017) ....................................................................... 1

*City of Mesquite v. Aladdin's Castle*,
   455 U.S. 283 (1982) ..................................................................................... 14

*Corey H. v. Bd. of Educ. of City of Chicago*,
   995 F. Supp. 900 (N.D. Ill. 1998) ................................................. 17, 27, 30

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
   580 U.S. 386 (2017) ..................................................................................... 27

*Fikre v. FBI*,
   904 F.3d 1033 (9th Cir. 2018) ............................................................. 14, 31

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................. 14, 15, 18, 19

*Getman v. Or. Health & Sci. Univ.*,
   No. 3:21-cv-01408-SB, 2022 WL 17156760 (D. Or. Nov. 22, 2022) ....................................... 31

*J.N. v. Or. Dept. of Educ.*,
  Case No. 6:19-cv-00096, 2020 WL 5209846 (D. Or. Sept. 1, 2020) ............................... passim

*Johnson v. City of Grants Pass*,
  72 F.4th 868 (9th Cir. 2023) ...................................................................... 18, 19, 20

*McCormack v. Herzog*,
  788 F.3d 1017 (9th Cir. 2015) ............................................................................. 14

*Mhany Mgmt., Inc. v. County of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ............................................................................... 25

*Mont. Green Party v. Jacobsen*,
  17 F.4th 919 (9th Cir. 2021) ............................................................................... 18

*NWDC Resistance v. Immigr. & Customs Enf't*,
  2022 WL 2073053 (W.D. Wash., June 9, 2022) ...................................................... 28

*Pitts v. Terrible Herbst, Inc.*,
  653 F.3d 1081 (9th Cir. 2011) ........................................................................ 14, 18

*Rosebrock v. Mathis*,
  745 F.3d 963 (9th Cir. 2014) .......................................................................... passim

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ......................................................................................... 24

*Tiwari v. Mattis*,
  No. C17-242 TSZ, 2017 WL 6492682 (W.D. Wash. Dec. 19, 2017) ...................................... 25

*Tsombanidis v. W. Haven Fire Dep't*,
  352 F.3d 565 (2d Cir. 2003) ............................................................................... 25

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ....................................................................................... 15

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) .......................................................... 14, 24, 25, 28

**STATUTES**

20 U.S.C. § 1416 (a)(3)(B) ................................................................................. 17

20 U.S.C. § 1416(a)(1)(C) ................................................................................. 17

20 U.S.C. § 1416(a)(3)(A) ................................................................................................. 17

29 U.S.C. §794 .................................................................................................................. 17

42 U.S.C. § 12131 ............................................................................................................. 17

Or. Senate Bill 263 ....................................................................................................... 2, 22

Or. Senate Bill 819 ..................................................................................................... passim

**OTHER AUTHORITIES**

Kelsie Cowart, *D21 school board hears implications of Senate Bill 819*, Columbia George News (Oct. 11, 2023), https://www.columbiagorgenews.com/news/d21-school-board-hears-implications-of-senate-bill-819/article_26414ec6-679a-11ee-bb8a-2f3c1bd601bd.html ........ 31

Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144 Pediatrics 1, 6, 8 (2019) https://publications.aap.org/pediatrics/article-pdf/144/1/e20183766/1077164/peds_20183766.pdf ................................................................ 2

United States Dep't of Educ., *State General Supervision Responsibilities Under Parts B and C of the IDEA*, https://sites.ed.gov/idea/files/Guidance_on_State_General_Supervision_Responsibilities_under_Parts_B_and_C_of_IDEA-07-24-2023.pdf (July 24, 2023) ............................................ 9, 29

**RULES**

Fed. R. Civ. P. 12(h)(3) .................................................................................................... 13

**REGULATIONS**

Or. Admin. R. 581-015-2015 (2022) ............................................................................... 12

## I.    INTRODUCTION

While hundreds of students with disabilities continue to languish in Shortened School Day ("SSD") placements, Defendants, including the Oregon Department of Education ("ODE"), yet again ask this Court to excuse them from their legal obligations under the Individuals with Disabilities Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504") to ensure that students with disabilities receive a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), free from discrimination.  This Court previously rejected the nearly identical argument that "state and federal laws provide procedural safeguards" that ensure the Plaintiff class could not be harmed, even in the face of evidence of widespread misuse of SSDs. *J.N. v. Or. Dept. of Educ.*, Case No. 6:19-cv-00096, 2020 WL 5209846, at *6 (D. Or. Sept. 1, 2020).  This time, in Defendants' second Motion to Dismiss, ECF No. 217 ("Defs.' Mot."), ODE argues that Senate Bill ("S.B.") 819—a state law—and ODE's other voluntary policy changes moot Plaintiffs' claims under federal law.  They do not.

Defendants ignore the current and ongoing harms to class members when they tout the potential benefits that could someday result from ODE's full implementation and enforcement of S.B. 819, a law which only took effect on July 13, 2023.  Despite Defendants' reforms, their own data shows that hundreds of students remain on SSDs in Oregon.  The continued widespread prevalence of students on SSDs in Oregon shows that Plaintiffs' claims are not moot.  Defendants' speculation regarding the future impact of S.B. 819 is insufficient to moot Plaintiffs' claims, let alone eradicate the widespread harms of ODE's longstanding illegal conduct. *Cf. DL v. D.C.*, 860 F.3d 713, 729 (D.C. Cir. 2017) (upholding district court corrective orders where, even though the State Educational Agency ("SEA") had been ordered to change its practices six years prior, the

record showed a "slew of continuing deficiencies" and "inconsistencies in [SEA] documents and practice"). Defendants' speculation about the hypothetical benefits of S.B. 819 is particularly insufficient considering the failure of Oregon's previous state statute on SSDs—S.B. 263—to ensure class members' rights. Defendants previously moved to dismiss Plaintiffs' claims when that law was on the books. Defs.' First Mot. to Dismiss, ECF No. 33. That motion, which included Defendants' argument that S.B. 263 made Plaintiffs' standing speculative, failed, *J.N.*, 2020 WL 5209846 at *7–*8, *12, and this motion must fail as well.

Apart from the fact that the latest data provided by ODE confirms that hundreds of Oregon students are still subject to SSDs and Defendants' admissions that many of their planned reforms have not yet been made, the passage of a state law cannot moot Plaintiffs' claims that Defendants fail to meet their duties under federal law. *See* Declaration of Thomas Stenson in Support of Pls.' Opp'n to Defs.' Mot. to Dismiss ("Stenson Decl.") ¶¶ 6, 12. As the parties' neutral expert's recommendations indicate, federal law requires more for students with disabilities and their families who continue to suffer the severe academic, social, and economic harms associated with SSDs. Report of the Neutral Fact Finder, ECF No. 157-2 at 5–6, 46. These harms cause adverse consequences, including potential disengagement from school and negative health and life outcomes.[1] Plaintiffs filed suit to end Defendants' violations of their rights under federal law. While S.B. 819 may require Defendants to develop policies and procedures that relate to Oregon's illegal use of SSDs, S.B. 819 is a state law that does not address Defendants' federal obligations nor does it eradicate the harms that result from Defendants' failures under federal law. Neither

---

[1] Riley J. Steiner et al., *Adolescent Connectedness and Adult Health Outcomes*, 144 Pediatrics 1, 6, 8 (2019) https://publications.aap.org/pediatrics/article-pdf/144/1/e20183766/1077164/peds_20183766.pdf.

this newly adopted state law nor its yet incomplete implementation can resolve the federal claims at issue in this lawsuit.

## II.    FACTUAL BACKGROUND

### A.  SSDs in Oregon

#### 1.    SSDs are a longstanding problem in Oregon and high numbers of students remain on SSDs to this day.

Between 2017 and 2020, about 140 Oregon school districts placed students on SSDs.  Pls.' Concise Statement of Material Facts ("CSMF"), ECF No. 176-1 ¶ 4.  These students include named Plaintiffs J.N., E.O., J.V., and B.M., all of whom have been placed on SSDs due to their disability-related behaviors.  Report of Albert William Greenwood, Ph.D., ECF No. 66-2 at 1. Plaintiffs J.N. and B.M. are still placed on SSDs.  CMSF, ECF No. 176-1 ¶ 28.  Over the 2017–2018, 2018–2019, and 2019–2020 school years, at least 2,700 Oregon students total—or an annual average of 1.12% of Oregon students with disabilities—were placed on SSDs for behavioral reasons and without documentation required under state law.[2]  Neutral Fact Finder Report, ECF No. 157-2 at 29, 31–33, 88.

Although Oregon students without disabilities typically receive six hours of daily instruction, students with disabilities who are subjected to SSDs are sometimes only allowed to attend school for one or two hours of instruction each day, or less.  CSMF, ECF No. 176-1 ¶¶ 8– 10.  For many students, placement on highly restrictive SSDs starts as early as kindergarten, prior to creation of an Individualized Education Program ("IEP") or the completion of evaluations and assessments, and continues for multiple years.  CSMF, ECF No. 176-1 ¶¶ 12, 14–15.  The majority

---

[2] Plaintiffs compiled these figures based on data in neutral expert Dr. David Bateman's report: "Total Students with Disabilities and those on ASD due to behavior by year," located in the Report's Spreadsheet Appendix.  Neutral Fact Finder Report, ECF No. 157-2 at Table 6, Appendix C.

of students placed on SSDs are elementary school age.  Neutral Fact Finder Report, ECF No. 157-2 at 42.  Instead of receiving necessary behavioral instruction and supports, Neutral Fact Finder Report, ECF No. 157-2 at 12, they are placed in the most restrictive placement.  CSMF, ECF No. 176-1 ¶ 47.  Very few students placed on SSDs receive any instruction outside of school.  CSMF, ECF No. 176-1 ¶ 11.  Some do not attend school at all.  CSMF, ECF No. 176-1 ¶ 10.

The data made available to Plaintiffs by ODE thus far demonstrate that the number of Oregon students on SSDs has remained consistently high, including throughout the implementation of S.B. 263 and after the passage of S.B. 819 in July 2023.  The parties' neutral expert, Dr. David Bateman, reported that 685 students with disabilities were on SSDs in 2017–2018, 1,029 in 2018–2019, and 986 in 2019–2020.  Neutral Fact Finder Report, ECF No. 157-2 at 23.  Data produced by ODE for the 2022–2023 school year showed an increase in the number of students with disabilities on SSDs for more than 30 days with 747 students in October 2022, 848 students in November 2022, 850 students in December 2022, and 855 students in January 2023.  Supplemental Declaration of Thomas Stenson in Support of Pls.' Reply in Supp. of Mot. for Summ. J. and Resp. to Defs.' Cross Mot. for Summ. J., Ex. 4, ECF No. 196-4.  ODE's data illustrated the continued pervasiveness of the problem—over 57% of school districts reported students with disabilities placed on SSDs in March 2023.  *See* Stenson Suppl. Decl. Ex. 3, ECF No. 196-3.[3]  The number of school districts with six or more students on SSDs also remained

---

[3] Defendants produced specific numbers of students who were placed on SSDs for more than 30 days for October, November, and December 2022, as well as for January 2023, Stenson Suppl. Decl. Ex. 4, ECF No. 196-4; however, for February and March 2023, Defendants have only provided a summary of this data which does not allow Plaintiffs to calculate the exact number of students who remain on SSD placements for more than 30 days. *See* Stenson Suppl. Decl. Exs. 2–3, ECF No. 196-2, 196-3.  Since March 2023, Defendants have not produced any data regarding the number of students with disabilities on SSDs to Plaintiffs.

steady—40 school districts in January 2023 compared to 37 school districts in March 2023.  *See* Stenson Suppl. Decl. Exs. 1–3, ECF Nos. 196-1–196-3.

Now, despite the actions Defendants described in their cross-motion for summary judgement and the passage of S.B. 819, the number remains nearly as high.  As of October 3, 2023—several months after S.B. 819 was signed into law—a partially complete report discussed during a recent meeting of ODE's Data Collection Committee shows *at least* 738 students with disabilities on SSDs.  Stenson Decl. ¶ 6.  During that meeting, the ODE officials charged with collecting this data noted that "we expected a lot more than that."  Stenson Decl. ¶ 6.  ODE officials implied that this number was less than ODE expected not because ODE's efforts had been successful at meaningfully reducing the number of students on SSDs but because the data submission was incomplete and there were "some political things going on with the [data] submission."  Stenson Decl. ¶ 6.  That number does not include frequent "informal removals" that also result in SSDs for students with disabilities.  Even after the passage of S.B. 819, Oregon schools still do not collect sufficient data to track these informal removals when students are taken out of the classroom and required to remain elsewhere in the school without instruction for behavioral reasons, or when school staff calls a student's parent to take the student home for behavioral reasons.

Defendants have acknowledged the importance of eliminating the use of inappropriate informal removals, but preliminary reports indicate that informal removals continue nonetheless. *See*, *e.g.*, Declaration of Olivia Denton (showing extensive problems involving SSDs, informal removal, and misuse of suspensions in the Central School District); Declaration of C.S. (showing ongoing misuse of informal removals in the North Clackamas School District).  Dr. Bateman's report indicated that informal removal was "being used frequently with students with disabilities"

and that "little or no data are being collected or recorded regarding its use." Neutral Fact Finder

Report, ECF No. 157-2 at 47. Unrebutted evidence shows that school districts continue their

efforts to shorten students' days, by simply compelling parents to take students home. Stenson

Decl. ¶ 16, Ex. A (FACT Oregon found the reports of informal removals were "picking up" in

September 2023). ODE has demonstrated no efficacy in its efforts to redress informal removals.[4]

Although the definition of SSDs under S.B. 819 could be read to include informal removals, ODE

has no data mechanism to collect this information and consequently depends exclusively on the

self-reporting of districts regarding informal removals.

Schools placing students with disabilities on SSDs do so despite an "absence of logic and

evidence-based pedagogical decisions." Neutral Fact Finder Report, ECF No. 157-2 at 11. As Dr.

Bateman explains:

> When students are denied access to a full-day of instruction they miss out not only
> on the educational opportunities provided to the other students, but also the benefits
> and incidental learning from socialization and regular interactions with other
> students. These students often fall behind academically and miss out on critical
> social opportunities in which they can practice appropriate behaviors and
> implement the strategies they are learning. Instead of receiving this needed
> instruction and opportunities to practice, they are separated and disconnected from
> peers who receive the academic, social, and emotional benefits of attending school
> for a full-day. This isolation perpetuates the stigma, misunderstanding, and fear
> that often underlies a school district's decision to exclude children with disability-
> related behaviors from the classroom.

Neutral Fact Finder Report, ECF No. 157-2 at 11–12; *see also, e.g., id.* at 61 (noting that

"[s]tudents who miss 10% of kindergarten lag, on average, almost a year behind in reading by third

grade"); Declaration of Albert William Greenwood, Ex. A, Supplemental Report of Albert

---

[4] On November 7, 2023, Tenneal Wetherell, Chief of Staff for ODE, acknowledged in testimony
to the Oregon Senate Interim Committee that "navigating the requirements of manifestation
determination and reporting requirements for . . . suspension and informal removals" is a
"challenge that we're trying to get through." Stenson Decl. ¶ 12.

William Greenwood, Ph.D. (October 31, 2022), ECF No. 180-1 at 8 (noting other costs of SSDs, including "[p]otential . . . resistance to returning to a full day," feeling "different," and "[c]hanges in mindset about the need to follow directions").[5]  Indeed, hundreds of students with disabilities and their families continue to suffer the devastating short- and long-term consequences of SSDs.

### 2.  ODE has been aware of the statewide SSD problem for years.

ODE has been on notice of the harms experienced by class members on SSDs for nearly a decade through formal and informal complaints regarding the persistent and illegal use of SSDs. CSMF, ECF No. 176-1 ¶¶ 30–42.  ODE's knowledge included information provided by Disability Rights Oregon as early as 2013.  CSMF, ECF No. 176-1 ¶ 30.  ODE has continued to receive documentation of the ongoing problems with the use of SSDs during this litigation.  *See, e.g.*, CSMF ¶ 30; Stenson Decl. Ex. B, Overall ODE District Count Summary Spreadsheet (2021 self-reporting from more than one hundred districts documenting the use of SSDs).  Despite this knowledge, ODE has failed to effectively investigate or monitor individual school districts to prevent the misuse of SSDs.  *See, e.g.*, CSMF, ECF No. 176-1 ¶¶ 24, 38, 42, 49–56.

In 2017, that failure prompted the Oregon legislature to enact S.B. 263, a law proposed in part to address the illegal use of SSDs across Oregon and to force ODE to monitor school districts' use of them.  During the legislature's public hearings on S.B. 263, SSDs were described as "vexing and longstanding," happening at "unprecedented rates," and "a widespread problem for Oregon students with disabilities."  CSMF, ECF No. 176-1 ¶ 32.

---

[5] *See also* Neutral Fact Finder Report, ECF No. 157-2 at 46 (describing impacts of SSD placements on students' families, including "parents having to change jobs or hours of work to be during the night, locating childcare services, paying for childcare services, etc."), at 61 ("[s]tudents who miss two days of school per month . . . miss 1.5 years of instruction by the end of 12th grade").

Senator Gelser Blouin, one of the sponsors of S.B. 819, explained how ODE not only failed to implement S.B. 263, but also used it as a justification for SSDs.  During a legislative hearing on S.B. 819, Senator Gelser Blouin explained that "[denying children with disabilities an education] has been against the law for longer than I have been alive."  Stenson Decl. ¶ 10.  The legislature "tried to fix this problem" with S.B. 263, but it "[did] not fix[] the problem."  Stenson Decl. ¶ 10.  Instead, ODE "described that the legislature in 2017 'established abbreviated day programs' [through S.B. 263]," even though the legislation was passed "to curtail the illegal exclusion of children with disabilities from the free and appropriate public education that they need to successfully participate as adults in society."  Stenson Decl. ¶ 10.

Even after S.B. 263 was passed, ODE rarely conducted serious investigations in response to the many reports and complaints about SSDs.  CSMF, ECF No. 176-1 ¶¶ 33, 38.  Other than the Lane and Clackamas investigations that ODE opened over seven months after learning that students were being subjected to SSDs, discussed *infra*, ODE never opened any independent investigations of the SSD problems raised through dozens of inquiries.  CSMF, ECF No. 176-1 ¶¶ 30, 33–41.  ODE officials were also informed of inappropriate systemic use of SSDs in numerous school districts, including some formal SSD programs; ODE failed to investigate those school districts despite that knowledge.  *See* Pls.' Mot. for Summ. J., ECF No. 176 at 9.[6]  For example, during ODE's 2021 investigation of a state complaint, ODE officials were informed that

---

[6] New guidance from the U.S. Department of Education emphasizes that an SEA fails to meet its general supervisory responsibilities when it ignores information that indicates a violation of IDEA.  United States Dep't of Educ., State General Supervision Responsibilities Under Parts B and C of the IDEA, https://sites.ed.gov/idea/files/Guidance on State General Supervision Responsibilities under Parts_B_and_C_of_IDEA-07-24-2023.pdf (July 24, 2023) at 13 ("A State must conduct proper due diligence when made aware of an area of concern regarding an LEA's or EIS program's or provider's implementation of IDEA and reach a conclusion in a reasonable amount of time.").

the school district under investigation had created its SSD program by "[m]imick[ing] half day programs from nearby districts."  CSMF, ECF No. 176-1 ¶ 40.  As of January 2023, ODE had not conducted any investigation of the use of SSD programs elsewhere in nearby districts.  CSMF, ECF No.176-1 ¶ 40; Declaration of Thomas Stenson in Support of Pls.' Mot. for Summ. J., Ex. 16, Deposition of Eric Wells, ECF No. 177-16 at 61:8–21, 174:4–175:4.  ODE's internal communications also show that the SSD problem was well-known to ODE staff who recognized that school districts often lacked the resources to serve students with disabilities effectively, and that school districts did not "always follow[]" the protections against SSDs.  CSMF, ECF No. 176-1 ¶ 31.

### B.  Dr. Bateman's Report and ODE's Partial Reforms in Response

On August 16, 2021, the Parties entered into an Interim Settlement Agreement that required them to jointly select a neutral expert to examine the use of SSDs and to inform remedies needed to ensure that Oregon students with disabilities receive FAPE in the LRE, free from discrimination. Interim Settlement Agreement, ECF No. 157-1 at 3.   The parties jointly selected Dr. David Bateman as the neutral expert.   Dr. Bateman obtained and reviewed evidence, answered the parties' questions about the use of SSDs statewide, and made recommendations.  CSMF, ECF No. 176-1 ¶ 1.

### 1.  Dr. Bateman's report confirmed Plaintiffs' allegations and documented the prevalence of SSDs in Oregon.

Dr. Bateman's report confirmed Plaintiffs' allegations.   Dr. Bateman found that the practice of placing students with disabilities on SSDs because of their behavior was both pervasive and profoundly detrimental to students and their families.  Neutral Fact Finder Report, ECF No. 157-2 at 29, 31–34, 88. Dr. Bateman found that school districts' systemic overreliance on SSDs stemmed from "ODE leadership consider[ing] SSD as a part of the continuum of placement

options for students eligible for special education—rather than a temporary last resort with a cognizable plan to return to a full-day." Neutral Fact Finder Report, ECF No. 157-2 at 45. As a result, many students started kindergarten on SSDs and tended to stay on SSDs for multiple years. Neutral Fact Finder Report, ECF No. 157-2 at 44. Indeed, Dr. Bateman found no examples of any student returning to a full school day. Neutral Fact Finder Report, ECF No. 157-2 at 44.

Multiple districts even used SSDs as a long-term placement by establishing SSD *programs,* which operated year-round and provided only three hours of education per day. Neutral Fact Finder Report, ECF No. 157-2 at 45–46. Dr. Bateman also found systemic non-compliance with SSD procedures: students were placed on SSDs without procedural protections established by S.B. 263, which was in effect at that time, or clear plans for transition back to a full school day. Neutral Fact Finder Report, ECF No. 157-2 at 42, 47. One of Dr. Bateman's overarching findings was that ODE lacked a basic ability to monitor school districts, noting that its "monitoring system did not allow for appropriate data gathering and monitoring of the use of shorten[ed] school days." Neutral Fact Finder Report, ECF No. 157-2 at 6. Finally, the Report made clear that districts lacked the training and staffing to support students considered for SSDs. Neutral Fact Finder Report, ECF No. 157-2 at 6, 63. Moreover, Dr. Bateman determined that districts across the state faced a shortage of trained specialists to address behavioral challenges. Neutral Fact Finder Report, ECF No. 157-2 at 48.

> ### 2. Dr. Bateman documented the significant investments ODE would need to make to correct the SSD problem and recommended that ODE make extensive reforms.

Dr. Bateman concluded that ODE must take several system-wide actions to "follow through with [its] general supervisory responsibility" and enforce class members' "right to attend

the same amount of time [at school] as typically developing students." Neutral Fact Finder Report, ECF No. 157-2 at 49, 65.

Among other recommendations, Dr. Bateman recommended that ODE establish a statewide data collection and monitoring system to adequately monitor districts. Neutral Fact Finder Report, ECF No. 157-2 at 55–57, Recommendation ("Rec.") 4. Dr. Bateman recommended that ODE "[p]urchase, implement, and mandate the use of a Statewide IEP System," and use that system to "collect data on the use of SSD[s] as part of [its] annual monitoring process and monitor the prevalence and use of SSD[s] quarterly." Neutral Fact Finder Report, ECF No. 157-2 at 55, Rec. 4: Priority Row 1-2.[7] Dr. Bateman also recommended that ODE use the data collected "to identify districts with a greater percentage of students on SSD[s] to provide supports, resources, and corrective actions, when necessary, to decrease the use of SSD[s]." Neutral Fact Finder Report, ECF No. 157-2 at 55, Rec. 4: Priority Row 3.

Dr. Bateman also made several recommendations designed to ensure that ODE would help districts build capacity to support students without resorting to SSDs, including recommendations designed to increase the number of staff available to districts with training to work with students with behavioral needs and creating and funding regional teams that districts could easily access for direct support. Neutral Fact Finder Report at 50–54, 58–59, Recs. 1–3, 5–6. Dr. Bateman recommended that ODE establish and enforce clear consequences for school districts that do not follow ODE guidance on the use of SSDs and reporting. Neutral Fact Finder Report at 57, Rec. 4: Priority Row 10. Finally, Dr. Bateman recommended that a Special Master be appointed to

---

[7] Plaintiffs refer to the sub-recommendations within each of Dr. Bateman's numbered recommendations by row number and, where applicable, priority.

"oversee the implementation of the final [Settlement Agreement]."  Neutral Fact Finder Report at 60, Rec. 8: Priority Row 1.

> ### 3.  The reforms that ODE has undertaken in response to Dr. Bateman's report have not eliminated or significantly reduced the number of class members who are unnecessarily subjected to SSDs.

After the issuance of Dr. Bateman's report, ODE described itself as having prioritized monitoring of SSDs during the 2022–23 school year, in part through a new state level administrative rule, Or. Admin. R. 581-015-2015 (2022).  Declaration of Tenneal Wetherell in Support of Defs.' Cross-Mot. for Summ. J., ECF No. 188 ¶ 4.  Although this rule arguably increases ODE's authority under state law to respond to issues that it previously ignored, it does not *require* ODE to take any action and can be rescinded at any time.  Dr. Wells, the Director of IDEA Programs at ODE and State Director of Special Education for Oregon, confirmed that ODE did not intend to enact rules to implement Dr. Bateman's recommendations.  Wells Tr., ECF No. 177-16 at 92:1–9, 93:3–94:11.  ODE has complete discretion to revise Or. Admin. R. 581-015-2015 or rescind many of the changes it mentions in its Motion at any time.

ODE also adopted guidance in response to Dr. Bateman's recommendations regarding guidance to school districts.  *See* Wetherell Decl., ECF No. 188 ¶ 8; Wetherell Decl. Ex. 3, ECF No. 188-3.  However, ODE's new guidance contains significant gaps and fails to address a number of Dr. Bateman's recommendations, including recommendations to explain how to calculate LRE when a student is on SSDs, or how to develop and implement BIPs and FBAs.  *See* Neutral Fact Finder Report, ECF No. 157-2 at 51, 56, 59; Rec. 1: Priority Row 5, Rec. 4: Priority Row 6, Rec. 6: Priority Rows 1, 2.

> ## C.  Senate Bill 819

The Oregon Legislature enacted S.B. 819 partly to address ODE's failure to implement S.B. 263.  As Senator Gelser Blouin explained during debate around S.B. 819: "We have tried to fix this problem here in the legislature twice . . . in 2017 and 2019.  . . . It has not fixed the problem."  Stenson Decl. ¶ 10.

To this end, S.B. 819 establishes policies and procedures broadly aimed at limiting the use of SSDs, and ensuring that ODE collects some data regarding the use of SSDs.  S.B. 819 heavily emphasizes and relies upon whether parents consent to the use of SSDs and does not provide for increased ODE enforcement on any other basis.  2023 Or. Laws Ch. 290 (S.B. 819) §§ 2, 3, 5.  S.B. 819 does not specifically address informal removals that result in SSDs.  S.B. 819 also provides a one-time appropriation of $3.1 million of funding over two years to accomplish its goals.  S.B. 819 § 12.  Significantly, although the subject matter of S.B. 819 is SSDs, it does not address how SSDs are related to the requirements of IDEA, the ADA, and Section 504.

## III.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(h)(3).

A jurisdictional challenge under Federal Rule 12(h)(3) may involve "jurisdictional issue[s] and substantive issues [that] are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits."  *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).  In "ruling on a jurisdictional motion involving factual issues which also go to the merits," the court "should employ the standard applicable to a motion for summary judgment, as a resolution of the jurisdictional facts is akin to a decision on the merits."  *Id.*  The moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.*  Here, Defendants have "converted the motion to dismiss

into a factual motion by presenting affidavits or other evidence." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

### B.  Mootness and Voluntary Cessation

Article III of the United States Constitution limits federal court jurisdiction to cases or controversies. *See Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 861 (9th Cir. 2017). "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). When subsequent events resolve the dispute such that no live issues remain or the parties lack a legally cognizable interest in the outcome, a case becomes moot. *Id.* at 1086–87.

Where, as here, a defendant claims to have ceased illegal activity mid-litigation, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982)). A public body's changes in policies or practices that are not prescribed by statute generally fall within the voluntary cessation exception to mootness. *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("[A] policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot."); *see also Fikre v. FBI*, 904 F.3d 1033, 1038 (9th Cir. 2018) ("[A]n executive action that is not governed by any clear or codified procedures cannot moot a claim.") (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)).

In cases involving a defendant's voluntary cessation of challenged practices, the defendant bears the "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior

could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 190; *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not . . . make the case moot, [unless] the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated.  The burden is a heavy one.") (internal quotations omitted).  A defendant must also show that the voluntary changes "fully address Plaintiffs' allegations" in the complaint.  *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013).

## IV.    ARGUMENT

Defendants attempt to avail themselves of several theories of mootness in their Motion.  At times, Defendants argue that the mere passage of a new state law—S.B. 819—somehow moots Plaintiffs' federal legal claims.  Defs.' Mot., ECF No. 217 at 14 ("The voluntary cessation exception to mootness does not apply where, as here, a legislative body has taken an action that moots a claim.").  At other times, Defendants argue that it is the actions that they are taking to *implement* S.B. 819 that moot Plaintiffs' claims.  *See* Defs.' Mot., ECF No. 217 at 15 ("In assessing the impact of S.B. 819 on this case, the Court is required to presume that ODE will follow the bill's requirements and implement it with fidelity.").  All the while, ODE blurs the distinction between the actions it is taking that are *required* by S.B. 819 and the actions it is taking that are *voluntary*.  *See* Defs.' Mot, ECF No. 217 at 2 (arguing that Plaintiffs' allegations "are comprehensively addressed via ODE's existing systems and new state law").

As detailed below, each theory of mootness put forward by Defendants fails, albeit for different reasons.  First, passage of a new state law—on its own—cannot moot legal claims that were brought under distinct federal laws.  Second, as a factual matter, the passage of S.B. 819 and any implementation efforts Defendants have taken in response have not mooted Plaintiffs' claims because the harms are still ongoing, as evidenced by a consistently high number of students with

disabilities on SSDs throughout the state.  Third, the actions required by S.B. 819 that Defendants have taken are insufficient, as S.B. 819 is critically deficient in numerous ways and leaves students with disabilities vulnerable to harm in many of the same ways that S.B. 263 did.  Finally, any actions taken by Defendants in response to S.B. 819 that are beyond the requirements of the law are subject to the voluntary cessation exception, and thus, do not moot Plaintiffs' claims.

### A.  Plaintiffs allege violations of federal law, and S.B. 819 does not address Defendants' obligations under federal law.

Plaintiffs' claims cannot possibly be mooted by S.B. 819 because Plaintiffs' claims are brought under federal law.  The harms Plaintiffs allege are harms due to violations of federal statutes—the IDEA, the ADA, and Section 504—not state law.

The passage of subsequent legislation can moot a case where the new legislation repeals or amends the legislation challenged in the complaint.  Defendants rely on *Board of Trustees of Glazing Health & Welfare Trust v. Chambers* for the proposition that "[the court] should assume that a legislative body is acting in good faith in repealing or amending a *challenged legislative* provision, or in allowing it to expire." 941 F.3d 1195, 1199 (9th Cir. 2019) (emphasis added).  But case law focusing on the repeal of "challenged legislation" is inapposite where, as here, a plaintiff's claims do not challenge the legislation at issue.

Plaintiffs did not bring an action to challenge S.B. 263, S.B. 819, or any other state law.  Rather, Plaintiffs challenged ODE's failure to abide by its specific obligations imposed by federal laws.  *J.N.*, 2020 WL 5209846 at *11 (finding Plaintiffs' action alleges a cognizable claim of "statewide failure to effectively implement the IDEA, Title II, and Section 504").  Specifically, the legal violations Plaintiffs identified in the Complaint and that this Court construed in denying Defendants' first motion to dismiss comprise the essence of the ODE's clear statutory duties under federal law.  Under the IDEA, Defendants must affirmatively monitor and enforce school districts'

implementation of the IDEA, and under the ADA and Section 504, they must ensure that Oregon students with disabilities are not subjected to discrimination in their educational programs and that they have educational opportunities equal to those provided to their peers without disabilities.  *See* Compl., ECF No. 1 ¶ 40 (citing 20 U.S.C. §§ 1416(a)(1)(C), (a)(3)(A), (a)(3)(B)), ¶ 138 (citing 42 U.S.C. § 12131), ¶ 145 (citing 29 U.S.C. §794).  Accordingly, the case law regarding mootness arising from a subsequent legislative enactment does not apply.  Just as S.B. 263 did not moot Plaintiffs' claims under federal law, *see J.N.*, 2020 WL 5209846 at *7–*8, *12 (rejecting contention that state law protections ensure no plaintiff could be harmed, where evidence demonstrated continued misuse of SSDs), neither does S.B. 819.  Mere enactment of collateral statutes that affect the topic of the litigation are insufficient to render Plaintiffs' claims moot, especially when the affected laws were not challenged in the first place.

### B. Defendants' nascent implementation of S.B. 819 does not moot Plaintiffs' claims because the harms alleged in the complaint are ongoing.

Plaintiffs' claims are not moot because the harms to class members have not stopped.  Class members continue to be harmed by being subjected to unnecessary SSDs and other forms of unlawful exclusion.  *See Corey H. v. Bd. of Educ. of City of Chicago*, 995 F. Supp. 900, 915 (N.D. Ill. 1998) (SEA did not show IDEA compliance by "briefly describing its monitoring plan and omitting any evidence of the effectiveness of the plan").  Even after the passage of S.B. 819, there are hundreds of students who continue to be subjected to SSDs.  That fact alone demonstrates that the enforcement mechanisms and other requirements provided by S.B. 819 have not meaningfully reduced the number of students on SSDs, whom Plaintiffs allege have been denied FAPE in the LRE, free from discrimination.

As discussed *supra*, Plaintiffs have not challenged S.B. 819 or any other state law so the analysis in *Chambers* is inapposite.  However, even if the Court were to consider the *Chambers*

analysis applicable to Defendants' argument, S.B. 819 continues to contain many of the deficiencies that were embodied in S.B. 263. *C.f., e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 824 (9th Cir. 2019) (case is not moot where new legislation "threatens to harm a plaintiff in the same fundamental way" as previous legislation); *Mont. Green Party v. Jacobsen*, 17 F.4th 919, 922 (9th Cir. 2021) (amendments to Montana election laws did not moot a challenge to those laws because "[t]he amendments do not fundamentally change either the challenged provisions or the applicable legal analysis"). Plaintiffs maintain a "legally cognizable interest in the outcome," as they continue to be harmed in the same fundamental way as before S.B. 819's enactment, and thus, Plaintiffs' claims are not moot. *See Cuviello*, 944 F.3d at 824 (citing *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086–87 (9th Cir. 2011)) (rejecting mootness claims by Defendants that passed a new law that continued to harm plaintiff, even to a lesser degree).

## 1. Significant numbers of students still experience the harms of SSDs under S.B. 819.

S.B. 819 does not moot Plaintiffs' claims because it does not address Plaintiffs' harms. Put simply, hundreds of students across the state of Oregon remain on inappropriate SSD placements. Plaintiffs challenge the ongoing failure by Defendants to effectively address Oregon school districts' systemic practice of inappropriately shortening the length of students' school days due to their disability-related behaviors. *See J.N.*, 2020 WL 5209846; Compl., ECF No. 1. S.B. 819 was signed into law on July 13, 2023. As of October 3, 2023, there are *at least* 738 Oregon students on SSDs. Stenson Decl. ¶ 6; *see Johnson v. City of Grants Pass*, 72 F.4th 868, 881 (9th Cir. 2023) (where there is "evidence the challenged practices have continued," a case is not moot); *see also Friends of the Earth, Inc.*, 528 U.S. at 193 (case is not moot where the "[t]he effect of [Defendants' actions] on the prospect of future violations is a disputed factual matter."). As recounted above, ODE itself admits that that number is likely an undercount, noting that ODE

"expected a lot more than that" and posited that "we heard there are some . . . political things going on with the [data] submission." Stenson Decl. ¶ 6. That number, although lower than the number of students on SSDs prior to the initiation of this lawsuit—1029 students—confirms that a significant number of class members continue to suffer ongoing harm. Neutral Fact Finder Report, ECF No. 157-2 at 23. That number also does not reflect the number of students subjected to SSDs through informal removals. *See, e.g.*, C.S. Decl. ¶¶ 33–39. Despite the passage of S.B. 819, Defendants are still failing to effectively address Oregon school districts' systemic practices of placing students on SSDs.[8] Those students continue to be "harm[ed] . . . in the same fundamental way" despite the passage of S.B. 819. *See Cuviello*, 944 F.3d at 824. Accordingly, Plaintiffs' claims cannot be moot.

The Court should also take note that Defendants, who bear the "formidable burden" of proving mootness, have made *no* factual showing as to the mootness of the case. *See Johnson*, 72 F.4th at 882; *see also Friends of the Earth, Inc.*, 528 U.S. at 170 (2000). Defendants have produced no evidence that the misuse of SSDs has stopped or even meaningfully decreased following S.B.

---

[8] Declarants in support of Plaintiffs' Opposition describe ongoing harms to class members in school districts where ODE has had knowledge of misuse of SSDs for years. One declaration shows ongoing misuse of informal removals in the North Clackamas school district. *See* C.S. Decl. ODE has known that North Clackamas misused SSDs for years. *See* ECF 177-9, at 7, 11, 12 (2021 FACT Oregon report showing that North Clackamas was identified as a school district with SSD complaints in the 2016–17, 2018–19, and 2019–20 school years); ECF 177-26, at 7, 12 (ODE data showing North Clackamas had 15 students on SSDs in 2017–18, 23 students in 2018–19, and 25 students in 2019–20). Similarly, another declaration shows extensive problems involving SSDs, informal removals, and misuse of suspensions in the Central School District ("CSD"). *See* Denton Decl. ODE records show CSD routinely used SSDs for years on two to four percent of the total number of students in special education in CSD. *See* ECF 177-26, at 5, 10, 15, 20 (ODE data showing CSD had 8 students on SSDs in 2016–17, 13 students in 2017–18, 10 students in 2018–19, and 11 students in 2019–20). This high rate of use of SSDs continued into the 2022–23 school year. *See* ECF 177-32, at 2 (showing 11 students on SSDs in October 2022 and 9 students in December 2022); 196-3, at 2 (6 students in March 2023).

819's passage.[9]  Although Defendants tout their newly enacted data collection processes, Defs.'
Mot., ECF No. 217 at 11, Defendants produce no evidence from that data collection process
demonstrating the current extent of the use of SSDs in September 2023 and October 2023.
According to their own pleadings, they clearly have or should have that data.  *See* Declaration of
Tenneal Wetherell in Support of Defs.' Mot. to Dismiss, ECF No. 219 ¶ 8.

### 2.  S.B. 819 does not contain sufficient enforcement mechanisms to limit the number of students on SSDs moving forward.

Defendants argue that "S.B. 819 creates new safeguards for parents and a new monitoring
and enforcement framework at the state level related specifically to abbreviated school day
placements."  Defs.' Mot., ECF No. 217 at 10.  Contrary to Defendants' assertion, S.B. 819's
efficacy depends heavily on whether and to what extent appropriate enforcement takes place.  S.B.
819 still relies heavily on self-reporting from school districts, requires parents to take an active
role in the process, and assumes ODE's diligent follow-through.   In other words, ODE's
longstanding pattern of failing to enforce state laws attempting to regulate SSDs like S.B. 263 and
now S.B. 819 remains intact as children with disabilities continue to be subjected to SSDs in
consistently high numbers.  *Cf. Cuviello*, 944 F.3d at 824 (considering whether plaintiffs are
"harm[ed] . . . in the same fundamental way" in assessing mootness based on the passage of a new
law).

---

[9] The Court can also take notice that discovery closed more than a year prior to Defendants'
bringing this motion.  As such, Plaintiffs have received no discovery, other than the documents
included as exhibits to Defendants' pleadings, since the enactment of S.B. 819.  *C.f. Johnson*, 72
F.4th at 882 (mootness defeated where Plaintiffs showed ongoing harms "between the point the
lawsuit was filed and the close of discovery").  Should the Court entertain Defendants' factual
arguments, it would be appropriate for Plaintiffs to have the opportunity to test Defendants' factual
assertions.

The lack of meaningful oversight and enforcement mechanisms in S.B. 819 is particularly concerning because of ODE's long history of failing to comply with its monitoring and enforcement obligations under federal law.  *See, e.g.*, Pls.' Mot. for Summ. J., ECF  No. 176 at 7–9 (describing ODE's failure to investigate numerous known instances of inappropriate systemic use of SSDs by various school districts); Compl. ¶¶ 12–14, 119 (describing State's longstanding failure to enforce its own laws and correct violations thereof).  As did advocates in Oregon before them, Compl. ¶¶ 12–13, 32, Plaintiffs challenged ODE's ongoing failure to meet its federally mandated obligations to supervise, monitor, and enforce the IDEA's guarantee of FAPE and of placing class members in the LRE and the ADA and Section 504's guarantees of nondiscrimination.   Those failures are not addressed by S.B. 819's limited enforcement mechanisms.

First, S.B. 819's data reporting falls short of the robust data collection system recommended by Dr. Bateman to address ODE's failings under federal law in a number of ways. For instance, S.B. 819 does not adequately track the processes by which students with disabilities are placed on SSDs and the districts' plans and processes for students to reenter full-day schooling. Second, S.B. 819's monitoring and reporting requirements are not informed by a statewide IEP system or other robust independent data collection system.  Instead, they rely almost exclusively on self-reporting by districts and district superintendents.  Unlike Dr. Bateman's validation of data provided by districts during his investigation, Neutral Fact Finder Report, ECF No. 157-2 at 26–27, ODE does not independently evaluate the data provided by districts, nor has ODE committed to taking other actions recommended by Dr. Bateman to effectively or proactively monitor compliance with S.B. 819 or with federal law.  *See* Pls.' Mot. for Summ. J., ECF No. 176 at 11; Neutral Fact Finder Report, ECF No. 157-2 at 55–57 (Rec. 4).

Perhaps most importantly, like S.B. 263, S.B. 819 is not self-effectuating. As outlined in Section 5 of S.B. 819, its limited enforcement mechanism of withholding state funding is linked *only* to the parental consent requirements in the bill; it is not linked to any of the substantive requirements in federal law to provide FAPE in the LRE, free from discrimination. This mechanism places the burden on the parents of children receiving SSDs, rather than on ODE, to oversee the use of SSDs for their children and to challenge violations either by refusing or revoking consent or filing complaints through ODE's cumbersome complaint system. At base, S.B. 819's enforcement framework does not address Plaintiffs' central complaint: that ODE refuses to effectively monitor and enforce each school district's obligation to provide its students with FAPE in the LRE free from discrimination. Instead, it asks parents who are already struggling to navigate a challenging situation to take on ODE's job as well. Moreover, regardless of whether a parent consents to an SSD during the IEP process, a parent cannot waive a child's rights to be free from discrimination on the basis of disability under Section 504 and the ADA.

Some vital provisions of S.B. 819 are similar or identical to those of S.B. 263, which undisputed evidence shows were not enforced by ODE. For instance, S.B. 263 specifically provided that an SSD program could only be provided if the program was offered "based on the student's needs," and after documenting that the IEP or 504 "team considered at least one option" for full day school including "appropriate supports for the student." Neutral Fact Finder Report, ECF No. 157-2 at 120. S.B. 819 contains essentially identical provisions. *See* S.B. 819 § 3 (requiring that an IEP team find an SSD program is "[b]ased on the student's individual needs" and that the district "offered at least one reasonable alternative placement" that would allow a full day of school "that included appropriate supports for the student"). Dr. Bateman found that school districts and ODE completely disregarded this requirement under S.B. 263. Neutral Fact Finder

Report, ECF No. 157-2 at 61. Similarly, S.B. 819's operation requires parental consent prior to imposing SSDs, yet districts and ODE disregarded parental participation requirements in enforcing S.B. 263. *See* Neutral Fact Finder Report, ECF No. 157-2 at 47, 78 (noting that children were placed on SSD over the objections of parents), 44 (noting "vast majority" of IEPs reviewed from 2017–18 and 2018–19 school years did not demonstrate parental participation in SSD decision). ODE and school districts failed to abide by similar and essentially identical requirements in S.B. 263, and there is simply no basis to assume that a different outcome will ensue under S.B. 819.

The legislative process leading up to the passage of S.B. 819 also undermines Defendants' mootness arguments. In the S.B. 819 legislative process, legislators expressed frustration with ODE's "shocking" failure to enforce special education law and the "seemingly callous response by districts and the Department of Education" to the stories of the "many, many parents that came forward." Stenson Decl. ¶ 10. Legislators further expressed concern that, even with the passage of S.B. 819, school districts would continue to violate the law and ODE would continue to permit such violations, requiring yet further legislation in addition to S.B. 819. *See* Stenson Decl. ¶ 10. Tellingly, even the proponents of S.B. 819 understand the structural and systemic problems at ODE that will likely prevent the realization of the goals of the law.

### C. Similarly, Defendants' voluntary policy changes regarding SSDs do not moot Plaintiffs' claims.

For the reasons explained above, Plaintiffs' claims are not moot because the harms Plaintiffs allege have not stopped despite any changes that Defendants have made independently or as a result of S.B. 819. But to the extent that Defendants' changes do address Plaintiffs' harms, the voluntary cessation exception applies to many of the changes that Defendants point to because a substantial number of those changes are not required by S.B. 819. While it is not clear from

Defendants' Motion exactly which actions they believe are required by S.B. 819, the text of S.B. 819 shows that many of the actions upon which their mootness argument relies are voluntary.

The Ninth Circuit applies numerous factors to evaluate public entities' mootness claims based on voluntary changes in policy or practice: (1) whether the changes are "evidenced by language that is 'broad in scope and unequivocal in tone;'" (2) whether the changes "'address[] all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case;'" (3) whether this lawsuit was the "catalyst" for the changes; (4) how long the changes have been in place at the time that court considers mootness; (5) whether the government has engaged in conduct similar to that challenged since the changes; and (6) whether the changes "could be easily abandoned or altered in the future." *Rosebrock v. Mathis,* 745 F.3d 963, 972 (9th Cir. 2014) (quoting *White v. Lee,* 227 F.3d 1214, 1242–44 (9th Cir. 2000)).

The voluntary cessation exception applies to all of the changed practices outside of those required by S.B. 819 upon which Defendants premise their mootness claim. That is true even where Defendants claim that newly adopted changes are in service of S.B. 819 despite not being statutorily required. Furthermore, several of the policy changes Defendants claim are the result of obligations created under S.B. 819 are actually voluntary policies developed prior to the passage of the legislation or are not required by the law.[10] Defs.' Mot., ECF No. 217 at 6–8. Indeed, five of the six *Rosebrock* factors clearly demonstrate that Plaintiffs' claims are not moot.[11]

---

[10] For example, Defendants' formal data collection process was developed prior to the passage of S.B. 819. Declaration of Eric Wells in Support of Defs.' Cross-Mot. for Summ. J., ECF No. 187 ¶ 30.

[11] The third *Rosebrock* factor—whether Plaintiffs' lawsuit has been a "catalyst" for change—is the only factor that does not clearly weigh against mootness. However, the Supreme Court has viewed this factor skeptically. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (noting that "there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation," which "has been applied to refuse the assertion of mootness by

The first factor—whether the changes implemented are "evidenced by language that is 'broad in scope and unequivocal in tone'"—weighs heavily against Defendants. *See Rosebrock*, 745 F.3d at 972. Because S.B. 819 contains such limited enforcement mechanisms, ODE is granted wide discretion over how to implement the law. For example, S.B. 819 does not specify, *inter alia*, how ODE should assess whether districts are properly and accurately reporting SSD data, how ODE itself should determine whether students are being properly placed on SSDs, and what procedures ODE should employ to independently monitor the improper use of SSDs outside of the complaints process. *See* S.B. 819 §§ 4(2)(e), 5(2)(a). Defendants do not cite to any rules that limit ODE's discretion regarding establishing guidance and facilitating trainings, developing and building ODE's internal capacity, or building S.B. 819 complaint and monitoring systems. Defs.' Mot., ECF No. 217 at 6–7. Where the public entity retains significant discretion in implementation, as it does here, a finding of mootness is unlikely. *See, e.g.*, *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003) (rejecting mootness claims because agency interpretation of code could change in new administration) *superseded by regulation on other grounds*, *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016).

Second, the policy changes recently implemented by ODE fail to "address[] all of the objectionable measures" challenged by Plaintiffs. *Rosebrock*, 745 F.3d at 972 (quoting *White*, 227 F.3d at 1243). ODE's changes have not meaningfully reduced the number of students on SSDs, have not addressed many of the priority recommendations suggested by Dr. Bateman, and have

---

a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity") (alteration in original) (citations omitted). Further, this factor is not dispositive, given the overwhelming weight of the other factors. *See Tiwari v. Mattis,* No. C17-242 TSZ, 2017 WL 6492682, at *4–*5 (W.D. Wash. Dec. 19, 2017) (the third *Rosebrock* factor did not establish mootness where "the recent revisions to [the challenged] policy show[ed] just how quickly [defendant agency could] revise its internal procedures").

not resolved the procedural defects identified in Plaintiffs' complaint, which are central to the ongoing and pervasive improper use of SSDs.  Most critically, the number of students with disabilities who are still subject to SSDs remains high.  *See supra* Sections II(A)(1), IV(B)(1).

Because ODE is still in the process of developing its system of monitoring and enforcement, Defendants cannot show that changes made to date "address[] all of the objectionable measures" challenged by Plaintiffs.  *See, e.g.*, Defs.' Mot., ECF 217 at 9 ("ODE *is aligning* [its] formal data collection with the S.B. 819 reporting requirements.") (emphasis added), 13 ("[D]uring the 2023–2024 school year, ODE *expects* that R-TAPs will receive focused training—and ensure that their regions' special education directors, teachers, and case managers have been trained.") (emphasis added).

Even if all the changes enumerated by Defendants were fully implemented, ODE's voluntary changes would not fully rectify the violations named in Plaintiffs' complaint.  In particular, Defendants' new policies and procedures fail to proactively monitor school districts' legal compliance with all relevant federal and state statutes and enable complete and accurate collection of district-level data on SSDs.  As noted by Plaintiffs' expert Dr. Musgrove, to assess whether a state's "policies and procedures are being implemented properly, states must meaningfully engage with all relevant stakeholders."  Declaration of Melody Musgrove in Support of Pls.' Mot. for Class Cert., ECF No. 67 ¶ 44.  That involves engagement with "parents, principals, teachers, advocates, early childhood and higher education leaders, administrators, paraprofessionals, related service providers, and others to analyze all available data in an organized and systemic manner."  Musgrove Decl., ECF No. 67 ¶ 44.  However, ODE's current monitoring system relies exclusively on school districts to self-report data related to SSDs, *see* S.B. 819 § 4(2)(e), a process that was demonstrably ineffective in the past, *see* Neutral Fact Finder Report,

ECF No. 157-2 at 26–27 (describing statewide systemic failures in data keeping and reporting, including a school district with no written special education records at all).  According to Dr. Musgrove, SEAs "cannot make sound decisions about whether districts meet the IDEA's requirements if they cannot verify that data from districts are adequate, sufficiently relevant to the identified areas of concern, accurate, and timely."    Musgrove Decl., ECF No. 67 ¶ 59.  Additionally, Dr. Bateman's report states that many students are placed on SSDs without necessary FBAs and BIPs documented in their records—yet Defendants' new monitoring policies do not assess the appropriateness of school district SSD placement decisions.  Finally, and perhaps most importantly, Defendants nowhere assess whether students on SSDs make appropriate progress as required by federal law.  *See Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 402 (2017).

While Defendants have described various plans and policies for data collection and monitoring, they have not demonstrated with specificity how they will proactively assess district compliance or alternatively verify the accuracy of the data that school districts report.  *See Corey H.*, 995 F. Supp. at 915 (SEA failed to show it met IDEA standards when admitting its monitoring manual into evidence but demonstrating no evidence of the "results of its LRE compliance monitoring efforts").  Defendants only note that they are in the process of "launching a permanent data collection system on abbreviated school day placements," and "developing comprehensive monitoring protocols," with scant details as to how such protocols will actually be effectuated.  *See* Defs.' Mot., ECF No. 217 at 8.  Defendants' new changes and policies also lack needed resources, technical assistance, and training to help school districts support students effectively for the full school day.  As noted by Dr. Musgrove, it is "not enough to tell school districts they are doing the wrong thing . . . [SEAs] must provide supports that will help [school districts'] take necessary

*preventive* steps." Musgrove Decl., ECF No. 67 ¶ 66 (emphasis in original). Guidance alone is insufficient; ODE must "make sure all districts receive . . . detailed information [on SSDs] and that follow up support via trainings and guidance would be available to districts." Supp. Greenwood Report, ECF No. 180-1 at 33. Such support would include "consulting assistance to administrators, teachers, instructional or educational aides, and others who are responsible for supporting students with significant needs;" in some cases, "[i]n-person consultation may be needed . . . to better understand how to advise a school or model and coach staff in implementing interventions more effectively." Greenwood Report, ECF No. 66-2 at 47.

The fourth *Rosebrock* factor—the timing and rhetoric surrounding ODE's changes—also weighs against a finding of mootness. *Rosebrock*, 745 F.3d at 972 (citing *White*, 227 F.3d at 1243). Despite Defendants' knowledge of the pervasive use of improper SSDs across the state for nearly a decade, the policy changes upon which Defendants premise their mootness claims have only been in place for a period of months (and in some cases, are still in the process of being put into effect). *See NWDC Resistance v. Immigr. & Customs Enf't,* 2022 WL 2073053, at *5 (W.D. Wash., June 9, 2022) (noting that "courts finding that the fourth [*Rosebrock*] factor weighs in favor of mootness have observed that the policy was in effect for a period of years."); *see also Am. Diabetes Ass'n,* 938 F.3d at 1153 (finding that fourth *Rosebrock* factor was met via a policy which had been in place for at least two years). Moreover, Defendants have never acknowledged that their previous conduct violated the law. *See* Pls.' Mot. For Summ. J., ECF No. 176 at 28, 43; *Armster v. U.S. Dist. Ct.,* 806 F.2d 1347, 1359 (9th Cir. 1986) ("It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct.").

Fifth, Defendants continue to engage in the type of conduct similar to that challenged by Plaintiffs.  As noted above, Defendants' new practices maintain many of the same failures and deficiencies initially identified in Plaintiffs' complaint.  ODE's new monitoring system relies on school districts to self-report data on SSDs; despite implementing formal data collection systems and "comprehensive monitoring protocols," ODE has not detailed how it will comprehensively assess whether the data school districts provide is accurate and complete.  *See* Defs.' Mot., ECF No. 217 at 8; Stenson Decl. ¶ 12.  ODE has additionally failed to introduce necessary supports and resources to ensure that districts are able to take preventive steps to ensure that students' federal rights to FAPE in the LRE and nondiscrimination are not violated.  Nothing in ODE's recent changes monitors whether districts are appropriately placing students on SSDs—through, for example, conducting high-quality FBAs and developing high-quality BIPs—and whether students placed on SSDs are making appropriate progress as required by federal law.  In addition, ODE continues to lack any enforcement mechanism to ensure compliance by districts with high numbers of students on SSDs.  Similarly, ODE has not developed a capability to provide effective support to such school districts even when it is able to identify high numbers of students who are on SSDs or otherwise excluded from their classrooms because of unaddressed needs for effective behavioral supports.

As further evidence of this factor, the federal violations Plaintiffs identified in their complaint are still ongoing, despite Defendants' changed policies and practices.[12]  ODE's new

---

[12] *See* n. 6, *supra;* United States Dep't of Educ., State General Supervision Responsibilities Under Parts B and C of the IDEA, https://sites.ed.gov/idea/files/Guidance on State General Supervision Responsibilities under Parts B and C of IDEA-07-24-2023.pdf (July 24, 2023) at 16  ("A State may not establish a threshold of less than 100 percent for determining [a school district's] compliance.").

policies and practices have not resolved or significantly reduced the incidence of these violations. This, in and of itself, confirms that ODE's new system of monitoring SSDs contains the same defects and limitations that Plaintiffs challenged in this lawsuit.

Lastly, the sixth *Rosebrock* factor also weighs against mootness. ODE's voluntary changes provide minimal checks on its discretion in how it responds to problems and which, if any, of those changes will remain in place moving forward. Defendants cite numerous aspects of ODE's system that are still in the planning stages. *See, e.g.,* Defs.' Mot., ECF No. 217 at 7 ("ODE is *in the process* of hiring a Research Analyst to work with data submitted by school districts under S.B. 819"), ("ODE has added or *is working to add* 14.0 full time employees to support the effective implementation of SB 819"), 9 ("ODE *intends* to fully implement the abbreviated school day program data requirements from S.B. 819 through an effective, ongoing data collection system"), 13 ("[D]uring the 2023-2024 school year, ODE *expects that* R-TAPs will receive focused training—and ensure that their region's special education directors, teachers, and case managers have been trained" on various topics related to SSDs.), 14 ("ODE *will utilize* the Statewide Technical Assistance Center to build school district staff capacity and implement evidence-based behavioral systems that support all learners effectively while also providing behavioral support for emergent issues.") (emphasis added). However, Defendants' expressions of their expectations and intentions cannot be and are not sufficient to show that harm to the class has ended.

Because S.B. 819 does not specifically require these policies and practices, there is little assurance that they will be effectively implemented or continued.[13] *See Corey H.*, 995 F.Supp. at

---

[13] To the extent that any of the actions that Defendants are taking are based on *requirements* in S.B. 819, this *Rosebrock* factor still weighs against a finding of mootness. S.B. 819 is already facing significant resistance from local school districts. For instance, the District Director of Student Services at North Wasco County School District expressed concern that the law "forces

915 (an SEA that accepts federal funds under IDEA must "follow[] through and ensur[e] that the local school districts effectively educate children with disabilities in the least restrictive environment").  That means that many of these policies "could be easily abandoned or altered in the future."  *Rosebrock,* 745 F.3d at 971–972 (quoting *Bell*, 709 F.3d at 901); *see also Getman v. Or. Health & Sci. Univ.,* No. 3:21-cv-01408-SB, 2022 WL 17156760, at *4 (D. Or. Nov. 22, 2022) ("The Ninth Circuit has recognized that 'a lack of "procedural safeguards insulating the new state of affairs from arbitrary reversal" can counsel against mootness.'") (quoting *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1153 (9th Cir. 2019) (quoting *Fikre*, 904 F.3d at 1039)).  Even if Defendants "have no intention to alter or abandon" their newly introduced practices, "the ease with which [Defendants] could do so counsels against a finding of mootness."  *Bell*, 709 F.3d at 900.

## V.    CONCLUSION

Ultimately, S.B. 819 is a state law and cannot possibly moot Plaintiffs' claims under federal law.  And even though S.B. 819 may be related to Plaintiffs' claims, it cannot possibly moot them because harms to class members continue despite S.B. 819.  Moreover, none of Defendants' voluntary changes are sufficient to resolve Plaintiffs' claims.  For the above reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.

---

some students to have a full school day." Kelsie Cowart, *D21 school board hears implications of Senate Bill 819*, Columbia George News (Oct. 11, 2023), *available at* https://www.columbiagorgenews.com/news/d21-school-board-hears-implications-of-senate-bill-819/article_26414ec6-679a-11ee-bb8a-2f3c1bd601bd.html.  Organizations and attorneys across the state are already contemplating legal challenges to S.B. 819.  Stenson Decl. ¶¶ 7–8.  In light of the early and vocal resistance to the bill, there is a "reasonable expectation" that S.B. 819 could be amended or repealed.  Stenson Decl. ¶¶ 7–8.

Respectfully submitted,

By:*/s/ Hannah Benton Eidsath*____
Thomas Stenson (OR No. 152894)
tstenson@droregon.org
Joel Greenberg (OR No. 943233)
jgreenberg@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR 97205-2748
(503) 243-2081

Hannah Benton Eidsath (CT No. 428982)*
hbenton@youthlaw.org
Seth Packrone (NY No. 5395769)*
spackrone@youthlaw.org
Nina Monfredo (NY No. 5717624)*
nmonfredo@youthlaw.org
National Center for Youth Law
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
(202) 868-4781

Dated: November 13, 2023

Selene Almazan-Altobelli (MD No. 10506)*
selene@copaa.org
Council of Parent Attorneys and Advocates
8 Market Place, Suite 300
Baltimore, MD 21285
(844) 426-7224 ext. 702

Ira A. Burnim (D.C. No. 406154)*
irab@bazelon.org
Lewis Bossing (D.C. No. 984609)*
lewisb@bazelon.org
Bazelon Center for Mental Health Law
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005-4900
(202) 467-5730

Katherine Giordano (NY No. 5952270)*
katherine.giordano@probonolaw.com
1 Manhattan West
New York, NY 10001
(212) 735-3000

*Admitted pro hac vice
*Attorneys for Plaintiffs*