IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**J.N., et al.;**                                                    6:19-cv-00096-AA

               Plaintiffs,                          **OPINION AND ORDER**

        v.

**OREGON DEPARTMENT OF
EDUCATION, et al.**,

               Defendants.

_____

AIKEN, District Judge:

Plaintiffs in this class action are Oregon public school children with disabilities and a non-profit advocacy group. They allege that inadequate state policies and procedures for monitoring, compliance and enforcement, and technical training and assistance for school districts has led to a statewide practice among school districts of misusing shortened school day schedules for students with disability-related behaviors. Plaintiffs assert that the inadequacy of the state's policies and procedures violate their rights under the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. § 1400 et seq.; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794. Now before the Court is defendants' Motion to Dismiss under Federal Rule of Civil Procedure ("Rule") 12(h)(3), on the grounds that plaintiffs' claims are mooted by the Oregon Legislature's passage of Senate Bill 819[1] ("SB 819"), a new law altering Oregon's abbreviated school day placements[2] for students with disabilities. For the reasons discussed, defendants' motion is GRANTED. Pending Motions for Summary Judgment and related motions, ECF Nos. 175, 176, and 186 are DENIED as moot. This case is DISMISSED for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3). Judgment shall be entered accordingly.

## FACTUAL BACKGROUND

The named plaintiffs and plaintiff class are "students with disabilities aged 3 to 21 residing in Oregon who are eligible for special education and related services" under the IDEA, Title II, and Section 504, who are "currently being subjected to a shortened school day or are at substantial risk of being subjected to a shortened school day due to their disability-related behaviors." Compl. ¶ 31. Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA") is a national not-for-profit membership organization of parents of children with disabilities, their attorneys, and their advocates. Plaintiffs name as defendants the Oregon Department of Education ("ODE"), ODE Director Colt Gill, and Governor Tina Kotek (collectively,

---

[1]    SB 819, 2023 Leg. Assem., Reg. Sess. (Or. 2023).
[2]    Throughout this opinion, the term "abbreviated school day" is used interchangeably with "shortened school day" or "SSD."

"defendants").

The Court references the IDEA, Title II, and Section 504 claims together because plaintiffs allege a systemic failure of policies and procedures that result in unnecessarily shortened school day schedules for children with disabilities—an alleged violation of all three statutes. *See, e.g., Christopher S. ex rel. Rita S. v. Stanislaus Cty. Office of Educ.*, 384 F.3d 1205, 1208-09, 1212 (9th Cir. 2004) (holding that a policy of shortened school days for autistic students violates the IDEA, Title II, and Section 504). The Court need not repeat its detailed discussion of the statutory framework and application of the IDEA, Title II, and Section 504, which is set forth in the Court's prior order. *See* Op. & Order on Mot. to Dismiss at 2-8, ECF No. 104 (D. Or. Sept. 1, 2020) ("2020 Order").

Plaintiffs maintain that students on shortened school days "frequently fall behind academically and miss out on critical social opportunities in which they can practice appropriate behaviors." Compl. ¶ 5. Accordingly, plaintiffs contend that defendants failed to provide a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), as required by the IDEA,[3] and failed to provide an education free from discrimination under Title II of the ADA and Section 504.

In shortening plaintiffs' school days due to their disability-related behaviors, plaintiffs allege that the district does so without first providing the supports and

---

[3]    The IDEA holds the State responsible for ensuring that children with disabilities are educated in the "least restrictive environment" in which they can learn alongside their non-disabled peers to the maximum extent appropriate to their needs. 20 U.S.C. § 1412(a)(5).

services that would enable plaintiffs to attend a full school day. Compl. ¶¶ 55, 74, 83, 95. Under the IDEA, Title II, and Section 504, plaintiffs allege that shortening the school day of a child with a disability is not an appropriate substitute for providing the academic and behavioral services and supports that would enable that child to learn and progress socially during a full school day. *Id*. ¶ 6. Plaintiffs maintain that the majority of children with disability-related behavioral challenges can learn in general education classrooms along with their nondisabled peers if given the appropriate and legally required services and supports. *Id*.

Plaintiffs contend that defendants are legally responsible for ensuring that all Oregon students with disabilities receive a free appropriate public education that is free from discrimination, and for taking action when school districts fail to provide such an education. *Id*. ¶ 7. In plaintiffs' view, defendants have been on notice for years that many of its school districts, often rural and small school districts, deny children with disability-related behaviors a full day of school—or the chance to attend school at all—in lieu of providing them with needed services. *Id*. ¶ 12.

While defendants did take steps to address systemic issues of improper placement on SSDs—such as issuing memoranda and taking investigative action in some cases—plaintiffs maintain that those policies and practices have been inadequate to identify, correct, or prevent the frequent violations of federal law that continue to occur on defendants' watch. *Id*. ¶ 13.

Under policies existing before and during this lawsuit, plaintiffs assert that their respective districts delayed, often for years, the functional behavioral

assessments that are required for students to receive the supports that address their disability-related behaviors. *Id.* ¶¶ 55-66, 88. And that instead of providing those supports, their districts shortened their school days, sometimes against the wishes of parents and without proper Individualized Education Program ("IEP")[4] documentation. *Id.* ¶¶ 91-105.

Plaintiffs allege that defendants' violations of federal law can be categorized into four broad-based deficiencies: (1) the lack of state-level policies or procedures to collect essential information regarding the school districts that impose SSDs and that may need further supervision and monitoring, *id.* ¶¶ 115-18; (2) failure to proactively monitor school districts' legal compliance and correct any noncompliance beyond simply operating its administrative complaint system, *id.* ¶¶ 115, 119-22; (3) failure to enforce federal and state laws and policies and correct violations, *id.* ¶ 119; and (4) failure to provide needed resources, technical assistance, and training to help districts support students effectively for the full school day, *id.* ¶¶ 101, 115, 123-26. *See also* plfs.' Mot. Summ. J. ("Plfs.' MSJ") at 19.

As relief, plaintiffs seek a declaration that "[d]efendants have violated the [IDEA, the ADA, and Section 504]." Compl. at 48 (prayer for relief). Plaintiffs seek to enjoin defendants from "subjecting [plaintiffs] to policies and practices that violate their rights" and order defendants "to develop, adopt, and implement policies and

---

[4]    In 2017, the U.S. Supreme Court confirmed that a student's (IEP) "must aim to enable the child to make progress," since "the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

practices that will ensure [defendants] provide a free and fair public education in the least restrictive environment." *Id*. Plaintiffs also requested class certification, which the Court granted.

## PROCEDURAL HISTORY

Plaintiffs filed this action in January 2019. In September 2020, the Court denied defendants' Motion to Dismiss for lack of standing. *See* 2020 Order. In February 2021, the Court granted plaintiffs' motion for class certification.  Op. & Order on Mot. for Class Cert, ECF No. 123 ("2021 Order"). In August 2021, the parties entered into an Interim Settlement Agreement that required them to jointly select a neutral expert to examine the use of shortened school days and to formulate remedies to ensure that Oregon students with disabilities receive a FAPE in the LRE, free from discrimination. *See* Interim Settlement Agreement, ECF No. 157-1 at 3.

## I.    Neutral Factfinder Investigation and Report

Defendants proposed, and plaintiffs agreed, that Dr. David Bateman would lead a highly qualified team of neutral experts to obtain and review evidence; identify and answer questions about SSD problems; and make recommendations. The team of experts completed a comprehensive report totaling more than 170 pages.  *See* Report of the Neutral Factfinder ("the Report" or "Report"), June 30, 2022, ECF No. 157-2. The Report is based on evidence from state and district statutes, policies, guidelines, processes, and procedures relevant to shortened school day placements. The experts collected data and interviewed personnel, parents, and relevant focus groups. Report at 14.

Information from the school districts on the number of children placed on shortened school days proved difficult to obtain. The Report states that the experts encountered "multiple, unanticipated, and unnecessary barriers" to obtaining data and information. *Id*. at 17. Barriers included a lack of response from the districts to the experts' questionnaires, despite repeated inquiries.  After several months, the experts called upon the Oregon Department of Justice to issue subpoenas to the districts to gain their response to requests for data about students on SSD placements.  *Id*. at 18.  Other roadblocks to completing the Report occurred when the expert team received documents from the districts that were so redacted that basic, non-private, necessary data was obscured. *Id*. at 19. At other times, the districts provided documents delivered haphazardly, with pages out of order, and student files mixed up, requiring hours of the experts' time to sort and organize.  *Id*.

When it came time to conduct interviews, many districts did not permit teachers to speak with the experts. *Id*. Districts largely limited the experts' contact to short conversations with the superintendent. *Id*. The experts also faced reluctance from parents—some did not show up to scheduled meetings to talk with the experts. *Id*. at 20. On other occasions, the school districts represented that they would provide the experts with contact information for parents of children on shortened school days, but those districts ultimately failed to do so. *Id*. at 20.

Even with these challenges, the experts eventually compiled sufficient data from which the team could make findings. *See id*. at 21-35 (summarizing quantitative data points). As to the findings in the Report, the Court need not duplicate them here,

but to highlight a few examples, the experts found that during pendency of this litigation, there are about 1,000 students with disabilities placed on SSDs because of their disability-related behaviors.  *Id*. at 42.  The Report found that there were no mandated trainings on SSDs or instruction how to prevent putting students on SSDs. *Id*. at 42. Further, no system-wide method existed for the state to gather or monitor data on district use of SSDs. *Id*. at 43.

With few exceptions, the Report found that the districts did not demonstrate an understanding that, when a student is subject to a shortened school day, the student's IEP should be calculated to aggressively move the student along the LRE continuum toward instruction time with their peers. *Id*. at 5.  The experts were unable to locate sufficient guidance, training, or other resources and support from ODE to help districts understand the LRE considerations and the role of an IEP to ambitiously move students back to a full day. *Id*. Thus, the evidence was that the districts largely treated shortened school days as long-term solution on the LRE continuum. *Id*.

The Report also found that although Oregon students without disabilities typically receive six hours of daily instruction, students with disabilities who are subject to SSDs sometimes only attend school for one or two hours of instruction each day, or less. *Id*. at 44. For many students, placement on SSDs start as early as kindergarten, prior to creation of an IEP or the completion of assessments, and continue for multiple years. *Id*. Very few students placed on SSDs receive any instruction outside of school. *Id*. Strikingly, the experts did not find a single IEP that

documented a student returning to a full day of school after placement on an SSD. *Id.* The Report also identified that some students with disabilities are being placed on SSDs without parental consent, noting that Oregon law was inconsistent on whether parents must consent to their child being placed on an SSD, or whether a parent must "meaningfully participate in a meeting to discuss the placement." *Id.* at 47 (quoting now-repealed SB 263 Section 2(1)(d) and 2(3)(a)(B)).

The Report made at least eight recommendations to ODE, including that ODE should clarify guidance on the proper use of shortened school days; conduct mandatory—rather than optional—trainings; designate federal funding for special education teachers; establish technical training and support; create a universal system for monitoring the placement of children on SSDs and tracking individualized education programs; and issue clear guidance on legal requirements. *Id.* at 50-61.

The parties met for settlement negotiations multiple times over five years between 2019 and 2023, facilitated by Judges John Acosta, Stacie Beckerman, and Patricia Sullivan, and on each occasion were unable to reach a mutually satisfactory resolution to the problems plaintiffs identified, and the Report confirmed, with respect to defendants' policies and on shortened school days.

While this action was pending and settlement talks remained mostly unsuccessful, some of plaintiffs' lawyers testified before the Oregon State Legislature as advocates for a statewide overhaul of defendants' policies and practices identified in this very lawsuit.

The Oregon Legislature obtained plaintiffs' court filings identifying the

systemic deficiencies pertaining to the use of shortened school days. The Senate Committee on Education's first hearing on the bill included the following materials, submitted by the bill's chief sponsor, Senator Gelser Blouin: (1) Plaintiffs' Complaint; (2) the Court's 2020 Order on Defendants' Motion to Dismiss; (3) the Court's 2021 Order on Plaintiffs' Motion for Class Certification; (4) the Declaration of Melody Musgrove in Support of Plaintiffs' Motion for Class Certification; (5) Report of the Neutral Fact Finder; (6) and transcripts from two hearings held on the parties' motions.[5]

Plaintiffs' counsel  provided testimony to the legislature on behalf of Disability Rights Oregon that SB 819 would provide "a clear legal framework that will require ODE to aggressively pursue the elimination of frequent and long-term shortened school days in an accountable way. In doing so, it will spare hundreds of Oregon children from an experience that robs them of their basic right to receive a full day of effective education at a public school where they live. It will change lives." Englander Decl. (ECF No. 218) Ex. 1 at 1.

At the legislative hearing, Senator Gelser Blouin discussed this case and explained that SB 819 would address the deficiencies plaintiffs allege. *See* Englander Decl. Ex. 2, Hr'g Tr. page 17-21 (discussing and citing to court proceedings), 23-31 (explaining how SB 819 will address the issues in this case).

In addition to legislative hearing testimony, the Staff Measure Summaries for

---

[5]     *See* https://olis.oregonlegislature.gov/liz/2023R1/Committees/SED/2023-02-07-15-00/MeetingMaterials (last visited Feb. 24, 2024).

the Senate Committee on Education, the House Committee on Education, and the House Committee on Rules all include a summary of the litigation and the findings in the Report as background context for SB 819. Englander Decl. Ex. 3 at 2; *id*. Ex. 4 at 2; *id*. Ex. 5 at 2.

By April 2023, the parties had filed dispositive motions for summary judgment and the time for discovery closed. On July 13, 2023, before the Court ruled on the parties' motions, Governor Kotek signed SB 819—the bill for which plaintiffs advocated—repealing Oregon's shortened school day statute, ORS 343.161, and materially overhauling ODE's policies and practices for placing students on shortened school days. The text of SB 819 provides requirements for data collection and monitoring; complaint investigation; designating and withholding funds for districts depending on compliance; and compensatory education. (A more detailed discussion of specific provisions of SB 819 follows below).

In their motion to dismiss, defendants assert that SB 819 remedies the asserted systemic deficiencies at issue in this case, rendering the case moot. Defs.' Mot. to Dismiss ("Mot.") at 8. Defendants point to specific provisions in SB 819 they contend comprehensively address each alleged violation plaintiffs identified. Because SB 819 specifically repeals ORS 343.161 and, by its text, provides the remedy plaintiffs seek, defendants argue that this case no longer presents a live case or controversy and, as such, the Court lacks jurisdiction. Mot. at 2.

## LEGAL STANDARDS

## I.    Subject Matter Jurisdiction

Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). The difference between a Rule 12(h)(3) motion and a motion to dismiss under Rule 12(b)(1) "is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party." *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 n.3 (3d Cir. 1992); *see also Augustine v. United States*, 704 F.2d 1074, 1075 n.3 (9th Cir. 1983) (stating that the issue of subject-matter jurisdiction may be raised by the parties at any time pursuant to Rule 12(h)(3)).

An attack on the court's subject-matter jurisdiction may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As is the case here where the defendants bring a factual challenge to the court's subject-matter jurisdiction, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* A court "need not presume the truthfulness of [the] plaintiffs' allegations," *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000), and "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction," *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

## II.    Mootness

Under Article III of the U.S. Constitution, the judicial power extends to "Cases" and "Controversies." Courts cannot decide legal disputes "in the absence of such a case or controversy." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). No principle is more fundamental to the judiciary's proper role in the federal system. *Clapper v.*

*Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). This limitation requires that a plaintiff have standing: "an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Article III requires that an actual controversy exist "through all stages of the litigation." *Already, LLC*, 568 U.S. at 91 (quotations omitted). "A case becomes moot, and therefore no longer a 'Case' or 'Controversy' for purposes of Article III, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* Put another way, a case is moot if the dispute "is no longer embedded in any actual controversy about the plaintiff's particular legal rights." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

In determining whether a case is moot, the court presumes that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it. *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019). "The rigors of the legislative process bespeak finality and not for-the-moment, opportunistic tentativeness." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1038 (9th Cir. 2018) (citation and internal alterations omitted). On the other hand, "an executive action that is not governed by any clear or codified procedures cannot moot a claim." *Id.* For cases that lie between these two ends of the spectrum, courts ask whether the government's new position "could be easily abandoned or altered in the future." *Id.*

## DISCUSSION

### I.    Preliminary Arguments

Some of plaintiffs' arguments can be resolved before discussing defendants' theories of mootness of plaintiffs' claims. Plaintiffs contend that defendants' theories of mootness fail, arguing that "passage of a new state law—on its own—cannot moot legal claims that were brought under distinct federal laws." Resp. at 15.  To support that contention, plaintiffs maintain that their harms are due to violations of federal statutes—the IDEA, the ADA, and Section 504—not state law.  *Id*. at 16. Plaintiffs' argument is not well-developed; cases too numerous to cite have been brought challenging state laws, policies, and practices under federal law, where the repeal or expiration of those state laws, policies, or practices rendered a plaintiffs' challenge moot. Plaintiffs provide no source from which the Court can glean authority in support for plaintiffs' proposition on this point.

Next, plaintiffs contend that the passage of SB 819, and any implementation efforts defendants have taken in response, have not mooted plaintiffs' claims "because the harms are still ongoing, as evidenced by a consistently high number of students with disabilities on SSDs throughout the state." *Id*. at 15-16. Plaintiffs' argument relies on the premise that placement on an SSD necessarily constitutes a violation of a FAPE, and, therefore, a high number of students on SSDs constitutes a systemic denial of FAPE.

But plaintiffs' lawsuit challenges systemic policies and practices that result in inappropriate use of SSDs. Plaintiffs' systemic claims under the IDEA, ADA, and

Section 504 are *not* about whether individual students are denied FAPE—which necessarily requires an individualized "student specific" assessment—but instead are about whether ODE has in place procedural safeguards that comply with the state's general supervision obligations. *See* Pls.' MSJ at 19 (identifying the alleged deficiencies that form the basis for plaintiffs' systemic claim); Pls.' Reply in Supp. of Mot. Class Cert. at 18, ECF No. 101 (plaintiffs "do not ask the Court to 'determine whether the IEP team for each putative class member has reached the correct decision'"); *see also* 2021 Order ("plaintiffs do not challenge individually-faulty IEPs, they challenge uniformly-applicable state practices that they allege expose them and all class members to risk of being placed unnecessarily on a shortened school day in violation of the IDEA, ADA and Section 504.").

Additionally, plaintiffs argue that SB 819 is "critically deficient in numerous ways" and leaves students with disabilities vulnerable to harm in the same way that now-repealed legislation did. Plfs.' Resp. at 16. In plaintiffs' view, SB 819 is not different from now-overhauled statues and policies, and accordingly, their claim cannot be moot. *Id*. That argument misses that SB 819 was enacted specifically to fill the gaps plaintiffs successfully identified in this case. SB 819 precisely imports remedies plaintiffs requested to address the shortcomings plaintiffs pointed to throughout litigation. Plaintiffs do not point to evidence that SB 819 contains the same shortcomings as now-repealed legislation. Accordingly, this argument is not well-taken.

Last, plaintiffs assert that any actions defendants take post-enactment of SB

819 that are beyond the requirements of that law are subject to the "voluntary cessation exception," and thus, do not moot plaintiffs' claims. The Court will discuss that argument in more detail below along with defendants' claims of mootness.

## II.    Supervision and Monitoring

Plaintiffs' first theory of liability is that Oregon's administration of special education violates the IDEA because ODE lacks "state-level policies or procedures to collect information regarding school districts that impose SSDs and may need further supervision and monitoring." Pls.' MSJ at 19; *see also* 2021 Order (plaintiffs allege that ODE's failure "to implement a statewide data collection and monitoring system that would enable it to proactively identify violations of the class members' rights" creates a risk the class members will be unnecessarily subjected to SSDs).

Defendants assert that SB 819 directly repeals the allegedly deficient statutory scheme on which ODE's policies were based and addresses alleged deficiencies by imposing a statutory requirement for ODE to collect information regarding school districts that impose SSDs.

SB 819 provides that, at least every 30 days, school districts must provide data to ODE regarding each student with a disability placed on an abbreviated school day program. SB 819 § 4(2)(e). The required data includes the student's grade level; the number of hours of instruction and educational services the school district is scheduled to provide to the student each week; the date the student began the abbreviated school day program; and the date by which the student is expected to receive meaningful access to the same number of hours of instruction that most other

students in the same grade receive. *Id*.

By enacting SB 819, plaintiffs' challenged policies and procedures—or lack thereof—are no longer in effect. SB 819 is a newly adopted law that addresses collection of specific data regarding students in school districts that impose SSDs. In this lawsuit, plaintiffs sought adoption of policies requiring data collection aimed at enabling defendants to proactively identify violations of the class members' rights. The legislature directly addressed plaintiffs' claims: the information SB 819 requires to be collected would enable the proactive identification of violations plaintiffs seek.

Further, as relief, plaintiffs requested injunctive relief, seeking an order from the Court enjoining defendants from "subjecting [plaintiffs] to policies and practices that violate their rights" and an order to defendants "to develop, adopt, and implement policies and practices . . ." Compl. at 47.

The party asserting mootness bears the heavy burden of establishing that there remains no effective relief a court can provide. *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). An action "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017). "A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. *Bayer*, 861 F.3d at 864.

Plaintiffs are no longer subject to the policies they initially challenged—those

policies have been overhauled by the statutory mandate in SB 819 derived specifically from plaintiffs' allegations in this case. Further, in enacting SB 819, the legislature "develop[ed] and adopt[ed]" the new "policies and practices" identified above. Plaintiffs successfully obtained the relief they requested, but through the political process, rather than by a court order. Accordingly, there "remains no effective relief" the Court can provide, and there is no longer a live controversy regarding this theory of liability. *See Forest Guardians*, 450 F.3d at 461. Plaintiffs' claims under this theory are moot.

### III.   Safeguards and Requirements for Monitoring and Enforcement

Plaintiffs' second and third theories of liability are interrelated. Plaintiffs argue that Oregon's administration of special education violates the IDEA because ODE does not (a) "proactively monitor the districts' legal compliance and correct any noncompliance beyond simply operating its administrative complaint system" or (b) "enforce federal and state laws and policies and correct violations thereof." Pls.' MSJ at 19.

Defendants argue that plaintiffs' claims under this theory of liability are moot because SB 819 replaced the old framework for monitoring the noncompliance, a system alleged to be deficient in plaintiffs' complaint. Defendants maintain that SB 819 establishes a reinvented monitoring and enforcement framework at the state level specifically aimed at correcting improper abbreviated school day placement.

SB 819 provides that schools must obtain informed and written consent from parents or foster parents before placing a student on an abbreviated school day

Page 18 – OPINION AND ORDER

program. *See* SB 819 § 1(8). Informed and written consent requires, among other things, that: (1) the parent or foster parent has an opportunity to meaningfully participate in an IEP team meeting before the school district requests consent, *id.* § 1(8)(b); (2) the school to offer at least one reasonable alternative placement before requesting parental consent, *id.* § 1(8)(c); (3) the parent or foster parent voluntarily sign the consent form for the SSD placement, *id.* § 1(8)(f); and (4) the parent or foster parent to be informed of the right to revoke consent at any time, *id.* § 1(8)(g).

In addition, the new law provides that a parent or a foster parent may, at any time, revoke consent for the placement of a student with a disability on an abbreviated school day program. *Id.* § 5(1)(a). On receipt of revocation or objection, the school district superintendent shall ensure that, within five school days or by a later date specified by the parent or foster parent, the student has meaningful access to the same number of hours of instruction and educational services that are provided to other students in the same grade. *Id.* § 5(1)(c).

SB 819 also establishes short timelines for an ODE investigation. Specifically, ODE must investigate whenever it receives a complaint or has reason to believe that a student has been unilaterally placed on an abbreviated school day and must complete that investigation and inform the district of noncompliance within 30 days. *Id.* § 5(2)(a). If noncompliance is identified through the investigation—or the complaint relates to a specific student and is made by the student's parent or foster parent—ODE must order the school district to terminate the abbreviated school day program and return the student to school within five school days. *Id.* § 5(2)(b).

If the district fails to comply with ODE's order, the Department must take certain actions, which include immediate withholding of State School Fund moneys that would be allocated to the district and requiring the district to provide compensatory education. *Id*. § 5(2)(c)(C)–(D). In addition, school district superintendents are subject to discipline by the Teacher Standards and Practices Commission ("TSPC") if they fail to restore meaningful access to a student within the time required by the Act. *Id*. § 5(3).

Plaintiffs assert that that their claim for inadequate monitoring and enforcement is not moot. They contend that defendants failed to specify *how* they will proactively assess compliance or verify accuracy of district-reported data. Resp. at 27. Plaintiffs' response misses the mark. Plaintiffs challenged defendants' lack of policies and practices to proactively monitor compliance, correct noncompliance "beyond simply operating its administrative complaint system," and specify how they will "enforce federal and state laws and policies and correct violations thereof." Pls.' MSJ at 19. As can be seen from the text of SB 819 summarized above, the *legislature* addressed, with specificity, the framework for proactive monitoring and correction. By its text, SB 819 requires actions that well beyond "simply operating a complaint system." To answer "how" defendants will conduct proactive monitoring, SB 819 details financial incentives; corrective measures such as compensatory education, and immediate termination of SSDs; and timeliness requirements, the violation of which triggers discipline.

For the same reasons discussed under plaintiffs' first theory of liability,

plaintiffs have ultimately obtained the relief requested on their second and third alleged basis of liability. The challenged system for monitoring and enforcement has been replaced by SB 819, enacted based on the record in this case to remedy the violations plaintiffs successfully identified. There "remains no effective relief" the Court can provide, and there is no longer a live controversy regarding this theory of liability.

## IV.    Technical Training System Implementation

Plaintiffs' fourth and final theory of liability is that ODE has failed to provide needed resources, technical assistance, and training to help districts support students effectively for the full school day. Pls.' MSJ at 19. Unlike plaintiffs' first three theories of liability, SB 819 does not address ODE's duty to provide school district staff "with technical assistance and training necessary to assist" the school district staff in providing a FAPE in the LRE.

Plaintiffs contend that their claim that defendants failed to provide technical training, guidance, and assistance is thus not moot under the "voluntary cessation exception."[6] Plaintiffs assert that because SB 819 does not specifically require defendants to provide technical training, defendants embarked on making those changes voluntarily, thus, there is "little assurance" that defendants' commitments

---

[6]    Plaintiffs also vaguely challenge defendants' other three theories of mootness under the "voluntary cessation" exception, but because defendants identified text in a legislative act directly effecting the policies and practices plaintiffs challenge, the Court presumes that the repeal, amendment, or expiration of challenged policies and practices renders an action challenging those policies moot. *See Glazing*, 941 F.3d 1195 (9th Cir. 2019).

to providing technical assistance will be effectively implemented or continued. Pls.' Resp. at 30.

Under the voluntary cessation exception, "'a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.'" *Brach v. Newsom*, 38 F.4th 6, 12 (9th Cir. 2022). The exception is based on "'the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Id.*; *see also Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (stating that the "'[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed'").

However, voluntary cessation can yield mootness if a "stringent standard" is met. A case might become moot if subsequent events made it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* "Reasonable expectation means something more than 'a mere physical or theoretical possibility.'" *Brach*, 38 F.4th at 14 (where plaintiffs alleged state officials violated federal law by suspending in-person instruction during COVID-19 pandemic but restrictions had since been lifted and schools reopened, stating that the "speculative contingency [that pandemic conditions might change] and the fact 'the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot'").

"The party asserting mootness bears a 'heavy burden' in meeting [the] standard [of no reasonable expectation of recurrence]." *Rosebrock*, 745 F.3d at 971.

This is true even where it is the government that claims mootness. But a court nonetheless "treat[s] the voluntary cessation of challenged conduct by government officials with more solicitude ... than similar action by private parties." This is no bare deference: we probe the record to determine whether the government has met its burden, even as we grant it a presumption of good faith. *Brach*, 38 F.4th at 12-13; *see also Rosebrock*, 745 F.3d at 971 ("We presume that a government entity is acting in good faith when it changes its policy, but when the Government asserts mootness based on such change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again.").

Defendants' evidence is that ODE has developed over 25 new guidance documents, sample forms and FAQs regarding SB 819. *See* Wetherell Decl. ¶ 5, ECF No. 219, Exs. 3-33. ODE has also developed comprehensive internal and external training materials, and conducted extensive training on SB 819 for districts, partners, and parents. *Id*. ¶ 5 (as of September 28, 2023, ODE conducted over 50 hours of training on SB 819 for districts, partners, and parents). ODE has significantly expanded its capacity to provide technical assistance and support relating to abbreviated school day programs in response to the new legislation. *Id*. ¶ 9.

Defendants also made hiring decisions aimed at providing long-term assistance with the adoption of SB 819: ODE hired six additional District Support Specialists ("DSSs"), which defendants assert doubled capacity to support school districts on IDEA and SB 819 implementation. *Id*. With additional staff, each DSS

has increased capacity and serves a fewer number of school districts. The record also shows that ODE hired an SB 819 Director to lead ODE's implementation of the bill and serve as a centralized point of contact and additional staff to work specifically on SB 819's data collection.

Defendants point to evidence that even before SB 819 was enacted, ODE had allocated $5 million of state administration dollars from the IDEA to build 19 new Regional Special Education Support Networks and a Statewide Technical Assistance Center to support school district capacity to address abbreviated school days, including a specific focus on addressing disability-related behavior effectively. *See* Defs.' MSJ at 12-13, ECF No. 186; Wetherell Decl. ¶¶ 10-14. Defendants assert that ODE will utilize these tools to provide, for the long-term, technical assistance, training, and resources on SB 819. *See* Wetherell Decl. ¶ 10. Defendants point to other evidence that it has executed contracts with regional special education support networks to offer training and assistance to school districts. *Id*. ¶ 11.

Here, the Court finds that defendants' decision to bolster ODE's ability to provide resources, technical assistance, and training is a policy change, but one not contemplated in SB 819. Accordingly, there is not a "presumption" of mootness. On this point, the Ninth Circuit's decision in *Rosebrock* is instructive. There, the Ninth Circuit noted that "a policy change not reflected in statutory changes" or even changes in ordinances or regulations will not necessarily render a case moot, but it may do so in certain circumstances.

The appellate court stated that mootness is more likely if (1) the policy change

is evidenced by language that is "broad in scope and unequivocal in tone"; (2) the policy change fully "addresses all of the objectionable measures that [government] officials took against the plaintiffs in th[e] case"; (3) "th[e] case [in question] was the catalyst for the agency's adoption of the new policy"; (4) the policy has been in place for a long time when we consider mootness; and (5) "since [the policy's] implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff[ ]." On the other hand, the court noted it was less inclined to find mootness where the "new policy ... could be easily abandoned or altered in the future." *Rosebrock*, 745 F.3d at 971-72.

The Court finds that those factors point to mootness: the policy change to provide resources, technical training, and guidance to the districts is (1) broad in scope and unequivocal, evidenced by the multitude of training documents created and defendants' contractual commitments; (2) the policy change fully addresses plaintiffs' allegations in this case of inadequate resources and training; (3) this lawsuit served as a catalyst for defendants' policy change, including the findings and recommendations from the expert Report on the need for technical training, which defendants imported; (4)-(5) while defendants' increased commitment to delivering technical training and guidance has not been in force for a long duration, defendants nevertheless demonstrate a that the agency's officials have not engaged in conduct similar to that challenged by plaintiffs, evidenced by the multiple trainings and guidance now issued. Finally, the contracts, agreements, and financial investments defendants have made weigh against a finding that they might "easily abandoned or

alter" their conduct in the future." *Rosebrock*, 745 F.3d at 971-72. Accordingly, the Court finds that no active controversy exists on this theory of liability.

## V.    Declaratory Relief.

In addition to seeking injunctive relief, plaintiffs also ask the Court to declare that "defendants have violated the [IDEA], the [ADA], and [Section 504]." Compl. at 48.

A declaratory judgment adjudicating *past* violations of federal law—as opposed to continuing or future violations of federal law—is not an appropriate exercise of federal jurisdiction. *See, e.g., Green v. Mansour*, 474 U.S. 64, 74 (1985). The "value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Accordingly, the Court cannot grant any of the relief plaintiff requests.

## CONCLUSION

For the reasons explained, the Court GRANTS defendants' Motion to Dismiss for Lack of Jurisdiction, ECF No. 217.  Pending Motions for Summary Judgment and related motions, ECF Nos. 175, 176, 186, are DENIED as moot.  This case is DISMISSED for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3). Judgment shall be entered accordingly.

Plaintiffs' lawyers embarked on a worthy path to make a difference—and they did—for all of Oregon's Public School Children attending school with disabilities.

Plaintiffs' dogged advocacy to bring this landmark case caught the attention of the Oregon Legislature, and the legislative branch carried the baton over the finish line to enact the very protections plaintiffs zealously sought. Defendants' responsiveness to the allegations in this lawsuit and herculean effort to quickly implement SB 819 demonstrates its commitment to the public to correcting the systemic deficiencies identified by plaintiffs and the jointly retained expert. The Court commends the lawyers' diligent work in this important case.

It is so ORDERED and DATED this 29th day of February 2024.


    /s/Ann Aiken

    Ann Aiken
    United States District Judge